Mickey EDWARDS, Member of Congress, Oklahoma, et al., Appellants,

v.

James Earl CARTER, President of the United States.

No. 78–1166.

United States Court of Appeals, District of Columbia Circuit.

Argued March 10, 1978.

Decided April 6, 1978.

Certiorari Denied May 15, 1978. See 98 S.Ct. 2240.

As Amended May 18 and June 13, 1978.

Rehearing Denied June 1, 1978.

Robert E. Kopp, Atty., Dept. of Justice, Washington, D. C., with whom Steven I. Frank, and Brook Hedge, Attys., Dept. of Justice, Washington, D. C., were on the motion for summary affirmance, for appellee.

Daniel J. Popeo, Washington, D. C., with whom Joel D. Joseph and Paul D. Kamenar, Washington, D. C., were on the motion for an injunction pending appeal and the motion for summary reversal, for appellants.

Before FAHY, Senior Circuit Judge, and McGOWAN and MacKINNON, Circuit Judges.

Opinion PER CURIAM.

Dissenting opinion filed by MacKINNON, Circuit Judge.

PER CURIAM:

This is an appeal from the District Court's dismissal of a challenge to appellee's use of the treaty power to convey to the Republic of Panama United States properties, including the Panama Canal, located in the Panama Canal Zone.[1] Appel-

1. Two treaties, signed by the chief executives of Panama and the United States, were presented to the Senate for ratification. The Treaty Concerning the Permanent Neutrality and Operation of the Panama Canal has now been ratified by the Senate, *see* note 2 *infra.* The Article conveying the Canal Zone properties to the Republic of Panama is contained in the Panama Canal Treaty:

PROPERTY TRANSFER AND ECONOMIC PARTICIPATION BY THE REPUBLIC OF PANAMA

1. Upon termination of this Treaty, the Republic of Panama shall assume total responsibility for the management, operation, and maintenance of the Panama Canal, which shall be turned over in operating condition and free of liens and debts, except as the two Parties may otherwise agree.

lants, sixty members of the House of Representatives, sought a declaratory judgment that the exclusive means provided in the Constitution for disposal of United States property requires approval of both Houses of Congress, see Art. IV, § 3, cl. 2, and that therefore the Panama Canal Zone may not be returned to Panama through the Treaty process, which invests the treaty-making power in the President by and with the advice and consent of two-thirds of the Senators present, see Art. II, § 2, cl. 2. Appellee contends that the Constitution permits United States territory to be disposed of either through congressional legislation or through the treaty process, and that therefore the President's decision to proceed under the treaty power is constitutionally permissible.

The District Court did not reach the merits of this controversy; rather, it dismissed the complaint for lack of jurisdiction after concluding that appellants lacked standing because they had failed to demonstrate injury in fact from the President's invocation of the treaty process. A notice of appeal and a request for a preliminary injunction pending appeal were immediately filed with this court. Appellee has moved for summary affirmance of the District Court's judgment either on the jurisdictional ground stated by the District Court or on the merits of appellants' contention; appellants have moved for summary reversal. We have heard oral argument and have considered the case on an expedited basis.[2] For the reasons appearing below, we affirm the dismissal of the complaint, not on the jurisdictional ground relied on by the District Court but for failure to state a claim on which relief may be granted.

I

In addition to its argument on the merits, appellee has presented several substantial and complex challenges to the jurisdiction of the federal courts to adjudicate the merits of the constitutional question presented in this case. We refer not only to the contentions as to lack of standing, but also to the arguments that appellants' action is both premature and presents a nonjusticiable political question. Deciding only the jurisdictional issue before us could result in this court, or the Supreme Court, remanding the case for further proceedings either on the merits or on jurisdictional issues. Because the merits of this controversy present a pure question of law, with no

2. The United States of America transfers, without charge, to the Republic of Panama all right, title and interest the United States of America may have with respect to all real property, including non-removable improvements thereon, as set forth below:

(a) Upon the entry into force of this Treaty, the Panama Railroad and such property that was located in the former Canal Zone but that is not within the land and water areas the use of which is made available to the United States of America pursuant to this Treaty. However, it is agreed that the transfer on such date shall not include buildings and other facilities, except housing, the use of which is retained by the United States of America pursuant to this Treaty and related agreements, outside such areas;

(b) Such property located in an area or a portion thereof at such time as the use by the United States of America of such area or portion thereof ceases pursuant to agreement between the two Parties.

(c) Housing units made available for occupancy by members of the Armed Forces of the Republic of Panama in accordance with paragraph 5(b) of Annex B to the Agreement in Implementation of Article IV of this Treaty at such time as such units are made available to the Republic of Panama.

(d) Upon termination of this Treaty, all real property and non-removable improvements that were used by the United States of America for the purposes of this Treaty and related agreements and equipment related to the management, operation and maintenance of the Canal remaining in the Republic of Panama.

3. The Republic of Panama agrees to hold the United States of America harmless with respect to any claims which may be made by third parties relating to rights, title and interest in such property.

4. The Republic of Panama shall receive, in addition, from the Panama Canal Commission a just and equitable return on the national resources which it has dedicated to the efficient management, operation, maintenance, protection and defense of the Panama Canal . . . ..

2. The Senate consented to The Neutrality Treaty on March 14, 1978. It is expected that the vote on the Panama Canal Treaty will occur in early April 1978.

need of a hearing for fact development, because these merits are so clearly against the parties asserting jurisdiction, and because the judgment appealed from was based on only one of several asserted grounds of lack of jurisdiction, we believe it is appropriate to proceed directly to the merits of this case. This conclusion is bolstered when the time constraints imposed by the immediacy of Senate action on the treaties are considered. *See Adams v. Vance,* 187 U.S.App.D.C. 41, at 45, n.7, 570 F.2d 950 at 954 n.7 (1978), and cases cited therein.

Consequently, the precise question we address is whether the constitutional delegation found in Art. IV, § 3, cl. 2 is exclusive so as to prohibit the disposition of United States property by self-executing treaty—*i. e.,* a treaty enacted in accordance with Art. II, § 2, cl. 2, which becomes effective without implementing legislation.

## II

Article IV, § 3, cl. 2 of the Constitution states in its entirety:

The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States; and nothing in this Constitution shall be so construed as to Prejudice any Claims of the United States, or of any particular State.

Appellants contend that this clause gives Congress exclusive power to convey to foreign nations any property, such as the Panama Canal, owned by the United States.[3] We find such a construction to be at odds with the wording of this and similar grants of power to the Congress, and, most significantly, with the history of the constitutional debates.[4]

The grant of authority to Congress under the property clause states that "The Congress shall have Power . . .," not that only the Congress shall have power, or that the Congress shall have exclusive power. In this respect the property clause is parallel to Article I, § 8, which also states that "The Congress shall have Power . .."

---

3. In addressing the merits, we assume without deciding that the Panama Canal Zone real property which would be conveyed by the Panama Canal Treaty is indeed property belonging to the United States. Appellee has not contended otherwise and neither party has briefed this issue.

4. The Senate Foreign Relations Committee has thoroughly considered and rejected appellants' argument. That Committee reported the treaties with Panama to the full Senate by a 14 to 1 vote, and the one dissenting Senator did not dispute the power of the President, by and with the advice and consent of two-thirds of the Senate present, to transfer United States property. *See* Exec. Rept. No. 95–12 (95th Cong., 2d Sess., Feb. 3, 1978).

In addition to the American Law Institute's Restatement of Foreign Relations Law, *see infra,* other authorities in agreement with this conclusion include Professor Louis Henkin, *see* L. Henkin, Foreign Affairs and the Constitution 159-60 (1965); Dean Louis Pollak, *see* 124 Cong.Rec., No. 8, at 5729 (95th Cong., Jan. 30, 1978); Professor Covey Oliver, *see* Hearings Before the Committee on Foreign Relations, Part IV, at 95, 103, 112–13 (Jan. 19, 1978); and Professor John Norton Moore, *see id.* at 89, 93–94. The Attorney General and the State Department Legal Adviser have also issued opinions that the Panama Canal may be dis-

posed of through self-executing treaty. *See* Opinion of the Attorney General to the Secretary of State, Aug. 11, 1977; Hearings Before the Subcommittee on the Separation of Powers of the Senate Judiciary Committee, Part I, at 3–25 (July 29, 1977). Raoul Berger, in testimony before the Subcommittee on Separation of Powers of the Senate Judiciary Committee in the fall of 1977, expressed a contrary position. His thesis seems to be that the President and Senate cannot exercise under the treaty power any power granted to Congress, *see* Hearings Before the Subcommittee on Separation of Powers, (95th Cong. 1st Sess., Nov. 3, 1977). We agree with Professor Henkin that such a narrow view of the treaty power would, by "outlaw[ing]" treaties on matters as to which Congress could legislate domestically," "virtually wipe out the treaty power." L. Henkin, *supra,* at 149.

We note that Professor Henkin's treatise leaves no doubt but that he is in agreement with our position. The passage quoted by the dissent, as is realized upon a careful reading of the passage itself (with its references to "unilateral" Presidential action and "executive order[s]"), concerns the limitations upon the President's power to dispose of property through unilateral executive action. *See* note 24 *infra.*

Many of the powers thereafter enumerated in § 8 involve matters that were at the time the Constitution was adopted, and that are at the present time, also commonly the subject of treaties. The most prominent example of this is the regulation of commerce with foreign nations, Art. 1, § 8, cl. 3, and appellants do not go so far as to contend that the treaty process is not a constitutionally allowable means for regulating foreign commerce. It thus seems to us that, on its face, the property clause is intended not to restrict the scope of the treaty clause, but, rather, is intended to permit Congress to accomplish through legislation what may concurrently be accomplished through other means provided in the Constitution.

The American Law Institute's Restatement of Foreign Relations, directly addressing this issue, comes to the same conclusion we reach:

> The mere fact, however, that a congressional power exists does not mean that the power is exclusive so as to preclude the making of a self-executing treaty within the area of that power.

ALI Restatement of Foreign Relations Law (2d), § 141, at 435 (1965). The section of the Restatement relied on by the dissent merely states that the treaty power, like all powers granted to the United States, is limited by other restraints found in the Constitution on the exercise of governmental power. (Rest.For.Rel. § 117).[5] Of course the correctness of this proposition as a matter of constitutional law is clear. *See Reid v. Covert*, 354 U.S. 1, 77 S.Ct. 1222, 1

L.Ed.2d 1148 (1957); *Geoffroy v. Riggs*, 133 U.S. 258, 10 S.Ct. 295, 33 L.Ed. 642 (1890); *Asakura v. Seattle*, 265 U.S. 332, 44 S.Ct. 515, 68 L.Ed. 1041 (1924), also relied on by the dissent. To urge, as does the dissent, that the transfer of the Canal Zone property by treaty offends this well-settled principle—that the treaty power can only be exercised in a manner which conforms to the Constitution—begs the very question to be decided, namely, whether Art. IV, § 3, cl. 2 places in the Congress the *exclusive* authority to dispose of United States property.[6]

There are certain grants of authority to Congress which are, by their very terms, exclusive. In these areas, the treaty-making power and the power of Congress are not concurrent; rather, the only department of the federal government authorized to take action is the Congress. For instance, the Constitution expressly provides only one method—congressional enactment—for the appropriation of money:

> No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law.

Art. I, § 9, cl. 7. Thus, the expenditure of funds by the United States cannot be accomplished by self-executing treaty; implementing legislation appropriating such funds is indispensable. Similarly, the constitutional mandate that "all Bills for raising Revenue shall originate in the House of Representatives," Art. 1, § 7, cl. 1, appears, by reason of the restrictive language used, to prohibit the use of the treaty power to impose taxes.[7]

---

**5.** Similarly, § 118(1) of the Restatement lends no support to the dissent's position because it is not even relevant to the issue before us. That section, consistent with *Missouri v. Holland*, 252 U.S. 416, 40 S.Ct. 382, 64 L.Ed. 641 (1920), indicates that the treaty power is broader than the power of Congress to enact legislation. The issue before us, on the other hand, is whether the treaty power extends to an area in which Congress, by virtue of Art. IV, § 3, cl. 2, does have power to enact legislation.

**6.** It is important to understand the limited scope of this inquiry. If Art. IV, § 3, cl. 2 does in fact provide the exclusive means of property disposition, *i. e.*, by legislation, clearly a self-executing treaty would be a constitutionally impermissible alternative. As the dissent re-

peatedly indicates, the treaty power may not encroach on delegation made exclusively to Congress.

**7.** The dissent argues that because the power to declare war is exclusively reserved to Congress by Art. 1, § 8, so also must be the power to dispose of United States property, which power is granted to Congress in the same language as the war-making power. *Cf.* L. Henkin, *supra*, at 160 n.\*\*. The *sui generis* nature of a declaration of war and the unique history indicating the Framers' desire to have both Houses of Congress concur in such a declaration, may place it apart from the other congressional powers enumerated in Art. 1, § 8 and in Art. IV, § 3, cl. 2. The history, discussed *infra*, of

These particular grants of power to Congress operate to limit the treaty power because the language of these provisions clearly precludes any method of appropriating money or raising taxes other than through the enactment of laws by the full Congress. This is to be contrasted with the power-granting language in Art. 1, § 8, and in Art. IV, § 3, cl. 2. Rather than stating the particular matter of concern and providing that the enactment of a law is the only way for the federal government to take action regarding that matter, these provisions state simply that Congress shall have power to take action on the matters enumerated.

Thus it appears from the very language used in the property clause that this provision was not intended to preclude the availability of self-executing treaties as a means for disposing of United States property. The history of the drafting and ratification of that clause confirms this conclusion. The other clause in Art. IV, § 3 concerns the procedures for admission of new states into the Union, and the debates at the Constitutional Convention clearly demonstrate that the property clause was intended to delineate the role to be played by the central government in the disposition of Western lands which were potential new states. Several individual states had made territorial claims to portions of these lands; and

as finally enacted the property clause, introduced in the midst of the Convention's consideration of the admission of new states, sought to preserve both federal claims and conflicting state claims to certain portions of the Western lands.[8]

The proceedings of the Virginia state ratifying convention provide further evidence of the limited scope of the property clause. During a debate in which the meaning of the clause was questioned, Mr. Grayson noted that the sole purpose for including this provision was to preserve the property rights of the states and the federal government to the Western territory as these rights existed during the Confederation.[9]

This history demonstrates the limited concerns giving rise to the inclusion of Article IV, § 3, cl. 2 in the Constitution. Whether or not this historical perspective might serve as a basis for restricting the scope of congressional power under the property clause, we view it as persuasive evidence for rejecting the claim that Article IV is an express limitation on the treaty power, foreclosing the availability of that process as a constitutionally permissible means of disposing of American interests in the Panama Canal Zone.

### III

The debates over the treaty clause at the Constitutional Convention and state ratify-

the constitutional convention and ratifying conventions with respect to the property clause and the treaty clause, on the other hand, clearly demonstrates the Framers' intention to allow disposition of the United States property through self-executing treaty. Moreover, while there are numerous instances in past treaty practice of the latter, we know of no instance in which the United States has been in a state of formally declared war without a congressional declaration thereof.

8. The states' claims to unsettled Western (trans-Allegheny) regions were based on charters granted to them from Great Britain. Landless states argued that all Western lands should inure to the benefit of all states, *i. e.*, should be federal properties. *See* H. Hockett, The Constitutional History of the United States 1776–1826, 143–46 (1939); 2 M. Farrand, The Records of the Federal Convention of 1787, 461–66 (1937); 3 *id.* at 226–27.

9. This issue arose in a debate over the treaty clause that was not unlike the controversy before this court. Governor Randolph of Virginia stated that he could "conceive that neither the life nor property of any citizen, nor the particular right of any state, can be affected by a treaty." He then argued that Art. IV, § 3 must be intended to protect against the dismemberment of the Union. Mr. Grayson replied that

[t]his clause was inserted for the purpose of enabling Congress to dispose of, and make all needful rules and regulations respecting, the territory, or other property, belonging to the United States, and to ascertain clearly that the claims of particular states, respecting territory should not be prejudiced by the alteration of the government, but be on the same footing as before; that it could not be construed to be a limitation on the power of making treaties.

3 Elliot's Debates in the Several State Conventions on the Adoption of the Federal Convention 504–05 (1907).

ing conventions even more directly demonstrate the Framers' intent to permit the disposition of United States property by treaty without House approval. As originally reported to the Convention, authority to make treaties would have been entrusted to a majority of the Senate, without even Presidential participation.[10] However, this structure was thought to entrust too much power to the Senate, and the provision was subsequently amended to include an active Presidential role. Nonetheless, concern over the extensive scope of the power remained; particularly worrisome was the potential use of treaties as a means of effecting territorial cessions. Elbridge Gerry expressed this fear when he noted that "[i]n Treaties of peace the dearest interests will be at stake, as the fisheries, territory, etc. In treaties of peace also there is more danger to the extremities of the Continent, of being sacrificed than on any other occasion."[11]

Concern about the sweeping character of the treaty clause led to several proposed amendments aimed at limiting its exercise. One amendment would have restricted this power by requiring that "no Treaty of Peace affecting Territorial rights should be made without the concurrence of two thirds of the (members of the Senate present.)"[12] For some delegates, however, merely increasing the level of Senate approval did not go far enough towards ensuring the proper exercise of the treaty power. Thus Connecticut's Roger Sherman proposed an amendment providing that "no such [territorial] rights should be ceded without the sanction of the Legislature."[13]

The Committee of Eleven, in whose hands this issue finally rested, rejected the proposed amendment for House participation. Instead, a provision requiring a two-thirds Senate vote for the passage of all treaties was adopted. This choice clearly indicates the Framers' satisfaction was a supermajoritarian requirement in the Senate, rather than House approval, to serve as a check upon the improvident cession of United States territory.

That the two-thirds voting requirement did not affect the scope of the treaty power, but only made ratification of treaties more difficult, was clearly understood at the state ratifying conventions. An amendment proposed at the Virginia Convention provided that

> no treaty ceding, contracting, restraining, or suspending the territorial rights or claims of the United States . . . shall be made, but in case of the most urgent and extreme necessity; nor shall any such treaty be ratified without the concurrence of three fourths of the whole number of the members of both houses respectively.[14]

This, and a similar amendment offered at the North Carolina Convention,[15] evidence the broad interpretation given Article II, § 2 at the time of its inception.[16] As was true of the effort at the Constitutional Convention to introduce House participation in ratification of treaties, these state attempts to limit the treaty power as now contained in the Constitution also failed.

That those who framed and ratified the Constitution rejected several express attempts to limit the treaty power in the

10. The account in the text is from 2 Farrand, *supra*, at 540–49.

11. *Id.* at 541.

12. *Id.* at 543.

13. 3 Elliot's Debates, *supra*, at 500.

14. *Id.* at 660.

15. *See* S. Crandall, Treaties, Their Making and Enforcement 63 (2d Ed.1916); 4 Elliot's Debates, *supra*, at 115.

16. James Madison stated that "I do not conceive that power is given to the President and Senate to dismember the empire, or to alienate any great, essential right." But he continued by noting "I do not think the whole legislative authority have this power. The exercise of the power must be consistent with the object of the delegation." 3 Elliot's Debates, *supra*, at 514. It appears, thus, that Madison was only formulating a well-recognized limitation on all of the constitutional powers, namely, that the exercise of constitutional delegations is restrained by the basic premises upon which the Union and the Constitution were created.

manner now urged by appellants greatly undermines the interpretation of that power they press upon us. From this evidence we conclude that the disposition of property pursuant to the treaty power and without the express approval of the House of Representatives was both contemplated and authorized by the makers of the Constitution.

## IV

In view of the lack of ambiguity as to the intended effects of the treaty and property clauses, it may be surprising that judicial pronouncements over the past two centuries relating to these constitutional provisions are somewhat vague and conflicting. However, none of the actual holdings in these cases addressed the precise issue before us—whether the property clause prohibits the transfer of United States property to foreign nations through self-executing treaties. While, therefore, neither the holdings

17. *Wisconsin Cent. R.R. Co. v. Price County,* 133 U.S. 496, 504, 10 S.Ct. 341, 344, 33 L.Ed. 687 (1890).

18. The dissent also relies upon *Alabama v. Texas,* 347 U.S. 272, 74 S.Ct. 481, 98 L.Ed. 689 (1954), which upheld the Submerged Lands Act of 1953, 67 Stat. 29. The reference in that case to Congress' power to dispose of property "without limitation" had no application to whatever limitation on Congress' power may be thought to result from use of the treaty power to accomplish disposal of property. Rather, the salient question in the case was whether Congress could grant to individual states indefeasible title to and ownership of certain resources under submerged marginal ocean lands. Thus, it appears that in referring to Congress' power "without limitation", the Court was holding that Congress' authority under Art. IV, § 3, cl. 2 embraces any disposition of property of the United States chosen by Congress. *See also Inter-Island Co. v. Hawaii,* 305 U.S. 306, 59 S.Ct. 202, 83 L.Ed. 189 (1938) (Under the Art. IV, § 3 powers to regulate, Congress has the authority to permit the Territory of Hawaii to impose taxes on petitioner's interstate business operations); *United States v. Celestine,* 215 U.S. 278, 30 S.Ct. 93, 54 L.Ed. 195 (1909) (Congress has power to retain federal jurisdiction over crimes committed by an Indian allottee on allotted land of an Indian reservation within the confines of a state); *Wisconsin Cent. R.R. Co. v. Price County,* 133 U.S. 496, 10 S.Ct. 341, 33 L.Ed. 687 (1890) (United States property is not subject to state taxation since enforcement of such a tax might result in states, instead of Congress, controlling

nor the dicta of these previous cases are dispositive of the case before us, we believe that in the main they support the conclusions we have stated heretofore.

One line of cases, involving the property clause, has arisen in the context of the division of power between the federal government and the states. In discussing this question, the Supreme Court has stated that Article IV "implies an exclusion of all other authority over [United States] property which could interfere with this right or obstruct its exercise." [17] We think that the most reasonable interpretation of such dicta, occurring in the context referred to, is that there is a lack of any constitutional basis for exercise of authority by individual states over United States property.[18] But that a specific congressional power is exclusive against intrusion by the states does not necessarily remove it from the sphere of the federal treaty power.

the disposition of federal property contrary to Art. IV, § 3, cl. 2); *Griffin v. United States,* 168 F.2d 457 (8th Cir. 1948) (county resolution declaring federally owned property open for grazing is invalid encroachment upon power delegated to Congress to regulate United States property).

Appellants also cite several cases that, while not dealing with federal-state relations, are nonetheless inapplicable here. *See United States v. Fitzgerald,* 40 U.S. (15 Pet.) 407, 10 L.Ed. 785 (1841) (an individual employee of the federal government is not empowered by his position to dispose of federal property without further congressional authorization); *United States v. Gratiot,* 39 U.S. (14 Pet.) 526, 10 L.Ed. 573 (1840) (congressional authorization to lease publicly owned lead mines to individuals is within constitutional delegation permitting "disposal" of United States property); *Sierra Club v. Hickel,* 433 F.2d 24 (9th Cir. 1970), *aff'd sub nom., Sierra Club v. Morton,* 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972) (Congress had the power to delegate regulation of the public lands to Executive officers).

In *Sioux Tribe v. United States,* 316 U.S. 317, 62 S.Ct. 1095, 86 L.Ed. 1501 (1942), cited by appellants, the Court held that the President could not by *Executive Order* dispose of public lands without congressional authorization. However, the unilateral nature of Presidential action by Executive Order renders that case inapposite here. Treaties involve not only Presidential action but senatorial participation as well.

**1062**

Another line of cases, involving the treaty clause, has arisen in the context of conveyances by the federal government to Indian tribes. The leading case on the power to convey such land by self-executing treaty is *Holden v. Joy,* 84 U.S. 211, 21 L.Ed. 523 (1872). In quieting adverse claims to certain lands west of the Mississippi which had previously been conveyed to the Cherokee nation by treaty, the Court had to determine the validity of the original grant to the Indians. The Court noted that

> still it is insisted that the President and Senate, in concluding [a treaty for the transfer of property], could not lawfully covenant that a patent should issue to convey lands which belonged to the United States without the consent of Congress. . . . On the contrary, there are many authorities where it is held that a treaty may convey to a grantee good title to such lands without an act of Congress conferring it. . . .

*Id.* at 247. Because later congressional enactments repeatedly recognized the validity of the transfer, the Court found it unnecessary to rest its decision on this constitutional basis. However, the principle espoused is repeated in subsequent Supreme Court decisions.

The treaty in *Holden* involved a cession of non-Indian lands in return for tribal property. More common, however, were treaties in which Indian tribes ceded to the United States portions of their lands in return for, generally, some money and the creation of reservations. Usually these reservations consisted of tracts of territory originally occupied by the tribes and excepted by the treaty provisions from cession to the federal government. In order to fully comprehend the nature of the property interest transferred by the United States in these reservations it is necessary to understand the extent of the Indians' legal title prior thereto. The law early recognized the limited possessory rights of Indians in their territory. Ultimate title, that necessary to dispose of the property, rested solely in the hands of the federal government. *Johnson v. McIntosh,* 21 U.S. (8 Wheat.) 543, 5 L.Ed. 681 (1823). The purpose of the reservation treaties was to transfer the Indian tribes' possessory rights to most of their property to the United States in exchange for a fee simple title in excepted reservations. Such treaties, then, clearly disposed of United States property interests.

Supreme Court cases involving these cessions have provided dicta similar to that of *Holden v. Joy.* In *Jones v. Meehan,* 175 U.S. 1, 20 S.Ct. 1, 44 L.Ed. 49 (1899), the Court considered the nature of Indian property rights acquired by "reservation." There, Chief Moose Dung of the Chippewas had "reserved" a certain tract of land in a treaty ceding tribal territory to the United States. He subsequently leased some of that property to various individuals. A challenge was made questioning the Chief's authority to engage in that transaction. As framed by the Court, the issue for resolution was whether the treaty merely confirmed Chief Moose Dung's original right of occupancy in the reserved lands or whether the treaty granted a fee simple interest to the reservee. In holding that a fee simple passed under the treaty,[19] the court noted that "[i]t is well settled that a good title to parts of the lands of an Indian tribe may be granted to individuals by a treaty between the United States and the tribe, without any act of Congress, or any patent from the Executive authority of the United States." 175 U.S. at 10, 20 S.Ct. at 5. Thus the Court concluded that the treaty power alone was sufficient to transfer the underlying United States title in the reserved lands. In a similar situation the Court in *Francis v. Francis,* 203 U.S. 233, 241–42, 27 S.Ct. 129, 51 L.Ed. 165 (1906), stated that "this court and the highest court of Michigan concur in holding that a title in fee may pass by treaty without the aid of an act of Congress."

**19.** *Jones v. Meehan* discussed and rejected as irreconcilable with later Supreme Court opinions the contrary views expressed by Attorney General Taney and Justice Nelson, which are also relied on by the dissent in the case before us. 175 U.S. at 12–14, 20 S.Ct. 1.

As is true of most of the cases in which the Supreme Court has addressed the scope of the treaty power, *Holden, Jones,* and *Francis* involved the federal government's interaction with Indian tribes. Because of the *sui generis* nature of the relationship between the Indian tribes and the federal government, it might be argued that these decisions are not dispositive.[20] We think, however, that they are persuasively supportive of the authority of the President and the Senate under the treaty clause.

V

While certain earlier judicial interpretations of the interplay between the property clause and the treaty clause may be somewhat confused and less than dispositive of the precise issue before us, past treaty practice is thoroughly consistent with the revealed intention of the Framers of these clauses. In addition to the treaties with Indian tribes upheld in the cases discussed above, there are many other instances of self-executing treaties with foreign nations, including Panama, which cede land or other property assertedly owned by the United States.[21] That some transfers have been effected through a congressional enactment instead of, or in addition to, a treaty signed by the President and ratified by two-thirds of the Senate present lends no support to appellants' position in this case, because, as stated previously, self-executing treaties and congressional enactments are alternative, concurrent means provided in the Con-

stitution for disposal of United States property.

For instance, the Treaty with Panama of 1955, 6 U.S.T. 2273, transferred certain property (a strip of water and other sites within the Canal Zone) to Panama without concurring legislation by the Congress, while transfer of other property (owned by the United States but within the jurisdiction of Panama) was, under the terms of the treaty itself, dependent upon concurring legislation by the Congress. The decision to cast some but not all of the articles of conveyance in non-self-executing form was a policy choice; it was not required by the Constitution.

The transfer of property contemplated in the current instance is part of a broader effort in the conduct of our foreign affairs to strengthen relations with another country, and indeed with the whole of Latin America. The Framers in their wisdom have made the treaty power available to the President, the chief executant of foreign relations under our constitutional scheme, by and with the advice and consent of two-thirds of the members of the Senate present, as a means of accomplishing these public purposes.

We do not think it is relevant that many previous treaties couched in self-executing terms have been different in scope, dealing with boundary issues or otherwise ceding land which was claimed both by the United States and by a foreign nation.[22] We note

---

**20.** Although this unique relationship has often been cited as a basis for distinguishing "Indian cases," we question the applicability of the distinction to this case. This *sui generis* relationship is traditionally found in the context of individual rights, and it does not seem directly relevant to the scope of the treaty power vis-a-vis other sources of federal power. The Supreme Court long ago noted that "the power to make treaties with the Indian tribes is as we have seen, coextensive with that to make treaties with foreign nations." *United States v. 43 Gallons of Whiskey,* 93 U.S. 188, 197, 23 L.Ed. 846 (1876).

**21.** *See, e. g.,* Florida Treaty with Spain of 1819, 8 Stat. 252 (256); Treaty Between the United States and Great Britain (Webster-Ashburton Treaty, 1842), 12 Bevans 82; Treaty between

the United States and Japan (June 17, 1971), 23 U.S.T. 447, citations in note 22 *infra.*

**22.** *See, e. g.,* The Treaty with Mexico of 1933 (Rectification of the Rio Grande), 9 Bevans 976; The Treaty with Mexico of 1963 (Solution of the Chamizal Problem), 15 U.S.T. 21; The Treaty with Mexico of 1970 (changing position of Rio Grande to maintain boundary), 23 U.S.T. 371; Florida Treaty with Spain, *supra* note 21.

The dissent asserts that the treaties with Mexico cited herein were not self-executing. However, the only portions of these treaties dependent upon legislation were provisions in the latter two treaties requiring the United States to acquire certain property from private individuals prior to ceding it to Mexico. Because such acquisition necessitated appropriation of funds, implementing legislation was re-

first that it is hardly surprising that land transfers often involve boundaries or other disputed territory; indeed, it is in these situations that the decision to dispose of land would most often be made. Second, the grant of power to Congress in the property clause is not predicated on the territory disposed of being on a boundary or being the subject of conflicting claims. Thus we do not understand the basis for appellants' argument that, even if that clause does not provide the exclusive means of disposing of disputed or boundary lands, it is the exclusive source of power for disposing of land concededly owned by the United States. If the status of the land has any bearing on whether it may be conveyed without congressional enactment under the property clause,[23] it would seem to cut in a direction contrary to that urged by appellants, for the Western lands that were the focus of the property clause were the subject of conflicting claims by the states and the federal government.

 It is important to the correct resolution of the legal issue now before us not to confuse what the Constitution permits

with what it prohibits. In deciding that Article IV, § 3, cl. 2 is not the exclusive method contemplated by the Constitution for disposing of federal property, we hold that the United States is not prohibited from employing an alternative means constitutionally authorized.[24] Our judicial function in deciding this lawsuit is confined to assessing the merits of the claim of appellants that in the conduct of foreign relations in this matter, involving, *inter alia,* the transfer of property of the United States, the treaty power as contained in Article II, § 2, cl. 2, was not legally available. We hold, contrarily, that this choice of procedure was clearly consonant with the Constitution.

For the foregoing reasons, the judgment of the District Court dismissing the complaint is

*Affirmed.*

MacKINNON, Circuit Judge, dissenting:

The United States Constitution in Article IV, § 3, cl. 2[1] provides that "The *Congress*

---

quired, *see* pp. ———— of 188 U.S.App.D.C., pp. 1058–1059 of 580 F.2d, *supra.* Similarly, the treaties with Panama also will require implementing legislation for the payment of annuities to Panama and certain other provisions in the treaties. *See* Hearings Before the Subcommittee on Separation of Powers, *supra,* at 20 (Department of State Statement of Legislation Required to Implement Proposed New Agreement with Panama).

23. It is exceedingly difficult to understand why the constitutionality of utilization of the treaty process should depend on whether the nation to which the land is conveyed has previously "claimed" such land.

24. The dissent tends to obscure the distinction between the treaty power and presidential power asserted to be inherent in his authority to conduct our foreign relations. There is no doubt that the latter is more restricted than the former. As Professor Henkin notes:

Whatever, then, [the President] might do by treaty or other international agreement . . he cannot *unilaterally* regulate commerce with foreign nations, or make domestic laws punishing piracy or defining offenses against the nations or declare war. Equally, he cannot exercise, even for foreign affairs purposes, the general powers allocated to Congress: he cannot regulate patents or copy-

rights or the value of money, or establish post offices, or dispose of American territory or property. . . .
L. Henkin, *supra* at 94–96 (1972) (emphasis added). A similar view is expressed in the 1940 Opinion of the Attorney General indicating that the President could not, by *executive agreement,* transfer "mosquito" boats to Great Britain. 39 Op.Atty.Gen. 484 (1940). Additionally, the State Department Guidelines, upon which the dissent draws, states that:

The President may conclude an international agreement on the basis of existing legislation or subject to legislation to be enacted by the Congress. . . .
Department of State, 11 Foreign Affairs Manual § 721.2(a)2. Thus these too recognize that the President, when acting alone, has only limited power. However, we are not now faced with determining the permissibility of territorial cession by executive agreement. Before us is the much broader power established by the treaty clause of Art. II, § 2, cl. 2. Accordingly, these authorities are not applicable here.

1. The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States; and nothing in this Constitution shall be so construed as to Prejudice any Claims of the United States, or of any particular State. U.S.Const. art. IV, § 3, cl. 2.

shall have power *to dispose of . . . property* belonging to the United States . . . ." (emphasis added). Because of this specific constitutional provision, it is my opinion that the treaty clause[2] does not authorize the President to dispose of the large property interests of the United States in the Panama Canal Agreement without the approval of *Congress* to the transfer of the *property* involved. Yet the pending treaty with the Republic of Panama would violate the Constitution and disenfranchise the 435 members of the House of Representatives from voting as members of "the Congress" upon the proposal to "dispose of" eight billion dollars[3] worth of Canal "property belonging to the United States."[4] Since we are supposedly a participatory democracy, where the right and duty of the entire Congress to participate in that decision is clearly stated in the Constitution, and has been recognized by prior Presidents, it is almost impossible to understand the motivation for excluding the House of Representatives from exercising its constitutional authority.

In my opinion, Senator Connally of Texas, when he was Chairman of the Senate Committee on Foreign Relations, correctly interpreted the Constitution when he stated in the Senate debate on the procedure to be followed in authorizing a transfer of United States property to Panama:

> The House of Representatives has a *right* to a voice as to whether any transfer of real estate or other property shall be made either under treaty or otherwise.

88 Cong.Rec. 9267 (December 3, 1942) (emphasis added).

Recognizing that the House of Representatives has a vote on the disposition of the Panama Canal does not operate as a restriction on the "treaty" power. The *Per Curiam* opinion is in error in treating this as a

matter of "power" when it is merely a question of ratification procedure. Treaties may still be entered into by the President upon all subjects that are amenable to international agreement, and to become effective the "treaty provisions" must be ratified by two-thirds of the Senate; but if any treaty attempts to "dispose of . . . Territory or Property belonging to the United States . . . ." and it is ratified by the Senate, Art. IV of the Constitution still requires the concurrence of the House of Representatives to "carry out the obligations *by the enactment of legislation.*" *Id.*, Senator Connally, 88 Cong.Rec. 9270 (December 3, 1942) (emphasis added). In the transfer to Panama that was the subject of Senator Connally's remarks, the Senate by its vote acquiesced in that procedure and the House joined the Senate in voting to authorize the transfer of the property to Panama before the agreement was executed.

The net result is that unless it is previously approved by the "Congress," *i. e.*, the Senate *and the House of Representatives,*[5] the Constitution prohibits the effectuation of a self-executing agreement transferring the property in the Canal Zone belonging to the United States. The *Per Curiam* opinion reaches a different conclusion, but to my mind does not satisfactorily explain why this enormous disposition of property to the Republic of Panama should not recognize the proper role of Congress in such transfer as was followed in all prior transfers where the value of the property was infinitesimal compared to what is involved here. From its conclusion I thus respectfully dissent.

## I. IS A POLITICAL QUESTION INVOLVED?

At the outset appellee defends on the theory that this case involves a political

---

**2.** "He [the President] shall have power, by and with the Advice and Consent of the Senate, to make Treaties . . . ." U.S.Const. art. II, § 2, cl. 2.

**3.** S.Ex.Rep. No. 95–12, 95th Cong., 2nd Sess., at 99 (Feb. 3, 1978) (hereafter "Committee Report").

**4.** This opinion is confined to the Panama Canal Treaty and does not involve the Neutrality Treaty (for text of both agreements, *see* Appendix).

**5.** Since the merits of the case are reached, the discussion of standing is set forth in footnote 42, *infra*.

question which this court is without authority to decide. In other words, he contends that the treaty clause of the Constitution gives him the unchallengeable option to "dispose of . . . property belonging to the United States" without the approval of "the Congress" as set forth in Art. IV, § 3, cl. 2.[6] What this asserted defense amounts to is the claim that since he has already decided to proceed, and has taken certain steps that may violate the Constitution, the courts have no power to declare his conduct to be unlawful.

A question is not deemed political, however, when its resolution is committed to the courts by the Constitution. *Elrod v. Burns*, 427 U.S. 347, 351, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) (Brennan, J.); *Baker v. Carr*, 369 U.S. 186, 217, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). The issue here is plainly one that calls for a determination of which procedure is constitutionally required to approve an international agreement that will "dispose . . . of property belonging to the United States" of the value of eight billion dollars (S.Ex.Rep. No. 95–12, 95th Cong., 2nd Sess., at 99 (Feb. 3, 1978) (hereafter "Committee Report")).

The construction of treaties is the peculiar province of the judiciary. *Jones v. Meehan*, 175 U.S. 1, 32, 20 S.Ct. 1, 44 L.Ed. 49 (1899). This case presents a question for which there is no "textually demonstrable constitutional commitment of the issue to a coordinate political department." Instead, the question is purely judicial; it is committed by Art. III, § 2 to the courts established pursuant to Art. III, § 1 in which the "judicial power [is] vested." It is the type of controversy that the United States courts decide every day, and there is no lack of judicial and manageable standards for resolving it. Nor is the issue impossible for the courts to decide without a prior policy determination clearly involving non-judicial discretion. Since the issue is solely one of constitutional interpretation and both parties to the controversy are firmly committed to adhering to the dictates of the Constitution, and it is a relatively simple mat-

ter to do so, a proper declaration of the correct constitutional procedure would not embarrass or indicate any lack of respect due the two coordinate branches that are represented by the parties hereto. It should also be added that the issue is so clearly answered by the Constitution that the case does not involve any unusual need to adhere to any prior political decision. Therefore our authority to decide the issue is clear. *Baker v. Carr, supra*, 369 U.S. at 217, 82 S.Ct. 691.

## II. THE EXCLUSIVE POWER TO DISPOSE OF PROPERTY BELONGING TO THE UNITED STATES

No contention is advanced by this opinion that "Article II treaty power stops where the power of Congress begins," (Appellee Br., p. 12) but it is contended that in any international agreement the ratification or authorization procedure must conform to *specific* constitutional provisions. Therefore, the specific provisions of the Constitution outside of Art. I, § 8, which designate "Congress" as the body to levy taxes (Art. I, § 7), appropriate money (Art. I, § 9), and dispose of Government *property* (Art. IV, § 3, cl. 2), require that international agreements that transgress into these areas can only become effective by enactments of Congress. The President cannot violate any of these provisions under the claimed need or desire for a self-executing treaty.

The issue we are confronted with at the outset concerns the proposal in the Panama Canal treaty (*see* Appendix) that would immediately replace the interest *in perpetuity* of the United States in the Panama Canal to act "as though it were sovereign" with a mere 21-year operational right, would immediately transfer the entire Panama Railroad and certain other valuable structures (Appendix, Art. XIII), and would eventually provide for the *automatic* transfer on December 31, 1999, of whatever interest the United States still retained in the entire Panama Canal. Appellee claims all this can be accomplished by the pending Carter-Tor-

---

**6.** *See* note 1 *supra.*

rijos treaty with nothing more than Senate approval; and that the participation of the House in those parts of the agreement that dispose of property belonging to the United States is not required and will not be sought. Such construction conflicts directly with the above-quoted provision of the Constitution and with past practices. A number of Supreme Court decisions also contain statements which recognize the exclusive power of *Congress* under Art. IV, § 3, cl. 2 to dispose of United States territory and property.

**A. *The Supreme Court Decisions***

The decision in *Alabama v. Texas*, 347 U.S. 272, 74 S.Ct. 481, 98 L.Ed. 689 (1954), involved a motion by the States of Alabama and Rhode Island for leave to file complaints challenging the constitutionality of the Submerged Lands Act of 1953. In a *Per Curiam* opinion, the motions were denied on the ground that Art. IV, § 3, cl. 2 prohibited such suits by the states:

> The power of *Congress* to dispose of any kind of property belonging to the United States "is vested in Congress *without limitation.*" [Quoting *United States v. Gratiot*, 39 U.S. (14 Pet.) 526, 537, 10 L.Ed. 573.]

347 U.S. at 273, 74 S.Ct. at 481 (emphasis added).[7] Much earlier in *Gibson v. Chouteau*, 80 U.S. (13 Wall.) 92, 99, 20 L.Ed. 534 (1872), the Court had stated:

---

**7.** The *per curiam* understates the significance of many of the cases discussed here. For example, the majority concedes that *United States v. Gratiot*, 39 U.S. (14 Pet.) 526, 10 L.Ed. 573 (1840), does not involve a question of state-federal relations. While *Gratiot* did not involve the precise situation presented by this case, the principle relied upon therein—that the power to dispose of property rests exclusively with the Congress—should similarly, in my view, guide our disposition here. The majority seeks to distinguish away many of the Supreme Court's statements by noting that the context in which they were made involve state-federal relations and not separation of powers. *Gratiot*, among other cases, does not involve state-federal relations. While the holdings in those cases may not control our facts, it is submitted that the principle relied upon in those cases accurately states the proper construction of the provisions of the Constitution involved in this case.

> "With respect to the public domain, the Constitution vests in *Congress* the power of disposition and of making all needful rules and regulations. That power is subject to no limitations." [8] (Emphasis added.)

In *Wisconsin Central Railroad Company v. Price County*, 133 U.S. 496, 504, 10 S.Ct. 341, 344, 33 L.Ed. 687 (1890), the Court remarked: "[Art. IV] implies an exclusion of all other authority over the property which could interfere with this right or obstruct its exercise." This same conclusion was reached in *United States v. Celestine*, 215 U.S. 278, 284, 30 S.Ct. 93, 94, 54 L.Ed. 195 (1909):

> By the second clause of § 3, art. 4 of the Constitution, *to Congress and to it alone,* is given "power to dispose of and make all needful rules and regulations respecting the territory or other property belonging to the United States." [Emphasis added.]

The Supreme Court in *Sioux Tribe v. United States*, 316 U.S. 317, 62 S.Ct. 1095, 86 L.Ed. 1501 (1942) also acknowledged the power of the Executive to withdraw lands from the territory subject to their being sold, but recognized that the power to *dispose* of the land rested in the Congress:

> Section 3 of Article IV of the Constitution confers upon Congress *exclusively*

---

**8.** *See Sierra Club v. Hickel*, 433 F.2d 24, 28 (9th Cir. 1970), aff'd, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972): "Article IV, Section 3 of The United States Constitution commits the management and control of the lands of the United States to Congress. That congressional power is unlimited." The Court stated in *United States v. San Francisco*, 310 U.S. 16, 29, 60 S.Ct. 749, 756, 84 L.Ed. 1050 (1940): "The power over the public land thus entrusted to Congress is without limitations." The Court has also stated:

> Congress has the same power over [territory] as over any other property belonging to the United States; and this power is vested in Congress without limitation, and has been considered the foundation upon which the territorial governments rest.

*United States v. Gratiot*, 39 U.S. (14 Pet.) 526, 537, 10 L.Ed. 573 (1840) (emphasis added).

"the power to dispose of and make all needful rules and regulations respecting the territory or other property belonging to the United States."

316 U.S. at 324, 62 S.Ct. at 1098 (emphasis added). However, Congress had previously revealed its awareness of this practice and acquiesced in it (316 U.S. at 324–25, 62 S.Ct. 1095).

*Geofroy v. Riggs,* 133 U.S. 258, 10 S.Ct. 295, 33 L.Ed. 642 (1890) remarks:

The treaty power, as expressed in the Constitution, is in terms unlimited *except by those restraints which are found in that instrument* against the action of the government or of its departments, and those arising from the nature of the government itself and of that of the States. It would not be contended that it extends so far as to authorize what the Constitution forbids, or a change in the character of the government or in that of one of the States, or a cession of any portion of the territory of the latter, without its consent. *Fort Leavenworth R. Co. v. Lowe,* 114 U.S. 525, 541 [5 S.Ct. 995, 29 L.Ed. 264]. But with these exceptions, it is not perceived that there is any limit to the questions which can be adjusted touching any matter which is properly the subject of negotiation with a foreign country.

133 U.S. at 267, 10 S.Ct. at 297 (emphasis added). In my view, one of the "restraints" to which *Geofroy* refers is the Art. IV, § 3, cl. 2 power vested in Congress to dispose of property. By treaty, the President could not sell or give away Alaska to another country. Similarly, in my view, the President by treaty cannot dispose of our property in the Panama Canal without authorization from *Congress.*

Another decision which discusses the treaty power is *Asakura v. Seattle,* 265 U.S. 332, 44 S.Ct. 515, 68 L.Ed. 1041 (1924):

The treaty-making power of the United States is not limited by any express pro-

vision of the Constitution, and, though it does not extend *"so far as to authorize what the Constitution forbids,"* it does extend to all proper subjects of negotiation between our government and other nations. *Geofroy v. Riggs,* 133 U.S. 258, 266, 267 [10 S.Ct. 295, 33 L.Ed. 642]; *In re Ross,* 140 U.S. 453, 463 [11 S.Ct. 897, 35 L.Ed. 581]; *Missouri v. Holland,* 252 U.S. 416 [40 S.Ct. 382, 64 L.Ed. 641].

265 U.S. at 341, 44 S.Ct. at 516 (emphasis added). Since the treaty power does not extend so far as to authorize what the Constitution forbids, the power does not extend so far as to permit the disposal of our territorial and property interest in the Panama Canal without the approval of Congress as required by Art. IV, § 3, cl. 2.

If the scope of the treaty power were so broad as to permit such disposal, then the statements of the Supreme Court would be incongruent: if the treaty power were that broad, there would be a need to explain why Art. IV was not an express power limiting Art. II. Since there are no references to this possible conflict, it seems reasonable to state that the Court never conceived that the treaty power might be so broad as to permit disposition of property covered by Art. IV. These cases are wholly consistent with the Supreme Court's rulings concerning the treaty power.

Thus, the proper construction of the constitutional provisions is straight-forward and sensible. The treaty power is not limited by any express power in the Constitution *because it does not extend so far as to permit the disposition of property without an Act of Congress.* The power of Congress to dispose of property has no limit—in the language of *Celestine,* it resides in Congress alone; and thus, the treaty power is not a restriction on Congress, because it cannot operate to dispose of United States property.[9]

9. When Jefferson was Secretary of State, he issued instructions on March 18, 1792 to the American Commissioners negotiating with Spain as to the boundary between Georgia and the Floridas, stating that the right to alienate

even an inch of territory belonging to a member of the Union did not exist in the central government. American State Papers For. Rel., I 252. Jefferson was undoubtedly referring in part to the limitations imposed by Art. IV.

B. *Comparison of the Powers of Congress to Levy Taxes, to Make Appropriations and to Dispose of Property*

That Congress has exclusive power to dispose of United States property is also demonstrated by a comparative analysis of those delegated powers in which the right of Congress is admitted to be exclusive.

In overview, it is important to realize that the power to make treaties does not confer absolute authority upon the President and the Senate. It is a very broad power, but it is not unlimited. As a noted authority wrote before the form of the instant Panama Treaty became a national issue:

Broad assertions and extravagant adjectives, some of them supported by the Supreme Court, might leave the impression that the President can exercise virtually all the national political power in foreign affairs, at least concurrently with Congress. In fact, large areas have never been claimed by him [except now in the Panama Canal Treaty]. In principle, it would be difficult for a President to dispute that by vesting in Congress "all legislative Powers herein granted" *and* granting it a comprehensive array of specific powers, the Constitution barred the President from exercising these powers even as regards foreign affairs. Whatever, then, he might do by treaty or other international agreement . . ., he cannot *unilaterally* regulate commerce with foreign nations, or make domestic laws punishing piracy or defining offenses against the law of nations, or declare war. *Equally, he cannot exercise, even for foreign affairs purposes, the general powers allocated to Congress: he cannot* regulate patents or copyrights or the value of money, or establish post offices, or *dispose of American territory or property;* he cannot enact necessary and proper laws to carry into execution the powers of Congress or even his own powers, for example, criminal laws to enforce an arms embargo. He cannot spend money on his own authority for foreign aid, or draw funds from the Treasury, without Congressional appropriation, to build an embassy. Presumably, the unexpressed lawmaking powers of Congress deriving from national sovereignty are also generally denied the President: he cannot enact general immigration laws by executive order.

L. Henkin, Foreign Affairs and the Constitution 94–96 (1972) (emphasis and matter in brackets added). The foregoing quotation does not support the assertion that Henkin's treatise agrees with the conclusion of the *Per Curiam* opinion. *Cf. Per Curiam* op., at ⸻ n. 4, of 188 U.S.App.D.C., at 1057 n. 4, of 580 F.2d.[10]

The *Per Curiam* opinion grasps at the word "unilaterally" in one sentence and asserts therefrom that Henkin in the next sentence is also speaking solely of the President's power to act "unilaterally." Such construction cannot be supported. Henkin, in the first sentence, is referring to *unilateral* action by the President that transcend-

---

**10.** The *Per Curiam* opinion states at note 4 that among the authorities agreeing with its position is Prof. Henkin. The quotation above is from a subsection entitled "Exclusive Powers of Congress." The subsequent section on "Concurrent Powers" does not contain a statement that the general powers addressed in the "exclusive power" section can be exercised concurrently by treaty. This opinion does not contend that the Executive lacks the power to make a treaty disposing of property but rather that such treaty requires an act of Congress to become effective. Henkin does not address this question directly, and his comments are not inconsistent with this position. *See* Henkin, *supra*, at 149. The passage to which the majority refers as indicating that Prof. Henkin

is in accord with its position begins with the statement: "Some obligations, it is accepted, cannot be executed by the treaty itself." Examples follow: appropriation of funds, enactment of criminal laws, and probably declaration of war. Nothing in that passage states or implies that the list is exhaustive.

It is not surprising that those promoting the present treaty also decide that they have power to accomplish the result they seek. It is ever thus with usurped authority. *Cf. Per Curiam,* at ⸻ n. 4, of 188 U.S.App.D.C., at 1057 n. 4, of 580 F.2d. The Senate precedent, however, is directly contrary. *See* Part IV, and particularly pages ⸻ to ⸻ of 188 U.S.App.D.C., pages 1083 to 1084 of 580 F.2d.

ed what "he might do by treaty or *other international agreement.*" However, in the very next sentence, which is the critical sentence, Henkin shifts to deal with the President's entire "foreign affairs purposes" and these unquestionably refer to his powers to enter into treaties, international agreements, as well as to act *unilaterally* and by "executive order" as referred to in the last sentence of the quoted paragraph. In this broad context Henkin states that the President "cannot . . . dispose of American territory or property . . ." It is absurd to suggest that this statement by Henkin was only intended to state that the President was prohibited from disposing of American territory or property by *executive agreement,* and not by treaty, since no person has ever suggested that American territory could be disposed of by a mere executive agreement with another nation, much less by *unilateral* action or executive order without congressional approval. Henkin's statement with respect to the disposition of American territory and property thus included the President's power to make treaties and international agreements as well as his power to act unilaterally and by executive order. These are all encompassed within "foreign affairs purposes." It must thus be admitted that the present treaty is an attempt by the President to "dispose of American territory [and] property . . . for *foreign affairs purposes* "—and that Henkin states this cannot be done by treaty. Thus, Henkin is *not* "in agreement with [the *Per Curiam* ] opinion." *Per Curiam* at —— n. 4, of 188 U.S.App. D.C., at 1057 n. 4 of 580 F.2d. Not that Henkin is authoritative or binding—he is a highly respected professor.

The powers of government insofar as they may be exercised by treaty, are thus subject to the *specific* limitations imposed by the Constitution. First, Art. I, § 7, cl. 1, of the United States Constitution provides:

All Bills for raising Revenue shall originate in the House of Representatives; but the Senate may propose or concur with Amendments as on other Bills.

Second, Art. I, § 9, cl. 7, provides:

No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law; and a regular Statement and Account of the Receipts and Expenditures of all public Money shall be published from time to time.

Henkin has stated—and the appellee recognizes—that in a treaty the Executive cannot obviate these provisions by levying taxes or appropriating money from the United States Treasury.

In 1844 the President laid before the Senate a treaty he had negotiated which for at least three years would place the power to exceed certain maximum import duties beyond the power of Congress. The Senate, however, took the view that the constitutional method of imposing regulatory duties was by Act of Congress rather than by treaty. 2 Hinds' Precedents § 1532, at 998–1001. In a subsequent instance when the right of the Senate to act on a treaty was questioned, the Senate observed that the right of Congress to act by legislation was admitted and therefore the Report of the Senate Committee on Foreign Relations recommended that the treaty be amended by inserting: "This treaty shall not take effect until the same shall have been approved by the Congress." 2 Hinds' Precedents § 1533, at 1001–1002. The property transfer portion of the present treaty could be handled accordingly as all governments are on notice of the constitutional requirements of Art. IV.

Appellee also recognizes, as Henkin states, *supra,* that a Declaration of War is subject to the same limitation: it is beyond the President's *unilateral* power to declare war by edict. Likewise all seem agreed that "the United States cannot declare war" by treaty. Henkin, *supra,* at 159–60. That conclusion, however, devolves from the provision of Art. I, § 8, which states "Congress shall have Power . . . To declare War." There is nothing in the Constitution which specifically forbids a President from declaring war to comply with a prior treaty. The Committee Report relies upon "the unique legislative history of the declaration of war clause" which supposedly

"clearly indicates the power was intended to reside jointly in the House and Senate." Committee Report, at 74. This admits that the House of Representatives has a "share of the warmaking power," *id.* To read the clause as a concurrent power would unconstitutionally confer upon the President the power to declare war. However, since the President is commander-in-chief and represents the nation in our foreign relations, there is even less reason to read in the necessity for House participation in a declaration of war from the language of Art. I, § 8, solely the asserted history of the clause, then there is *to give effect to the separate constitutional limitation specifically requiring an Act of Congress to dispose of United States property as set forth in Art. IV, § 3, cl. 2.* This, unlike the war power, is one of the "general powers allocated to Congress" that Henkin recognizes the President cannot exercise in a treaty. Henkin, *supra.*

This then brings us to the placement of the power to dispose of Government property. This power is not specifically included in the general enumeration of powers set forth in Art. I, § 8, but it is undoubtedly one of the "general powers" "necessary and proper" for carrying into execution the previously enumerated powers and practically all other powers. In a separate provision outside Art. I, § 8 (like the taxing and appropriation provisions), Art. IV, § 3, cl. 2 imposes the requirement that "The *Congress* shall have Power to dispose of . . . Territory or Property belonging to the United States." (Emphasis added.)

In imposing a specific procedure *outside Art. I, § 8,* for "Congress" to dispose of Government property, the Framers followed the same pattern as they did with respect to the other *general provisions* of the Constitution—levying taxes and making appropriations. Thus, Art. IV in *requiring* action by *both* Houses of Congress is cast in exactly the same mold as the tax and ap-

propriation powers. Therefore, under the format of the Constitution, disposing of the United States' *property interests in the Panama Canal by a donation is entitled to action by the Congress to the same extent as would be an appropriation for the same amount which admittedly could only be accomplished by enactment of the "Congress."* It must thus be recognized that what is clearly required in the Carter-Torrijos Panama Canal Treaty is exactly what was done in the 1955 treaty involving the Panama Canal Zone: an Act of Congress was required to approve those provisions of the treaty which called for the disposition of United States property.[11]

To say that the Constitution is loose in this particular, and that it permits the President to have a free choice between bypassing the House, as is proposed here, and submitting the matter to the House and the Senate as was done in 1955, is to permit an important constitutional provision to be bypassed in the name of expediency—the exact motivation for which is not readily apparent. If there is any policy inherent in this decision, it should be to determine that at least a majority of the nation's representatives who have been elected on a one man-one vote apportionment support the property disposition portions of the treaty. Even a casual survey of the treaty (*see* Appendix) indicates that a great deal of implementing legislation is required and contemplated, and it has been recognized since 1796, *see* text at —— of 188 U.S.App. D.C., at 1075 of 580 F.2d, *infra,* that the President and the Senate cannot foreclose the House of Representatives from exercising its independent constitutional authority in all respects.

There are two other obvious matters which appear to require implementing legislation that a treaty cannot assure:

---

11. At that time Congress, in accordance with the language of the treaty, did enact legislation enabling the transfers agreed to in the treaty to be perfected. Pub.L. 85–223, 71 Stat. 509 (August 30, 1957) had the purpose of "authoriz[ing] and direct[ing] the fulfillment of those provisions of the [1955 Treaty], which contemplate, *subject to authorization by the Congress,* the conveyance of various lands and improvements to the Republic of Panama . . . ." (Emphasis added).

(1) Art. III, § 5, requires the Panama Canal Commission (constituted by and in conformity with the laws of the United States, see Art. III, § 3) to pay the Republic of Panama for municipal services "ten million United States dollars . . . per annum." The treaty does not provide that this sum will be paid annually from Canal tolls, which in any event are covered into the United States Treasury, and an appropriation may be required. At page 188 of —— U.S.App.D.C., at page 1058 of 580 F.2d the *Per Curiam* opinion states:

Thus, the expenditure of funds by the United States cannot be accomplished by self-executing treaty . . .

I agree. From the foregoing it also appears that this "self-executing treaty [does] require the expenditure of funds by the United States . . . " Hence, as the *Per Curiam* opinion states, the transfer "cannot be accomplished" and the treaty cannot be valid in its present form.

The treaty is self-executing in that it purports to create an annual liability of the United States for the sum of $10 million. It appears, from note 22 at page —— of 188 U.S.App.D.C., at pages 1063–1064 of 580 F.2d of the *Per Curiam* opinion, that the majority agree with this interpretation.

(2) Art. X, § 9 of the treaty also authorizes the affiliation of employees of the Panama Canal Commission with local and international unions, that they may negotiate collective bargaining contracts *with the Panama Canal Commission, and that labor relations with employees "shall" be conducted in accordance with forms of collective bargaining established by the United States after consultation with employee unions.* This apparently makes a collective bargaining contract mandatory and in operation might require all Panama Canal workers to belong to a particular labor organization. It seems to be pure legislation with respect to the employee relations of the United States' employees and is very far-reaching. The briefs do not discuss the issue and no authority has been cited in support of this obvious legislative action.

It would thus appear to be extremely doubtful that the President is authorized to commit the United States to all of this procedure without approval of Congress.

C. *The Restatement of Foreign Relations Law and the Constitutional Requirements for the Disposition of United States Property*

The Restatement, Second, Foreign Relations Law of the United States, is hardly authority for the proposition that the power to dispose of property *concurrently* resides in Art. II and in Art. IV of the Constitution. The majority cite, as the section most strongly supporting the concurrent power notion, a sentence in comment (f) to section 141:

The mere fact, however, that a congressional power exists does not mean that the power is exclusive so as to preclude the making of a self-executing treaty within the area of that power.

*Per Curiam* at —— of 188 U.S.App.D.C., at 1058 of 580 F.2d. In applying this broad single sentence to the specific constitutional power here vested in Congress, the majority ignore the general thrust of the Restatement.

The section of the Restatement which explains the relative boundaries of the treaty power and the powers delegated to Congress is section 118(1). That section states that the power of Congress to enact legislation does not limit the treaty power; but in so providing, that section does not stand for the proposition that property belonging to the United States may be disposed of by treaty without approval by the Congress. Section 118(1) states:

An international agreement made by the United States as a treaty may deal with any matter as to which the United States has the *constitutional power* to make an international agreement under the rules stated in § 117. [Emphasis added.]

Comment (b) to that section states:

*b. Treaty power and power of Congress compared.* The treaty power of the United States is not limited by the extent

of the powers delegated to the Congress by the Constitution. This follows from the fact that the treaty power is itself an independent power granted to the President and the Senate under the Constitution.

Nothing in section 118, however, supports a power to dispose of government "property" by treaty without the consent of the Congress. The Constitution vests that power in Congress by a separate provision. *In so doing, the grant to Congress of the power does not operate to impose a limitation on the power of the President to enter into international agreements but instead merely provides the necessary implementing procedure that must be complied with under the Constitution before certain international agreements become fully effective to accomplish their stated purpose.*

This opinion does not contend for its thesis, as the *Per Curiam* opinion attributes (rightly or wrongly) to Professor Raoul Berger, "that the President and Senate cannot exercise under the treaty power any power granted to Congress . . ." *Per Curiam,* at —— n.4, of 188 U.S.App.D.C., at 1057 n.4 of 580 F.2d. Admittedly such construction would "virtually wipe out the treaty power," as Henkin states. Furthermore, however, this opinion does not contend, as the *Per Curiam* opinion might conclude, that the President under his treaty power can exercise practically all the powers granted to Congress. That would, to paraphrase Henkin, "virtually wipe out the legislative power" in many recognized fields.

To be more specific, and to deal with the facts of this case, rather than attempting to write broad dicta, this opinion does contend that the treaty power cannot wipe out powers granted to Congress with the specificity indicated in Art. IV, § 3, cl. 2. Beyond that this opinion draws no line; but to my mind it seems clear, for the following and other reasons, that the placement of this separate paragraph in an article and section removed from Art. I, § 8 carries with it somewhat the same purpose to indicate exclusive congressional power that one derives from the

location outside Art. I, § 8 of those provisions which impart exclusivity to Congress in the exercise of the taxing and appropriation powers.

The foregoing interpretation is consistent with the language of section 117 of the Restatement, which is referred to in section 118. Section 117 provides:

(1) the United States has the power under the Constitution to make an international agreement if

\* \* \* \* \* \*

(b) the agreement does not contravene any of the limitations of the Constitution applicable to all powers of the United States.

Comment (d) states:

No power granted to the United States by the Constitution is unlimited. The power of the United States to make international agreements is not an exception to this rule. The extent of each power grounded in the Constitution must be determined not only by the constitutional language granting it but also by the restrictions placed upon it *by other constitutional limitations.*

The comment seems to be addressed in part to such constitutional restrictions as were added by the Bill of Rights. For example, the President and the Senate could not cause a treaty to go into effect which abridges the freedom of speech of the American citizenry. The power of Congress to dispose of "property" fits precisely within this same classification but may have a stronger base in the intendment of the Framers since it was part of the original Constitution. Other constitutional limitations—here Art. IV, § 3, cl. 2—thus place restrictions upon the manner of implementing the treaty power: property cannot be disposed of without the approval of Congress. Section 117 is consistent with this.

Section 141(3), which is relied upon by the majority, does not disparage this analysis in any respect. That section provides:

A treaty cannot be self-executing under the rule stated in Subsection (1) and have the effect stated there *to the extent that*

*it involves governmental action that under the Constitution can be taken only by the Congress.*

(Emphasis added.) By way of illustration, comment (f) states:

*f. Constitutional limitation on self-executing treaties.* Even though a treaty is cast in the form of a self-executing treaty, it does not become effective as domestic law in the United States upon becoming binding between the United States and the other party or parties, if it deals with a subject matter that by the Constitution is reserved *exclusively* to Congress. For example, only the Congress can appropriate money from the treasury of the United States. (Emphasis in original)

Illustration:

8. The United States enters into a treaty with state A under which A agrees to cede a portion of its territory to the United States in return for payment of $7,200,000. Advice and consent to the ratification of the treaty is given by the Senate and it is ratified by the President. The ratification does not have the effect of appropriating the $7,200,000. *Further action to this effect must be taken by both Houses of Congress.* (Emphasis added).

The mere fact, however, that a Congressional power exists does not mean that the power is exclusive so as to preclude the making of a self-executing treaty within the area of that power. Thus the fact that Congress has power to regulate commerce with foreign nations does not mean that the making of a self-executing treaty dealing with foreign commerce is precluded; in fact, many provisions in treaties dealing with foreign trade and commerce are self-executing.

The comment explicitly states that a treaty cannot be self-executing if it deals with a subject that is reserved exclusively to Congress. Art. IV, § 3 provides that Congress "shall," thus *exclusively,* dispose of property of the United States, just the same as "only the Congress can appropriate money from the treasury of the United States." The two powers, *i.e.,* dispose of property and appropriate money, are practically identical, and there is every reason to suspect that the Framers intended that both powers should be exclusively exercised by Congress. A disposition of Government property is to all intents and purposes an appropriation thereof. The Rules of the House of Representatives originally adopted in 1794 and amended in 1874 and 1896 have equated the appropriation of property with other appropriations:

All . . . bills making *appropriations of money, or property* or requiring such appropriation to be made . . . shall first be considered in a Committee of the Whole . . .

Rules of the House of Representatives, 95th Cong. (1977), Rule XXIII, ¶ 1, § 865 (emphasis added). In addition, Rule XIII, ¶ 1, § 742 speaks of

First. A calendar of the Committee of the Whole House on the state of the Union, to which shall be referred . . . bills of a public character directly or indirectly *appropriating money or property.*

(Emphasis added.) *See* 4 Hinds' Precedents § 4840, at 1050 (1907).

It is unreasonable to suggest that the Constitution is more concerned with the transfer of eight billion dollars of United States *funds* from the Treasury than with the transfer of eight billion dollars of United States *property.* And the potential earning power of the Canal makes it much more valuable even than eight billion in dollars.[12]

**12.** In footnote 7, the *Per Curiam* opinion states that "there are numerous instances in past treaty practice [of the] . . . disposition of United States property through self-executing treaty." The correctness of this statement is challenged. *See* Part VI hereof. There is no instance in the entire history of the United States that has been brought to our attention where any disposition of United States property even approaching the character and magnitude here involved was ever handled by a self-executing treaty.

Said footnote further states that "we know of no instance in which the United States has been *in a state of formally declared war* without a congressional declaration thereof." (Em-

It was observed in the discussion of the Supreme Court precedents that it is undisputed that the treaty power is not *limited* by the extent of the powers delegated to the Congress. Yet this does not mean that the general treaty power, so far as it exists, can overrun *specific* constitutional provisions. To state the proposition otherwise, the treaty power is not *so broad in the first instance* that it permits the disposition of property of the United States to be made other than in the manner specifically provided for by Art. IV, § 3, cl. 2. The treaty power clearly allows the President with the approval of the Senate to establish rights and obligations between this nation and other countries. However, the actual power to dispose of property *exclusively* rests in the Congress—which includes the House of Representatives, *i. e.,* a treaty cannot without the approval of both houses transfer *property* belonging to the United States. Justice Jackson, when as Attorney General in 1940 he advised President Roosevelt on the fifty destroyers transaction with Great Britain, held that the exchange for British bases was permissible because Congress had *previously* given the President such statutory authority to transfer unneeded naval vessels. He further advised, however, that since Congress had not by law given greater authority, the President was precluded from transferring *new* mosquito boats that were under construction. 39 Op.Atty.Gen. 484 (1940), 86 Cong.Reg. 11355. This recognized that, even in those critical times, only Congress could authorize the disposition of United States property.

It is unquestioned that the *negotiation* of treaties rests solely in the President. As Justice Sutherland declared for the Court in 1936:

He alone negotiates. Into the field of negotiation, the Senate cannot intrude; and Congress itself is powerless to invade it . . .

*United States v. Curtiss-Wright Corp.,* 299 U.S. 304, 319, 57 S.Ct. 216, 220, 81 L.Ed. 255 (1936). From the earliest times of our country, however, as reflected in a resolution adopted by the House of Representatives in 1796, it has been established:

That when a treaty stipulates regulations on any of the subjects submitted by the Constitution to the power of Congress, it must depend for its execution as to such stipulations on a law or laws to be passed by Congress, and it is the constitutional right and duty of the *House of Representatives* in all such cases to deliberate on the expediency or inexpediency of carrying such treaty into effect, and to determine and act thereon as in their judgment may be most conducive to the public good.

5 Annals of Congress 782 (1967) (emphasis added). The House of Representatives in 1871 adopted a resolution to similar effect. Cong. Globe, 42d Cong., 1st Sess. 835 (1871). Senate Document 92–83, 92d Cong., 2d Sess., 488, notes that the early precedents which prohibited a treaty from circumventing the constitutional appropriation power of Congress (Art. I, § 9), have *"apparently been uniformly adhered to"* since 1796.[13]

The last paragraph of comment (f), from which the majority quote, only illustrates the necessity for analyzing each case separately. This is precisely what the majority has not done. The *mere fact* that a congressional power exists, is not, *by itself,* enough to render a treaty touching that

phasis added.) That is a safe statement because a *"formally declared* war" can never exist without a congressional *declaration* thereof. Thus, the statement by its limitations *implicitly* carries its own proof. However, if the statement was intended to convey the impression that the President has never usurped the Congressional power to declare war, it must be recognized that there is no difference in the format of the grant of that exclusive power to Congress from the grant to Congress of the power to dispose of territory and property.

Therefore, by the same token, the President has no more power from the wording of the Constitution to dispose of United States territory and property than he does to declare war.

**13.** Citation is made to: S. Crandall, Treaties, Their Making and Enforcement (Washington: 2d ed. 1916), 171–182; 1 W. Willoughby, The Constitutional Law of the United States (New York: 2d ed. 1929), 549–552. *See also* H.Rept. 4177, 49th Cong., 2d Sess. (1887). *Cf. De Lima v. Bidwell,* 182 U.S. 1, 198, 21 S.Ct. 743, 45 L.Ed. 1041 (1901).

power ineffective without legislative action. However, there are some congressional powers—appropriation, revenue, and *disposal of property*—which are so basic to the legislative function and are so intrinsically legislative that the treaty power cannot operate without the concurrent exercise of the congressional power. The power to dispose of property is a power with specific constitutional limitations, substantially identical to the appropriation power, and by the Constitution, like the appropriation power and the power to levy taxes, it rests exclusively with the Congress. The transfer of property to the Republic of Panama requires an Act of "Congress" pursuant to Art. IV, § 3, cl. 2. Section 141(3) is consistent with this approach.

In short, it does not appear that anything in the Restatement supports the proposition that the Panama Canal, the Panama Railroad, and the other United States property which the Carter-Torrijos Treaty proposes to convey to Panama, can be transferred except by the "Congress." The treaty power is thus not unlimited and any treaty which disposes of substantial government property must, in that respect, be approved by both houses of Congress before coming into full force.

### D. *Exclusive Language and the Placement of Article IV*

Appellee advances two other arguments for the proposition that the power to dispose of United States property rests concurrently in the Executive and the Congress. First, it is suggested that since the property disposal clause does not use the same "exclusive language" as the appropriations and revenue clauses, the power to dispose of property must be concurrent. *See* Appellee Br. at 9. Second, it is argued that the property disposal clause is found in Art. IV

which deals with state-federal and state-state relationships. This, it is argued, strongly suggests that the provision was intended to distribute power between the state and federal governments rather than among the three branches of the federal government. *Id.* This argument however, is an incomplete answer. This is so because once a power is distributed between the state and federal government it must still be distributed between the three departments that constitute the three federal departments.

The first argument, that because the property disposal clause does not use, what is termed, "exclusive" language, the power rests concurrently in the Executive and the Congress, misapprehends the nature of Art. IV.

Of course the terminology by which a power is delegated to Congress is significant, and may be completely controlling in determining the scope of the President's treaty power; but each situation must be considered separately on its peculiar facts. *If any reasonably general statement were to be formulated for drawing the line at a point where the President's treaty power terminates, it would be at that point where the Constitution indicates that a legislative power was to be exercised.* That applies to the taxing and appropriation power. And it is submitted that the Constitution is addressing itself to legislative enactment in Art. IV when it confers the power on *Congress* "to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States. . . ." Certainly to "make all needful Rules and Regulations" refers to legislation. This clause is the source of the power that Congress exercised for more than a century in legislating for our territories, before they became states.[14]

---

14. *E. g., Dorr v. United States,* 195 U.S. 138, 149, 24 S.Ct. 808, 813, 49 L.Ed. 128 (1904) ("We conclude that the power to govern territory, implied in the right to acquire it, and *given to Congress in the Constitution in article 4, § 3, . . .* does not require that body to enact for ceded territory, not made a part of the United States by *congressional action,* a system

of laws which shall include the right of trial by jury, and that the Constitution does not, *without legislation,* and of its own force, carry such right to territory so situated." [emphasis added]); *Benner v. Porter,* 50 U.S. 235, 240, 13 L.Ed. 119 (1850) ("[The territorial governments] are not organized under the Constitution, nor subject to its complex distribution of

Providing for the disposition of property of the United States must also be recognized as a close counterpart to enactments providing for the appropriation of money to the United States. The paragraph is thus referring throughout to action by Congress.

Thus, the fact that the property disposal clause does not refer specifically to the "House," or to a "law" as in the taxing and appropriation clauses, is not controlling, because it otherwise indicates that the *Congress shall* have power to *legislate* for the territories and property belonging to the United States. It further lays down a very broad restriction, on all acts of the legislature, executive and judiciary, *i. e.,* that nothing said in the Constitution should be construed to prejudice any claims of the United States or of any State.[15]

It is a gross understatement to construe the constitutional powers conferred by Art. I, § 8 and Art. IV, § 3, cl. 2 merely as though "these provisions state *simply* that Congress shall have power to take action on the matters enumerated." *Per Curiam,* at —— of —— U.S.App.D.C., at 1059 of 580 F.2d (emphasis added). The first error in this statement is to include the separate and *special* provision contained in Art. IV, § 3, cl. 2 with the *general* enumeration of powers set forth in Art. I, § 8. The difference in composition and location of these

two sections indicated a difference in purpose and intent. The Constitution in Art. IV does "[state] the particular matter of concern, *i. e.:* the "Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States . . ." It has long been recognized that *expressly* conferring this power on Congress implies an exclusion of all other authority over the property which could interfere with this right or obstruct its exercise." *Wisconsin Cent. R.R. Co. v. Price County,* 133 U.S. 496, 504, 10 S.Ct. 341, 33 L.Ed. 687 (1890); *Van Brocklin v. State of Tennessee,* 117 U.S. 151, 167–168, 6 S.Ct. 670, 29 L.Ed. 845 (1886). The specific grant of power to Congress implicitly operates to deny that the power vests elsewhere. *United States v. MacCollom,* 426 U.S. 317, 321, 96 S.Ct. 2086, 48 L.Ed.2d 666 (1976); *Passenger Corp. v. Passengers Assn.,* 414 U.S. 453, 458, 94 S.Ct. 690, 38 L.Ed.2d 646 (1974); *T.I.M.E. v. United States,* 359 U.S. 464, 471, 79 S.Ct. 904, 3 L.Ed.2d 952 (1959); *Botany Worsted Mills v. United States,* 278 U.S. 282, 289, 49 S.Ct. 129, 73 L.Ed. 379 (1929).

The second argument also inaccurately analyzes Art. IV. It is too narrow a view of the property disposal clause to say that it is found in Art. IV, which deals with state-

---

the powers of government . . . but *are the creations, exclusively, of the Legislative Department,* and subject to its supervision and control." [emphasis added]); *American Insurance Co. v. 356 Bales of Cotton,* 26 U.S. 511, 542, 7 L.Ed. 242 (1828) ("Florida continues to be a territory of the United States; governed by virtue of that clause in the Constitution which empowers *Congress* 'to make all needful rules and regulations, respecting the territory, or other property belonging to the United States.' " [emphasis added]).

**15.** In the passage of Henkin relied upon the majority, the following statement appears in a footnote:

It has been suggested that treaties that deal with matters on which Congress could legislate could not be self-executing . . . In the numerous instances in which acts of Congress were held to supersede treaty provisions . . ., there was no suggestion that the treaty was not law anyhow since it could not be self-executing.

Henkin, *supra,* at 159 (in note). This section is discussing the effect of treaties as law—and not where the power to *implement* the treaty resides. In this regard, a later statement in the footnote is relevant:

Congress has often insisted that treaties modifying tariffs are not self-executing and require Congressional implementation, and the Executive has generally acquiesced. Crandall, Treaties 195–200 . . . In recent years tariffs have been the subject of executive agreements authorized by Congress or requiring Congressional implementation.

*Id.* At best, one could say that Henkin has made some statements, which if read out of their context, might lead to conflicting results. It is my view that his statement at 94–96, quoted above, is definitive and conclusive—the Executive may not use his foreign affairs powers to dispose of United States territory or property, since that power is specifically vested in the Congress by Article IV—and points to a position opposite to the *per curiam.*

federal and state-state relationships, and to conclude therefrom that the whole provision must be considered solely as distributing power between the state and federal governments rather than among the three branches of the federal government. Such argument ignores the fact that the Constitutional Convention went further and specifically designated which of the three departments was to exercise the power to dispose of United States property, to-wit: "The Congress . . ." As previously noted, the power is essentially legislative and the "Power" to exercise it was placed in the Congress, where the Constitution placed other general and specific legislative authority.

It is also significant that the Constitution in Art. IV also placed the power in "The Congress" to enact general laws to implement the full faith and credit clause and to admit new states. The designation of Congress to exercise these powers cannot be blandly dismissed as though the Constitution also left these *powers* in the air so that the President could exercise them if he so desired. Would anyone suggest that the President by treaty can admit new states?

The location of Art. IV, § 3, as indicated by prior discussion, was principally a function of the Framers' concern with the claims of particular states to territory granted in their original charters. This was inextricably related to state-state and federal-state relations but it also directly involved the separation of powers between the Congress and the President; and insofar as United States versus States' "claims" were concerned, the Judiciary were also very much involved. This great concern with disposition of territory and the claims thereto caused Section 3 to be placed in Article IV, but the language of the clause—which also addresses *property,* which did not figure as importantly in the Framers' expressed concern relative to the grants under Royal charters, should not be narrowed as a result of its mere placement. The language of the clause is unequivocal: "The Congress *shall* have Power to dispose of . . . Property belonging to the United States."

This indicates that *exclusivity* of the powers in Art. IV, § 3, cl. 2, is vested in the *Congress* because if the President and the Senate, in the absence of any specific grant to that effect, were construed to possess the power, the Congress would thereby be excluded in many instances from exercising the power and the mandatory (*shall*) grant of the power to the Congress would be negated. It is recognized that some of the powers vested in Congress by Art. I, § 8 have been the subjects of treaties and that the mandatory character of that section may thereby have been obviated to some extent. That section, however, contains a great many designated powers covering a wide spectrum of legislative activity and it is recognizable that treaties might properly involve the same subjects *in a non-legislative manner.*

Art. IV, § 3, cl. 2, however, is very specific and limited. It refers only to territory and property (the claims also refer to territory and property). Thus, the specific nature and limited scope of the paragraph are reasons why the ratification procedure thus required should not be taken from Congress and obviated by self-executing treaties.

Such construction is also supported by the historical fact that the recognized intent of the Convention in this paragraph was to restrict the power to dispose of territory or property and this was the only place such intent is addressed. Had the convention intended to authorize the disposition of property as an incident of the treaty power, it would have been very easy to do so by merely inserting before the semi-colon in Art. IV, § 3, cl. 2: "(which may also be disposed of by treaty)." The fact that the disposition of *territory* clause was followed by a separate restriction of general import to the entire Constitution which critically implicated state-state and federal-state relations—while also implicating the distribution of powers among the three branches—should not cause the separate grant of broad power to dispose of territory and property to be construed narrowly.

The contention that the *placement* of the power with respect to property and territory in Art. IV is an indication of a limiting effect overlooks some other significant features of the content of the paragraph and its location. Art. IV is the first Article after the three first Articles which provided for the distribution of the powers of government between the Congress, the President, and the Judiciary. Art. IV is also the *last Article* in the Constitution that can be said to deal with the allocation of governmental powers: the remaining Articles provide for the manner of amendment (Art. V); recognize prior debts, provide for the supremacy of federal law and the oath of office (Art. VI); and provide for the manner of ratifying the Constitution (Art. VII). The Articles after IV are thus largely procedural and declaratory, and the Articles before IV are each *confined* to a separate department of government. Thus, Art. IV was the appropriate place, *after* those sections in Art. IV which placed certain limitations on the states, and before the *broad* guarantee by the whole "*United States*" of a Republican form of Government, for the Convention to make provision with respect to "Territory [and] other Property belonging to the United States" and further to add the very broad assurance applicable to all departments, the United States, and the States that "*nothing in this Constitution*" shall prejudice any claims of the United States or the states. *This is so because the Convention intended to restrict all three departments in some respect* and it would be contrary to the arrangement of the Articles to place such restriction in any of the first three Articles that were each devoted to a single department. Article IV, § 3 was the obvious place to insert its present contents and by such placement its obvious meaning was not restricted.

Art. IV covers four areas: (1) the disposition and regulation of United States territory; (2) the disposition and regulation of United States property; (3) claims of the United States; and (4) claims of any particular state. Actually these are all closely related. With respect to these areas of concern, the Convention provided that Congress should exercise the power to dispose and regulate territory and property, and then restricted the power so conferred by providing, in effect, that none of the powers conferred on the Congress, the President, or the Courts ("nothing in this Constitution") shall be construed to prejudice "any claims of the United States or of any particular State."

The claims so referred to were claims to "territory" in the West under Royal Charters which during the Convention were among the greatest concerns of some of the states. It is thus apparent that the most propitious place to restrict the power of the Congress, the President, and the Courts from dealing with this matter, was after the first three Articles and following the provision concerning Congress' power to dispose and regulate territory and property. It would not have been appropriate to place the restrictive language of Art. IV, § 3, cl. 2, in any of the first three Articles, as that would have suggested that the limiting language of the clause had some special relation to one particular branch of the federal government rather than to all three branches. Placing the provision *after* those Articles, and after the territory and property provision, gives the limitation greater force and clarity.[16] Therefore, the location of the

16. The rules applicable to the construction of a statute also apply to the construction of a Constitution. *Badger v. Hoidale*, 88 F.2d 208, 211 (8th Cir. 1937) (construing Minnesota Constitution); *Davis v. Synhorst*, 225 F.Supp. 689, 691 (S.D.Iowa 1964) (construing Iowa Constitution: "Rules applicable to statutory construction are similar to constitutional construction"). "The established rule is that *if there exists a conflict in the provisions of the same act, the last provision in point of arrangement must control.*" *Lodge 1858, American Federation of Government Employees v. Webb*, 188 U.S.App.D.C. —— at ——, 580 F.2d 496 at 510 (1978) (emphasis added), and cases cited at *id.*, at —— ——, n.31, 580 F.2d at 510–512, n.31. Here, the fact that Art. IV, § 3, cl. 2 was placed *after* Articles I, II, and III is entitled to some weight in construing the intendment of Art. IV; it points to the conclusion that the language of the property disposition clause is not concerned simply with state-state and state-federal relations.

territory and property clause in Art. IV does not in any way limit the effect of its plain language to confer those powers on Congress as it prescribes. Furthermore, coupling the regulatory and disposition powers over "Territory [and] other Property belonging to the United States," because the regulatory power is so completely legislative, is indicative of an intent to refer to the disposition power also in its legislative context.

## III. ESTABLISHED STATE DEPARTMENT PROCEDURES FOR INTERNATIONAL AGREEMENTS

In bypassing the House of Representatives, the pending agreement does not conform to established procedures of the Department of State. These have been codified, set forth, and designated as the "Circular 175 Procedure." Department of State, 11 Foreign Affairs Manual § 700 *et seq.* (Oct. 25, 1974).

In its Circular 175 Procedure, the Department of State recognizes four types of International Agreements: Treaties which may be ratified by the Senate where to do so would not "*contravene the* United States Constitution . . ." (*Id.,* § 721.2(a), emphasis added). The Procedure also recognizes three types of agreements *other than* treaties:

(1) *Agreements Pursuant to Treaty*

The President may conclude an international agreement pursuant to a treaty brought into force with the advice and consent of the Senate, *whose provisions constitute authorization for the agreement by the Executive without subsequent action by the Congress*;

(2) *Agreements Pursuant to Legislation*

The President may conclude an international agreement on the basis of exist-

ing legislation or *subject to legislation to be enacted by the Congress*; and

(3) *Agreements Pursuant to the Constitutional Authority of the President*

The President may conclude an international agreement on any subject within his constitutional authority so long as the agreement is not inconsistent with legislation enacted by the Congress *in the exercise of its constitutional authority.*

Department of State, 11 Foreign Affairs Manual § 721.2(a) (Oct. 25, 1974) (emphasis added).

The Circular 175 Procedure also provides in the "Considerations for Selecting Among Constitutionally Authorized Procedures" for international agreements that consideration shall be given to:

c. Whether the agreement can be given effect without the enactment of subsequent legislation by the Congress;

d. Past U.S. practice as to similar agreements.

(*Id.,* § 721.3). Following these guidelines established by the Department of State, it is obvious that those portions of the treaty providing for the transfer of property to Panama are in effect outside the treaty power. This follows because the United States Constitution requires the additional approval of the House of Representatives, or the reference to the necessity for the enactment of subsequent legislation by Congress, because Art. IV, § 3, cl. 2 provides that "The *Congress* shall have Power to dispose of . . . Property belonging to the United States . . .." (emphasis added). No party to this case questions that the treaty in its present form seeks to dispose of property belonging to the United States without approval by Congress.[17]

---

17. Indeed, it is beyond serious dispute that if the treaty becomes effective, the United States will dispose of property. Art. XIII of the Treaty provides: "The United States of America transfers, without charge, to the Republic of Panama all right, title and interest the United States of America may have with respect to all real property, including non-removable improvements thereon . . ." We may take

judicial notice of the public dispute as to the nature of the interest this country presently possesses in the territory of the Canal Zone from its treaty right to act in perpetuity as though sovereign—whether it be a fee interest or a leasehold. In any event, the interest is a "property interest." Irrespective of the nature of this interest, this nation is definitely transferring a property interest in the fixtures and

This is true both as to the right to act as sovereign in the territory and as to our actual ownership of soil and fixtures which constitute property. The instant Panama Canal Treaty, insofar as it purports to dispose of the Canal territory and property, thus includes provisions of the second type, section 721.2(a)2, *supra*, which the State Department procedure correctly interprets the Constitution to provide that:

> The President may conclude . . . subject to legislation to be enacted by the Congress . . .

Thus, the property disposition portion of the treaty under the Constitution constitutes a severable international agreement that cannot constitutionally come into force unless the entire "Congress" approves that transfer.

Obviously Congress may not be required to approve other parts of the treaty. It should also be recognized that attempting to bypass the House of Representatives with the scheme which is framed as a "self-executing treaty" ignores that part of the Department of State Procedure which states that "[p]ast U.S. practice as to similar agreements" shall be followed. *Id.* § 721.3d. And, lest the *Per Curiam* opinion insist that its attempt to distinguish "executive agreements" was successful and authorizes the treaty procedure presently being followed, the "past practices" in Panama were in complete accordance with the views expressed in this opinion. *See* Part IV, *infra; but cf. Per Curiam* op., n.24.

## IV. PAST U. S. PRACTICES INVOLVING SIMILAR AGREEMENTS WITH PANAMA

### A. *Prior Panamanian Treaties*

The procedure to be used in conveying United States property to Panama con-

fronted President Eisenhower in 1955 in the Eisenhower-Remon Treaty with the Republic of Panama which, *inter alia*, disposed of some "property of the United States" in Colon and Panama City. That Eisenhower-Remon Treaty provided in Art. V:

> The United States of America agrees that, *subject to the enactment of legislation by the Congress*, there shall be conveyed to the Republic of Panama free of cost all the right, title and interest held by the United States of America or its agencies in and to certain lands and improvements in territory under the jurisdiction of the Republic of Panama [etc.] . . . The lands and improvements referred to in the preceding sentence and the determinations by the United States of America respecting the same, *subject to the enactment of legislation by the Congress*, are designated and set forth in Item 2 of the Memorandum of Understandings Reached which bears the same date as this Treaty. The United States of America also agrees that, *subject to the enactment of legislation by the Congress*, there shall be conveyed to the Republic of Panama free of cost all its right, title and interest to the land and improvements in the area known as PAITILLA POINT and that effective with such conveyance the United States of America shall relinquish all the rights, power and authority granted to it in such area under the Convention signed November 18, 1903.

Treaty of Mutual Understanding and Cooperation Between the United States of America and the Republic of Panama, 6 U.S.T 2274, 2278–79 (Jan. 25, 1955) (emphasis added).

Thereafter, *Congress* enacted Public Law 85–223, 71 Stat. 509 (1957), which authorized such disposition.[18] This is the most sub-

---

other improvements made on the real property. This includes the entire Panama Railroad, which the United States purchased as authorized by Congress (32 Stat. 481) and all the other real property that the United States purchased from the individual owners of the land, including the property and other interests of the French Canal Company for which the U.S. paid $40 million. (*See* 32 Stat. 481). All of this is property within the meaning of Art. IV. A

substantial payment was also made to Columbia.

**18.** Public Law 85–223 of August 30, 1957 provided:

> *Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*
> TITLE I—CONVEYANCE OF PROPERTY TO THE REPUBLIC OF PANAMA AND FIS-

stantial example of United States past practices that exists. It also transferred land to Panama. The treaty itself called for *congressional* enactment. In my opinion, that same procedure is required here by the property disposition provision of the Constitution and by the Department of State's Circular 175 Procedure.

The Committee Report asserts that Articles VI and VII of the Eisenhower-Remon Treaty of 1955 is an example of a self-executing treaty which authorizes the transfer of territory or property belonging the United States to other nations without a *"prior* Congressional act authorizing such trans-fer." Committee Report at 68, 69 (emphasis added). Close examination does not support that conclusion. Naturally, enactment of an act *prior* to the treaty is not necessary—but the Committee Report suggests that an act prior to the *transfer* is not necessary; and the intent of the Committee Report, the Attorney General's Opinion, and the wording of the present Treaty provide for the transfer of the property the instant the instruments of ratification are exchanged, thereby completely eliminating the House of Representatives from any constitutional role in the transfer of United States property. Art. V of the 1955 treaty belies the Senate's and appellee's position.

CAL ADJUSTMENTS BY PANAMA CANAL COMPANY

Sec. 101. It is hereby declared to be the purpose of this title—

(1) to authorize and direct the fulfillment of those provisions of the Treaty of Mutual Understanding and Cooperation between the United States of America and the Republic of Panama signed on January 25, 1955, and of the memorandum of understandings reached signed on the same date, which contemplate, subject to authorization by the Congress, the conveyance of various lands and improvements to the Republic of Panama, including, but not limited to, conveyance of the lands and improvements in, and simultaneous relinquishment of all right, power and authority in, the area known as Paitilla Point, and including the removal of the railway terminal operations of the Panama Canal Company from the city of Panama and the conveyance of the lands and improvements known as Panama Railroad Yard in the city of Panama; and

(2) to authorize and provide for the adjustments in the fiscal obligations of the Panama Canal Company necessitated by the aforesaid conveyances.

Sec. 102. (a) In accordance with and subject to the provisions of article V of the Treaty of Mutual Understanding and Cooperation between the United States of America and the Republic of Panama signed on January 25, 1955, and item 2 of the memorandum of understandings reached signed on same date—

(1) the Secretary of State is authorized and directed to convey to the Republic of Panama free of cost all the right, title, and interest held by the United States of America or its agencies in and to the land and improvements in the area known as Paitilla Point and in the areas designated in paragraphs 1, 2, and 3 of paragraph (a) of said item 2; and

(2) the Panama Canal Company is authorized and directed to remove its operations and withdraw from the other lands and improvements designated in said item 2, and to convey to the Republic of Panama free of cost all the right, title, and interest held by the Panama Canal Company and the United States of America in and to said other lands and improvements.

(b) The market value of the property of the Panama Canal Company conveyed under this directive or by operation of articles VI or VII of the treaty and the net capital loss, if any, as established by the Panama Canal Company and approved by the Director of the Bureau of the Budget, sustained in the disposal, relocation, or realization of any facility or other property of the Panama Canal Company rendered excess, wholly or in part, by operation of articles V or XII of the treaty or items 2, 6, 9, or 10 of the memorandum of understandings reached shall be treated as extraordinary expenditures and losses incurred through directives based on national policy and not related to the operations of the corporation, within the meaning of section 246(d) of title 2 of the Canal Zone Code, as added by the Act of June 29, 1948 (ch. 706, 62 Stat. 1075). The market value of Canal Zone Government property conveyed under this directive shall be removed from the capital investment of the United States in the Canal Zone Government without charge to the costs of operation of that agency. There are hereby authorized to be appropriated such amounts as may be required for the necessary replacement of property or facilities of the Panama Canal Company or Canal Zone Government conveyed or rendered excess as the result of the treaty or memorandum, such amounts to be charged to the Panama Canal Company or the Canal Zone Government, respectively.

Approved August 30, 1957. (71 Stat. 509)

And the two provisions in Articles VI and VII only related to minor boundary matters. Art. VI [19] concerned the modification of a boundary line between the City of Colon and the Canal Zone; this article replaced Art. V of the Boundary Convention of September 2, 1914 [20] and modified Art. VIII of the Hull-Alfaro Treaty, which had been signed on March 2, 1936.[21] Art. VII concerned a boundary modification near Manzanillo Island.[22]

The asserted "self-executing" nature of Articles VI and VII of the 1955 treaty therefore do not provide precedential authority for disposing of the Panama Canal property without congressional approval. First, rectification of boundaries is a distinct matter from the disposition of the straggering amount of property in question here.[23] Boundary rectification ordinarily involves a dispute about which country owns the property; the subsequent agreement is more like a disposition of *claims* than of property, for the question of whether there even exists "United States property" is the entire matter in dispute.[24]

Second, in comparing the amount of property allegedly disposed of by Articles VI

19. 6 U.S.T. at 2279–85.

20. 38 Stat. 1900.

21. The treaty is reprinted at 84 Cong.Rec. 9825–33 (1939).

22. 6 U.S.T. at 2285.

23. The *per curiam* opinion at notes 22–23 and the accompanying text addresses the boundary rectification point, and concludes that whether there is a dispute about the property or territory has nothing to do with whether the President can dispose of the same. This, in my opinion, is not correct: (1) the prior practices in this *unique area* are relevant, as the Circular 175 Procedure provides; (2) a bona fide boundary dispute is clearly not the same thing as disposing of our undisputed property in the Panama Canal. The point that the Western lands were the subject of conflicting claims, which causes the majority to conclude that status has no bearing on whether congressional enactment is required to convey land, is not analogous: it is not so much the status of the land itself that is crucial but the nature of the dispute and its relation to that status—that is, in all prior boundary settlements which appellee contends involved a cession, the dispute concerned claims of the grantor and grantee, and the settlement was of those claims. A dispute between two states, or between two private individuals, over a tract does not, by itself, give the land a peculiar status that removes it from the Art. IV requirement; thus, land that is subject to competing claims of two states of the United States would still require an act of Congress for conveyance to a foreign country.

Note 23 of the *per curiam* opinion asserts difficulty in understanding how the validity of using the treaty process should in any way depend upon whether the nation to whom the land is conveyed previously "claimed" the land. The explanation is not difficult but the statement of the *per curiam* opinion involves a false assumption, *i. e.*, that the property which the treaty recognizes as belonging to a prior claimant would be "conveyed" by the treaty. To so state is an inaccurate description, particularly of those treaties in the early days to which the *per curiam* opinion refers at —— n.21 of 188 U.S.App.D.C., at 1063 n.21 of 580 F.2d, where there was considerable ignorance of the territory involved. Since, for instance, Spain claimed the western lands to the 42nd parallel, the fact of their claim, based as it was on the recognized right of discovery, some minimal exploration in the most far reaching regions and very minor settlement, when that claim is recognized in a treaty by the United States it is almost impossible to conclude in view of our negligible exploration or settlement of the fringes of the Spanish claim that the United States was actually disposing of territory or property belonging to it. What rights we did possess in the eastern area flowed from the Louisiana Purchase from France of what had originally been territory claimed by Spain. Such situations are generally recognized as *not* being an alienation of territory but merely a *recognition of the particular claim and a determination of the invalidity of the losing claim*. *See* n.24. It follows, that since we admitted our claim was inferior, that the treaty in that respect did not dispose of any territory or property belonging to the United States. Here, however, the title of the United States to the property in question is recognized by all.

24. Writing in 1929, Willoughby stated: "In several treaties in settlement of boundary disputes areas previously claimed by the United States as its own have been surrendered to foreign powers. These, however, can scarcely be considered as instances of the alienation of portions of its own territory, for the fact that the treaties were assented to by the United States is itself evidence that it was conceded that the claim that the areas in question belong to the United States was unfounded. *There has been no instance in which territory, indisputably be-*

and VII to the amount being disposed in the present treaties, it is clear that the 1955 disposition, in relative terms, was even less than *de minimus.* Third, and most significantly, *Congress did approve Articles VI and VII in its 1957 statute.*[25] Section 102(b) of the statute in its last line "authorized to be appropriated such amounts as may be required for the necessary replacement of property or facilities . . . conveyed or rendered excess as the result of the treaty or memorandum . . . ." Unlike Section 102(a) which only addressed the matters contained in Art. V of the treaty, Section 102(b) addressed all *three* articles—V, VI and VII—and the authorization of appropriations for replacement of conveyed property constituted approval by Congress of the content of Articles VI and VII.

However, even if Articles VI and VII did involve a disposition of property which Congress did not initially approve, it may be

that those Articles were themselves unconstitutional. Even Congress' silent acquiescence in that small disposition—assuming that is what may have happened temporarily—cannot alter the proper constitutional procedures mandated under Art. IV of the United States Constitution for the transfer by the Panama Canal treaty of United States property of the staggering value here being disposed of.

It is also convincing that in 1932, in another transfer of property to Panama, the Government considered it to be necessary to obtain prior specific congressional authorization even for a *minor* disposition of property from the Canal Zone to the Republic of Panama. Public Law No. 117, 47 Stat. 145 (May 3, 1932), *authorized* the Secretary of State to effect with the Republic of Panama a modification of the boundary line.[26] This slight alienation was not a

longing to the United States, has been alienated to another power." 1 W. Willoughby, The Constitutional Law of the United States 572 (2d ed. 1929) (emphasis added).

Crandall writes that resolutions were introduced in the House in 1820 following the Florida treaty of 1819, which would have asserted that no treaty purporting to alienate any portion of the territory belonging to the United States could be valid without the concurrence of Congress, but no vote was taken on the matter. In the debates on the resolution, Mr. Clay, who introduced the resolution, stated that a treaty could fix the boundaries of the United States without the concurrence of Congress "when the fixation of the limits simply was the object. . . . in all these cases, the treaty-making power merely reduces to certainty that which was before unascertained. It announces the fact; it proclaims in a tangible form the existence of the boundary; it does not make a new boundary; it asserts only where the new boundary was. But it cannot under color of fixing a boundary previously existing, though not in fact marked, undertake to cede away, without the concurrence of Congress, whole provinces." He stated that if the subject was mixed, *i. e.,* partly cession and partly fixing a boundary, the consent of Congress was necessary. Mr. Clay believed that the Florida treaty was more than a boundary determination.

Mr. Lowndes, of South Carolina, took a different position and contended there could be no adjustment of a claim to a boundary without some cession of supposed right by one or the other party. Mr. Anderson, of Kentucky, believed that the treaty power must permit boundary settlements: "Its frequent operation

on the settlement of differences of this kind, must have been contemplated by the Convention; and it could never have been intended, that, in a general grant of power, it should be construed not to apply to cases, which had been invariably, in all countries, the subjects of its operation."

Boundary rectification is not an example of cession of territory. In addition to being an adjustment of claims, it is supported by *prior practices*, as Mr. Anderson points out: the prior practice of boundary rectification involves a matter different from the wholesale relinquishment of large areas of undisputed territory. S. Crandall, Treaties, Their Making and Enforcement 227–29 (1916).

25. *See* note 17 *supra* § 102(b).

26. *Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That with respect to that parcel of land in the Panama Canal Zone known as the Paitilla Point Military Reservation, title to which was acquired by the Government of the United States under the conventions concluded on November 18, 1903, and September 2, 1914, between the United States and Panama, the Secretary of State be, and he is hereby, authorized and empowered to effect with the Republic of Panama a modification of the boundary line between the Panama Canal Zone and the Republic of Panama so that such line shall then run as follows: [Property description]

Sec. 2. Nothing contained in this Act shall be construed to authorize the Secretary of

boundary correction but was in fact a cession of land made necessary by the requirements of international law with respect to embassies.[27]

During World War II, there were discussions between Panama and the United States concerning disposition of bases and the transfer of waterworks and railroad lots. On May 18, 1942, an agreement on the lease of defense sites was made between the two countries.[28] A more significant agreement was reached that same day,[29] which, based upon an exchange of notes, provided:

> When the authority of the Congress of the United States shall have been obtained therefor, the Government of the United States will transfer to the Government of the Republic of Panama free of cost all of its rights, title and interest in the system of sewers and waterworks in the cities of Panama and Colon.

State to convey or to surrender to the Government of Panama the title which the Government of the United States now holds in that parcel of land which may be detached from the Panama Canal Zone by virtue of the provisions of section 1 of this Act.

Sec. 3. No civil or criminal case that may be pending in the courts of the Panama Canal Zone at the time this Act shall become effective shall be affected thereby, either as to its present status or as to future proceedings, including final judgment or disposition.

Approved, May 3, 1932.

27. This boundary change was not a boundary dispute where there would be no cession. *See* note 24 *supra.* Instead, the United States wanted to build a new legation in Panama, and the chosen site was in the Zone. A legation could not be built on United States territory; hence, the property was alienated to Panama, which then retransferred the property back to the United States' jurisdiction, but with diplomatic immunity and immunity from local jurisdiction for use as a legation. 75 Cong.Rec. 4652–57 (1932).

28. Agreement for the Lease of Defense Sites in the Republic of Panama, 57 Stat. 1232 (May 18, 1942).

29. Agreement between the United States of America and Panama respecting general relations, 59 Stat. 1289 (May 18, 1942).

30. *Resolved by the Senate and House of Representatives of the United States of America in Congress assembled,* That the President of

59 Stat. at 1289 (emphasis added). The agreement also provided:

> The President will seek the authority of the Congress of the United States to transfer to the Republic of Panama free of cost all of its rights, title and interest to the lands belonging to or of which the Panama Railroad Company now has usufruct in the cities of Panama and Colon which are not currently or prospectively needed for the maintenance, operation, sanitation and protection of the Panama Canal, or of its auxiliary works, or for the operation of the Panama Railroad.

59 Stat. at 1290 (emphasis added). These agreements thus *recognized the constitutional necessity for Congress to approve the disposition of United States property.* On May 3, 1943, Congress enacted the legislation necessary to effectuate the transfer. Public Law No. 48, 57 Stat. 74 (May 3, 1943).[30] These are thus *not* examples of self-executing transfers by treaty.

the United States be, and is hereby, authorized to transfer to the Republic of Panama all of the right, title, and interest of the United States in and to water and sewerage systems installed by the United States in the cities of Panama and Colon: *Provided, however,* That pending the establishment of an independent water-supply system, and so long as the Republic of Panama desires to utilize a supply of water from the Canal Zone, it shall pay quarterly to the appropriate Canal Zone authorities the rate of B/0.09 per one thousand gallons or such other reasonable rate as may be agreed upon by both Governments: *And provided further,* That the turning over to the Government of the Republic of Panama of the physical properties of the water and sewerage systems and the administration thereof, including the collection of the water rates, does not in any way modify the existing arrangement in respect to responsibility for the public health services of the cities of Panama and Colon as specified in the second paragraph of article VII of the Convention between the United States of America and Panama, signed at Washington, November 18, 1903.

Sec. 2. The Panama Railroad Company is hereby authorized to convey to the Republic of Panama, in whole or in part, all of its right, title, and interest in and to so much of the lands of the Panama Railroad Company located in the cities of Panama and Colon as, in the opinion of the Secretary of War, are no longer needed for the operation of the Pana-

Appellee also cites the "Convention of May 24, 1950 [with the Republic of Panama] for Change in the Boundary and the Grant of Certain Corridors, 6 U.S.T. 462," Appellee's Supplemental Memorandum, March 17, 1978, at 3, as an example of a treaty which demonstrates "that under well established historical practice treaties with foreign countries have ceded rights to property of the United States," *id.*, at 4. Reference is also made to Art. VI in the 1955 treaty with respect to "a small portion of the Colon and of the Colon corridor." *Id.*, at 4.

The Convention of August 9, 1950 is entitled "Colon Corridor and Certain Other Corridors Through the Canal Zone." 6 U.S.T. 461. In Art. II thereof *the Republic of Panama transferred* certain tracts of land from the city of Colon to the Canal Zone as a boundary change and provided that said property would be incorporated "to form part of the Canal Zone in the same manner as though [said lands] had been included within the grants contained in the [boundary] convention of November 18, 1903 . . . " 6 U.S.T. 465.

Thereafter in Art. III the United States transferred to the Republic of Panama "*jurisdiction* over the corridor" (emphasis added). This included the Colon corridor and another corridor through a small portion of the Canal Zone. The purpose of these transfers was so that "the city of Colon may enjoy direct means of land com-

munication under Panamanian jurisdiction with other territory under jurisdiction of the Republic of Panama . . . ." 6 U.S.T. 465. This was something less than a transfer of "territory or property" because Art. V of the convention provided that the provisions previously referred to [conferring *jurisdiction* over corridors] "shall not affect the rights and obligations of either of the two high contracting parties under the treaties or other international agreements now in force between the two countries, nor be considered as a limitation, definition, restriction or restrictive interpretation of such rights and obligations . . . ." 6 U.S.T. 469.

The reference to prior "treaties or other international agreements now in force between the two countries . . . " included reference to the treaty of November 18, 1903 which provides that the grants to the United States by the Republic of Panama should not "interfere with the rights of way over the public roads passing through the said Zone . . . unless said rights of way . . . shall conflict with rights . . . granted to the United States." Art. VI, 33 Stat. 2235. Thus, there being no conflict with United States' rights, the convention of 1950 insofar as it related to highway corridors was dealing with a subject in which the Republic of Panama had *reserved* certain rights from the earliest treaty. Therefore, the recognition of Panama's "*jurisdiction*" over a highway corri-

ma Railroad or for the operation, maintenance, sanitation, or defense of the Panama Canal: *Provided,* That any such instruments of conveyance shall contain a provision under which the Panama Railroad Company and any of its successors in interest agrees to fully protect the Government of the United States against any claims for damages or losses heretofore or hereafter incurred by any lessee of any of the lands covered by such conveyance. The authority conferred by this section shall not be exercised after June 30, 1944.

(a) Any conveyance of any land in pursuance of the authority contained herein shall be deemed to release any and all reversionary rights of the United States in said property.

(b) The provisions of the joint resolution entitled "Joint resolution authorizing the disposal of certain lands held by the Panama

Railroad Company on Manzanillo Island, Republic of Panama," approved July 10, 1937, so far as they may conflict with the provisions of this joint resolution, are hereby modified accordingly.

Sec. 3. There is hereby authorized to be appropriated out of any moneys in the Treasury, not otherwise appropriated, a sum not to exceed $2,700,000, to enable the Secretary of the Treasury to pay to the Republic of Panama an amount equivalent to the principal and interest paid by that government on account of the credit of $2,500,000 made available to it by the Export-Import Bank for the construction of Panama's share of the Chorrera-Rio Hato Highway, and to pay to the Export-Import Bank an amount sufficient to liquidate the remaining obligation of the Republic of Panama to that bank on account of the aforesaid credit.

Approved May 3, 1943.

dor, which the agreement provided the United States had a right to use, and which did not take any land out of the Canal Zone proper, is not an instance where property owned by the United States was disposed of. *From the inception of the 1903 treaty, the United States had never possessed the right to "interfere with the rights of way over the public roads passing through* the said zone" (Art. VI). The necessity for appellee to attempt to rely upon such unsupporting authority is an indication of the great weakness of his position.

The present case boils down to this: President Eisenhower in 1955 recognized his constitutional obligation to obtain authority from Congress to transfer a *depot* of the Panama Railroad to the Republic of Panama; but the appellee presently contends he does not need congressional approval to transfer the *entire Panama Railroad* and very substantial amounts of other property to the same party, and to reduce the entire interest of the United States in the colossal Panama Canal to a 21-year partnership with Panama solely in its operation.

With respect to prior treaties and agreements between the United States and Panama, the "past U.S. practice," as demonstrated above, has recognized the necessity of approval by *Congress* and has sought such approval by legislation whenever *United States territory or property was conveyed to Panama.* Heretofore *every* transfer of United States' property to Panama has been authorized in advance or subsequently ratified by action of *Congress.*[31] The proposed agreement flies in the face of all these "past U.S. practices" and this violates established procedures of the State Department.

B. *Senate Debate in 1943 over Transfer of United States Property to Panama.*

The Joint Resolution of 1943 which transferred the waterworks and some of the property of the Panama Railroad to Panama (57 Stat. 74) was the subject of debate

in the Senate in which some Senators expressed the opinion that the disposition should have been made by Treaty, and not by resolution of both Houses (*see* 88 Cong. Rec. 9320 *et seq.*). The scope of Art. IV was discussed at considerable length. Senator Hiram Johnson of California argued that the resolution was dealing with "property of the United States" and that the Senate should "perform its constitutional function" by disposing of it by treaty. However, his views did not prevail against those pointing to the specific character of the language in Art. IV, § 3, cl. 2.

On December 3, 1942, Senator Connally of Texas, Chairman of the Senate Foreign Relations Committee, discussed the pending Senate Joint Resolution 162, which was to similar effect as the House Joint Resolution which eventually authorized the transfer. He quickly addressed the sentiment that a treaty should be the implementation instead of a Joint Resolution by the Congress:

Mr. President, I am and have been and in the future shall continue to be ardent in my maintenance of the integrity and the rights of the Senate of the United States in all its proper functions as a branch of the Government; but the matter covered by the joint resolution has to be passed by the Congress sooner or later in some form, for the simple reason that under the Constitution of the United States, Congress alone can vest title to property which belongs to the United States. The Constitution itself confers on Congress specific authority to transfer territory or lands belonging to the United States. *So, if we had a formal treaty before us and if it should be ratified, it still would be necessary for the Congress to pass an act vesting in the Republic of Panama the title to the particular tracts of land; because "the Congress" means both bodies.*

The House of Representatives has a right to a voice as to whether any transfer of real estate or other property shall be made either under treaty or otherwise.

---

**31.** Appellee's claims with respect to the minor matters referred to in Articles VI and VII of the 1955 Eisenhower-Remon Treaty are answered at ————— of 188 U.S.App.D.C., at 1082–1084 of 580 F.2d, *supra.*

88 Cong.Rec. 9267 (Dec. 3, 1942) (emphasis added). Senator Vandenberg of Michigan then intervened to inquire why the disposition of the waterworks and some property owned by the Panama Railroad could not be by executive agreement. They became somewhat sidetracked, whereupon Senator O'Mahoney of Wyoming queried why the disposition should not be by treaty? In the course of responding, Senator Connally stated:

> Mr. President, I referred earlier in my remarks to the constitutional requirement that Congress shall exercise consent in the case of the disposal of real estate. Article IV, section 3, of the Constitution, among other things, provides:
>
> The Congress shall have authority to dispose of and make all needful rules and regulations respecting the territory or other property belonging to the United States.
>
> So that, *in any event, it would be necessary to have congressional action even though there were a treaty. In this case it would be necessary to have congressional action parting with title to these properties.*

88 Cong.Rec. 9269 (Dec. 3, 1942) (emphasis added). In response to a query from Senator Taft of Ohio, Senator Connally made the point that a treaty could be substituted for the joint resolution *if* there was subsequent enacting legislation:

> Mr. TAFT. I am somewhat hazy on the subject of why an executive agreement should be confirmed by legislation instead of being made the subject of a treaty. I myself have had considerable difficulty in drawing the line. It does not seem to me that the mere fact that some legislation is necessary to implement this particular agreement necessarily excuses it from being made the subject of a treaty.
>
> Mr. CONNALLY. As a legal proposition I think the Senator from Ohio is correct. The mere fact that legislation is required does not necessarily mean that we could not first, by means of a treaty, assume the obligations, *and then carry out the obligations by the enactment of legislation.* I will say very frankly to the Senator from Ohio—I do not think he was present awhile ago when we discussed that question—that the Senator from Texas is not prepared with the accuracy of a civil engineer to draw the boundary line between what can be done by executive agreement and what can be done by a treaty.

88 Cong.Rec. 9270 (Dec. 3, 1942). (Emphasis added).

The next day, Senator Johnson of California spoke against the resolution, as described above. Senator Tunnell responded:

> There are different methods, apparently, by which questions of international moment are met. This is not a new question. Sometimes those who have objected to the course of the Executive have been more fortunate than those who are now making this objection. In this instance the Constitution specifically provides for this method. In article IV, section 3, second paragraph, I find this language:
>
> The Congress shall have power to dispose of and make all needful rules and regulations respecting the Territory or other property belonging to the United States.
>
> It seems to me that if any other method than that of transfer by Congress had been attempted, we should have been met by the objection that Congress was the only power by which this territory or this property could be disposed of. *There is no other method or authority to dispose of property of the Nation than that which is reposed in the Congress.*

88 Cong.Rec. 9322 (Dec. 4, 1942) (emphasis added). The Joint Resolution passed 40 to 29. 88 Cong.Rec. 9320 (Dec. 4, 1942).

It cannot be said from this that the procedure there adopted by the President and *the Congress* to transfer property to Panama has the same effect as a binding judicial precedent. It must be recognized, however, that the Senate did understand the nature and importance of the issue and its constitutional—and political—ramifications; and

in an instance where United States property of much less value than is here involved was being transferred, the Senate did decide that the proper procedure called for legislative action of the *Congress.* In our review of past practices, it is also important that this was another case involving the transfer of land to Panama.

## V. THE HISTORY OF THE TREATY CLAUSE IN THE CONSTITUTIONAL CONVENTION AND ITS RELATION TO THE DISPOSITION OF PROPERTY BELONGING TO THE UNITED STATES

Appellee contends that the Constitutional Convention

adopted a proposal that required two-thirds of the Senate to concur in all treaties, *including peace treaties involving cessions of territory.* 2 Farrand, *supra,* at 544, 549 . . . [which] demonstrate[s] that the framers of the Constitution contemplated the transfer of United States territory and property by treaty.

Appellee Br. at 11 (emphasis added). No such proposal was finally adopted. On September 4, 1787 the working draft of the proposed Constitution provided:

Sect. 4. The President by and with the advice and consent of the Senate, shall have power to make treaties . . . But no Treaty shall be made without the consent of two-thirds of the Members present.

2 Farrand, The Records of the Federal Convention of 1787, 495 (rev. ed. 1929) (hereafter "Farrand").

On September 7, the words "(except Treaties of Peace)" were added after the word "Treaty." [32] 2 Farrand, 533. Under this amendment, a *majority* vote of the Senate could have ratified a *peace treaty.*

Thereupon a motion was made to add the following amendment:

But no Treaty of Peace shall be entered into, whereby the United States shall be deprived of any of their present Territory or rights without the concurrence of two-thirds of the members of the Senate present.

2 Farrand, 534. This amendment was *defeated* by adjournment, 2 Farrand 534, 543, and was never offered again.

The very next day, as the first order of business, the convention *struck* the previously adopted amendment, *i. e.,* "(except Treaties of Peace)" from then section 4 by a vote of eight states to three. 2 Farrand 544, 548–549. Thus, even that clause never became part of the treaty provision.

Thus, the convention eventually rejected the proposal that peace treaties should be ratified by a majority vote of the Senate, and by adjourning, it also rejected the proposal to add a specific provision that treaties of peace *transferring United States Territory or rights* would require a two-thirds vote if other peace treaties could be ratified by majority vote. Appellee's brief and argument overlook these facts.

The mere offering, consideration, and rejection of the amendment as to United States "territory and rights" does not support appellee's claim "that the framers of the Constitution contemplated *the transfer of United States territory and property by treaty.*" [33] Appellee Br. at 11 (emphasis added). Had the amendment with respect to the "territory and rights" become part of the treaty clause of the Constitution, appellee's interpretation would have been correct, but that amendment, contrary to appellee's representation, never even reached the voting stage. 2 Farrand, 534, 543. Thus, the convention proceedings with respect to that amendment do not support

---

**32.** 2 Farrand 533 states: "which passed in the affirmative." *See also, id.,* 541.

**33.** None of the debates or amendments at the convention referred to United States "property." The concern of the delegates was with territorial and other rights, such as navigational rights on rivers and offshore fishing rights and the rights of sovereignty over such land and areas. Property rights, such as the United States owns in the physical property of the Panama Railroad and the Panama Canal which were purchased or constructed on land that was purchased, were not debated in the convention. The clarity of the reference to "property" eliminated need for debate.

appellee's present contention, and the temporary inclusion of peace treaties does not support an interpretation that the naked treaty power which was eventually voted included the right to cede territory. Even if a "Peace Treaty" could, they are a peculiar breed with their own characteristics, and insofar as they cede property they are usually recognizing that the property has already passed from their domain. The conclusive answer to that argument, however, is that we are not here concerned with a "Peace Treaty."

Doubtlessly, the two members who offered the amendment with respect to "territory and rights" were of the view that treaties could transfer territory and rights of the United States (to be) and of the particular states; but these amendments were defeated and there is no indication that the movers (Williamson and Spaight, 2 Farrand 543) took cognizance of the provision of the present Art. IV, § 3, cl. 2, which at that time was in its present form, except for its reference to "Legislature" which was later changed to "Congress" (2 Farrand 459, 466).

In this matter, however, we should be guided more by the *action* of the Convention as a whole and by the interpretation evident from *rejection* of the proposed amendment by a substantial majority of states. In this inquiry there is nothing in the convention proceedings to refute the conclusion that the majority rejected the amendment because it interpreted the then-existing broader language that became Art. IV, § 3, cl. 2 as providing better protection for their interests through *Congress* than would have been possible through the defeated addendum to the treaty clause. In believing they had guaranteed that no territory or property belonging to the United States could be disposed of except by *the Congress* the Framers of the Constitution were concerned lest the President and 10 Senators (two-thirds of a bare quorum), possibly from only 5 states, would be empowered to dispose of United States territory and property. This was a real concern because the Senators under the Constitution were to be "chosen by the [state] Legislature" and were to be representatives of the states, whereas the "House of Representatives [was] . . . chosen . . . by the People," and was considered to be their direct representatives—much like the House of Commons in England. In those days transportation from the outlying states of the newly formed nation was also slow, uncertain and difficult and there was always the possibility that the Senate might be meeting with short quorums. Hence the Framers were concerned that the assured broader representation of the House should be reflected whenever the President sought to dispose of Government territory or property particularly to foreign powers. The House of Representatives was also apportioned equally throughout the United States on the basis of population. Despite the Seventeenth Amendment providing for direct election of Senators, they are still elected from states without any apportionment based on population and the language of Art. IV, § 3, cl. 2, has not been changed or altered in any respect. Therefore, the territorial and property disposition provision retains the same intent as when it was originally composed by Gouverneur Morris and adopted by the Constitutional Convention—11 states to 1.

Any member who relied on what became the property disposition clause of Art. IV would have voted for adjournment on September 7 against the territorial amendment discussed above, and would have had no reluctance to vote for the Constitution in the form in which it was submitted with Art. IV, § 3, cl. 2 as at present.[34]

**34.** In other words, appellee's argument reasons as follows: At the outset, the draft of section 4 under consideration said that a treaty required for approval a two-thirds vote of the Senate. A majority thought that peace treaties were good, and therefore adopted an amendment excepting peace treaties from the two-thirds requirement (and thereby requiring only a majority). But at least two of the Framers thought that this authorized the transfer of territory with only a majority vote, and therefore sought to except peace treaties that transferred territory from the peace treaty exception (which would require a two-thirds vote to transfer property).

The majority also refers to the history of the state ratifying conventions, and concludes therefrom that the states—in addition to the Framers—were satisfied that a two-thirds requirement in the Senate, rather than full congressional approval, served as an adequate check on the alienation of United States territory.

Such a broad conclusion cannot be drawn from the history of the state conventions. Typical of the majority's position is reliance on a proposed amendment at the Virginia ratifying convention, which read in full as follows:

> [N]o commercial treaty shall be ratified without the concurrence of two thirds of the whole number of the members of the Senate; and no treaty ceding, contracting, restraining, or suspending, the territorial rights or claims of the United States, or any of them, or their, or any of their rights or claims to fishing in the American seas, or navigating the American rivers, shall be made, but in cases of the most urgent and extreme necessity; nor shall any such treaty be ratified without the concurrence of three fourths of the whole number of the members of both houses respectively.

3 Elliot's Debates in the Several State Conventions on the Adoption of the Federal Convention 660 (1907). Irrespective of the statements of the participants of the Virginia convention, who may well have been laboring under the mistaken pretense that Art. VI was not operative in this area or who may not have even thought about that section at all, a wholly permissible conclusion to be drawn from the *rejection* of this amendment was that the provision in Art. IV for a vote of the *full Congress* for dispo-

sition of territory or property was an adequate safeguard. The statements of parties who suggested such amendments, in their honest but mistaken fear that the treaty power alone allowed the disposition of territory or property in circumstances such as are here present, and then had their amendment defeated, do not constitute an authoritative interpretation of the scope of Art. II.

## VI. ELEVEN PRIOR TREATIES

Appellee's brief and the Committee Report[35] both refer to eleven treaties supplied by the Department of State and argue that such treaties were couched in self-executing terms and constitute examples of the transfer of United States territory or property to other nations, and in some instances to individuals, *without a prior congressional act authorizing such transfer.* It is further asserted that these instances support the contention that Art. IV, § 3, cl. 2 of the Constitution permits the President through a treaty to dispose of property belonging to the United States without approval of "the Congress."[36] We examine each of these treaties for verification of the asserted interpretation; and we find little or no support therefor.

### A. Indian Treaties

1. *The Treaty with the Cherokee Nation of December 29, 1835 (78 Stat. 478).*—This treaty was *preceded* by the Act of May 28, 1830, by which Congress authorized the exchange of western lands for the Cherokee's eastern lands in connection with their removal to lands west of the Mississippi River. However, the 1835 treaty, in some re-

Eventually all amendments were defeated, and a two-thirds vote was required for all treaties. Appellee reasons that since the two Framers above "got their way," the Convention believed that territory could be transferred by treaty without an Act of Congress. This does not necessarily follow, as the text demonstrates. It may have been that when the two Framers proposed their amendment, a substantial number of the convention realized that the amendment could well pass, and that that would create a conflict—or perhaps erase—the action taken earlier, namely Art. IV, sec. 3, cl. 2,

which allowed only *Congress* to dispose of property and territory. Faced with this prospect, a majority might have decided to abandon the peace treaty exception altogether, so as to preserve the language in Art. IV without compromise. Their reconsideration of the peace treaty exception, and its eventual rejection, is consistent with this interpretation.

**35.** Committee Report, at 68.

**36.** *Id.*

spects, exceeded the statutory authorization as to the lands that were to be transferred, and citizens who took title to some lands subsequently transferred from the Indians were subjected to attacks upon their title. *Holden v. Joy,* 84 U.S. (17 Wall.) 211, 21 L.Ed. 523 (1872), involved such a controversy. The Court held, in effect, that those who received land from the Indians acquired good title because Congress, by appropriating some four-and-one-half million dollars to carry out the treaty, had in effect ratified the *ultra vires* acts of the treaty

negotiators. In so ruling, the Court's opinion recognized the issue as to whether a treaty could convey lands belonging to the United States, but then stated:

> It is not necessary to decide the question in this case, [whether the treaty conveyed title without Congressional approval] as the treaty in question has been fully carried into effect, and its provisions have been repeatedly recognized by Congress as valid.

84 U.S. (17 Wall.) at 247.[37] Thus, far from holding that a treaty can transfer property

**37.** At 84 U.S. (17 Wall.) 247, the Court stated:
[T]here are many authorities where it is held that a treaty may convey to a grantee a good title to such lands without an act of Congress conferring it, and that Congress has no constitutional power to settle or interfere with rights under treaties, except in cases purely political.
The cases cited in the footnote to this statement do not support the argument that the President by Treaty is empowered to transfer the Panama Canal and Railroad. The cases cited are:
1. *Wilson v. Wall,* 73 U.S. (6 Wall.) 83, 89, 18 L.Ed. 727 (1867). This case is only authoritative on part of the *Holden* statement, and has no significance for the transfer of the Panama Canal and Railroad. A treaty between the United States and the Choctaw Indian Tribe entitled each Choctaw head of family to a section of land. The treaty was signed in 1830; in 1834, Wall, a Choctaw, entered into an agreement with Wilson to transfer the land to him as soon as he obtained it. He made the transfer in 1836, and was paid $750. Wall's children then sued Wilson for the land, alleging a constructive trust in their favor. Wilson claimed a bona fide purchaser defense. The Alabama Supreme Court held for plaintiffs, and the Supreme Court reversed.
Congress became involved in 1841; complaints concerning the Indians losing the land in the manner above caused Congress to enact a statute clarifying part of the treaty. The Court said what Congress did would not affect the case:
Now, while it is freely conceded that this construction given to the treaty should form a rule for the subsequent conduct of the department, it cannot affect titles before given by the government, nor does it pretend to do so. Congress has no constitutional power to settle the rights under treaties except in cases purely political. The construction of them is the peculiar province of the judiciary, when a case shall arise between individuals. The legislature may prescribe to the Executive how any mere administrative act shall be

performed, and such was the only aim and purpose of this act.
73 U.S. (6 Wall.) at 89. Thus, this case merely holds that a subsequent act of Congress cannot affect titles that were valid when conveyed. It does not control or even offer any assistance on the facts in the instant case.
2. *American Insurance Co. v. 356 Bales of Cotton,* 26 U.S. (1 Pet.) 511, 542, 7 L.Ed. 242 (1828), involved the validity of the judgment of a Territorial Court which ordered the purchaser of cotton salvaged from a shipwreck off Key West to make restitution to the insurer. The court held in an opinion by Chief Justice Marshall that the treaty with Spain ceded Florida to the United States and thereafter *Congress* was authorized to provide for the creation of territorial courts with admiralty jurisdiction. This upheld the establishment of a territorial court by the territorial legislature. The Court simply noted that *Congress* passed an act authorizing a Territorial Government, and that such government was thereby authorized to establish the court in question.
3. *Foster v. Neilson,* 27 U.S. (2 Pet.) 253, 7 L.Ed. 415 (1829): This case involved a dispute over land that was located in territory acquired by the Louisiana Purchase (the Treaty of Paris, 1803). Plaintiffs claimed under a grant from the Spanish Governor in 1804; defendants answered that the land had been ceded to the United States by France in 1803, and that plaintiffs grant was void. The dismissal of the petition was affirmed by the Supreme Court. First, the Court said that the "Legislature" had undertaken certain acts amounting to a construction of the 1803 Treaty which the court could not oppose. The Acts were passed by Congress, and concerned rules and regulations for the management of the new territories.
A question like this respecting the boundaries of nations, is, as has been truly said, more a political than a legal question; and in its discussion, the courts of every country must respect the pronounced will of the Legislature. [*i. e.,* Congress].
27 U.S. (2 Pet.) at 309.
Part of the case also involved the construction of Art. VI of the 1819 Treaty with Spain

belonging to the United States without Congress, the case recognizes the require- ment of congressional authorization and holds that when land is transferred in a

which provided in effect that grants from Spain prior to the Treaty would be respected by the United States, *i. e.,* "ratified and confirmed." The question was whether the treaty was self-executing with respect to the grants, or whether an Act of *Congress* was necessary to "ratify and confirm" and thereby respect the grants. The Court said the *Legislature* must act; that it had not done so here, and thus prior laws would be respected. The Court stated:

> A treaty is in its nature a contract between two nations, not a Legislative Act. . . . Our Constitution declares a treaty to be the law of the land. It is, consequently, to be regarded in courts of justice as equivalent to an Act of the Legislature, *whenever it operates of itself without the aid of any legislative provision.* But when the terms of the stipulation import a contract—when either of the parties engages to perform a particular act— the treaty addresses itself to the political, not the judicial department; and *the Legislature must execute the contract before it can become a rule for the court.*

27 U.S. (2 Pet.) at 314 (emphasis added). This is not inconsistent with the position that a legislative provision is necessary under Art. IV *to convey* property of the United States. This case is not authority for the proposition that Congress has no role; if anything, it tends the other way.

4. *Worcester v. Georgia,* 31 U.S. (6 Pet.) 515, 8 L.Ed. 483 (1834). This case concerns a treaty with the Cherokees. Petitioner (a missionary) was a prisoner who claimed that the law under which he was convicted was void, being repugnant to the United States Constitution. The opinion stated:

> [The Constitution] confers on Congress the powers of war and peace: of making treaties, and of regulating commerce with foreign nations, and among the several States, and with the Indian tribes. The powers comprehend all that is required for the regulation of our intercourse with the Indians. They are not limited by any restrictions on their free actions . . . The Constitution, by declaring treaties already made, as well as those to be made, to be the supreme law of the land, has adopted and sanctioned the previous treaties with the Indian nations, and consequently admits their rank among those powers who are capable of making treaties . . .

This language of the case does not approach the issues raised by the attempt to transfer and convey the Panama Canal and Railroad and other United States property.

5. *Crews v. Burcham,* 66 U.S. (1 Black) 352, 17 L.Ed. 91 (1861) is another case involving a reservation of Indian lands. The decision holds that the reservation creates an equitable estate. The opinion does not discuss the authority or power of Congress.

6. *The Kansas Indians,* 72 U.S. (5 Wall.) 737, 18 L.Ed. 667 (1866): The issue here was whether land belonging to the Shawnees was taxable by a county government. It was held that so long as the "treaties and laws of Congress" protect the Indians, they are immune from the operation of state laws. This recognizes the authority of *treaties and Congress* in said matters. The scope and authority of Congress was not otherwise discussed.

7. *Mitchel v. United States,* 34 U.S. (9 Pet.) 711, 9 L.Ed. 283 (1895) similarly does not control here. Mitchel and the United States both claimed certain land in Florida under deeds of conveyance. Mitchel's claims were based on deeds from Indian tribes, and the United States claims were asserted on the basis of the treaty with Spain. The issue was whose deed was superior. In stating the facts, the Court remarked:

> In taking possession of Florida pursuant to the treaty, and in establishing a government in and over it, Congress have acted on the same principles as those which were adopted by this court in the former cases. *In the Act of 1821, for carrying the treaty into execution, Congress authorizes the vesting the whole power of government in such person as the president may direct for the maintaining the inhabitants in the free enjoyment of their property.*

34 U.S. (9 Pet.) at 736 (emphasis added). In so acting Congress was relying upon Art. IV, § 3, cl. 2, which was the source of its power to *"make all needful Rules and Regulations respecting the Territory . . . "* (Emphasis added). Thus, the power to make rules and regulations concerning the proper management of the new territories was recognized as existing in Congress, and since the power to dispose of United States property is subject to the same language of the Constitution, there is some support for concluding that such power was also vested exclusively in Congress. Of course, there are some inherent differences between the acquisition of property and the government of property after it is acquired; but we are not dealing here with a contemporaneous disposition of property that is being acquired, but instead are dealing with property that has belonged to the United States for a long time, some of it since 1903. So any reason for applying a different rule as to exclusivity is non-existent.

Thus there is no reason why *Congress* should not be recognized as possessing the exclusive power to dispose of Government property. In other words, if disposition of property is a concurrent power, the power in general must be concurrent with respect to *all aspects* of Art. IV, § 3, cl. 2. Since such power is *not* concurrent with respect to rules and regulations of

treaty in excess of statutory authorization, the transfer may be legalized by a subsequent act of "Congress" which in some affirmative manner indicates approval of the otherwise *ultra vires* act.

2. *The Treaty of October 2, 1863 with the Red Lake and Pembina Bands of Chippewa Indians (13 Stat. 667).*—Appellee points to Art. IX of this treaty signed by President Lincoln as an alleged transfer of property not consented to by Congress. That article provided: "there shall be *set apart from the tract hereby ceded* [to the United States by the Bands of Chippewa Indians] a reservation of (640) six hundred and forty acres near the mouth of Thief River for the Chief 'Moose Dung' . . . " The validity of the reservation to Chief Moose Dung was involved in *Jones v. Meehan,* 175 U.S. 1, 20 S.Ct. 1, 44 L.Ed. 49 (1899),[38] which considered the validity of a subsequent lease made by one who inherited from the chief. Appellee cites the court's decision upholding the lease for the rule that property of the United States may be transferred to individuals by treaty between the United States and Indian tribes *without any act of Congress* or any patent

from the President. When the facts of this Indian treaty are analyzed, it is clear, however, that the authority of the case is limited to reservations of land made in treaties *between* the United States and Indian tribes, which were treated as being akin to nations. *See* following discussion of the Indian treaties.

3. *Summary.*—The early treaties with Indian tribes are *sui generis* as treaties. They are not treaties in the ordinary sense of the word as all have recognized since Congress in 1871 enacted a law prohibiting any "contract by treaty" with any Indian tribe or nations:

> That hereafter no Indian nation or tribe within the territory of the United States shall be acknowledged or recognized as an independent nation, tribe, or power with whom the United States may contract by treaty: *Provided, further,* That nothing herein contained shall be construed to invalidate or impair the obligation of any treaty heretofore lawfully made and ratified with any such Indian nation or tribe.

Act of March 3, 1871, 16 Stat. 566. Had Indian treaties been true treaties in the

---

newly acquired territory, it should not be concurrent with respect to the other powers in the relevant paragraph.

8. *United States v. Brooks,* 51 U.S. (10 How.) 442, 13 L.Ed. 489 (1850), involved the construction of a supplemental article to a treaty with the Caddo Indians. It held that *Indian Lands reserved* to Indians by treaty were held by them in fee simple since they acquired perfect title by treaty. Since it involves land *reserved* for Indians, it is in the same category as the other Indian treaty cases and it does not affect this case.

9. *Doe v. Wilson,* 64 U.S. (23 How.) 457, 461, 16 L.Ed. 584 (1859), involved Indian lands, but contains no reference to the scope of Congress' authority to dispose of property. The decision holds the Indian was a tenant-in-common with the United States and that the deed of conveyance by the Indian, which he executed prior to selection of the lands, conveyed the interest he would have taken if living.

10. The last two cites are *Blair v. Pathkiller,* 2 Yerg. 407 (1830), and *Harris v. Doe,* 4 Blackf. 369 (1837). They are state cases.

*Blair v. Pathkiller,* a Tennessee decision, involved a claim of title and the effect of Indian Treaties and state statutes enacted before the adoption of the Constitution of the United States. The *reservation* of 640 acres to the

head of each Indian family was held valid pursuant to treaties with the Cherokees of 1817 and 1819. The court pointed out that part of the consideration paid to the Cherokee Nation for its title to the land ceded was the reservation to the Indians of certain lands which were the subject of the litigation.

*Harris v. Doe* is an Indiana Supreme Court decision on an action in ejectment from land ceded by the Miami Indians by treaty to the United States and by the same treaty granted to Lafontaine and son, the predecessors in title of the defendant. The trial judge charged the jury that it could consider as evidence a special law of Congress as confirming the fee in the predecessor of the defendant. This decision is subject to the same infirmities as support for appellee's treaty contention as the other Indian Treaty cases and is additionally weakened by the fact that Congress did find it necessary to enact a law to confirm the title of one who claimed under a treaty.

38. In the Supreme Court, Later-Secretary of State, Frank B. Kellogg, was a counsel on the brief of appellee and Cushman K. Davis, one of the Plenipotentiaries of the United States in the 1898 Treaty with Spain, argued the case.

constitutional sense *Congress* could not have prohibited the President from so contracting by treaty. While the Act took the form of providing that Indian tribes shall not be "acknowledged or recognized" as "independent," the statute clearly prohibited the President from negotiating treaties with any Indian tribe that was "independent." The Act was thus in form a clear restriction on the treaty power, but actually it recognized that the Indian treaties were something different than the treaties referred to in the Constitution.

They have special features that generally make them inapplicable as authority that a treaty can dispose of other types of United States property without an Act of Congress. This is true because generally the subject of the Indian treaties was land owned and occupied by the Indians, which the United States was buying or acquiring. The treaty "reserved" some of the land for the Indians. Thus, property of the United States was not *disposed* of by the treaty.

Attorney General Taney in an opinion on September 20, 1833 stated: "These reservations [of Indian land in treaties] are *excepted out of the grant made by the treaty and did not therefor pass by it.* Consequently the title remains *as it was before* the treaty, that is to say *the lands reserved are still held under the original title.*" 175 U.S. at 12, 20 S.Ct. at 5. Mr. Justice Nelson in *Gaines v. Michelson*, 50 U.S. (9 How.) 356, 13 L.Ed. 172 (1850), pointed out that in such transactions, "it was so much carved out of the territory ceded, and remained to the Indian occupant, *as he had never parted with it.* He [the Indian] holds strictly speaking *not under the treaty* of cession but under his original title confirmed by the government in the act of agreeing to the reservation." 50 U.S. (9 How.) at 365.

In the *Per Curiam* opinion a statement in *Jones v. Meehan, supra,* 175 U.S. at 12–14, 20 S.Ct. 1, is cited as authority that the Taney opinion and the decision in *Gaines v. Michelson, supra,* were "irreconcilable with later Supreme Court opinions . . ." (*Per Curiam,* n. 19). This may be explained by virtue of a change in the statute after

*Jones v. Meehan, supra,* which eliminated the prohibition against individuals purchasing or leasing from any individual Indian. Act of June 30, 1834, c. 161, § 12, 4 Stat. 730.

But whether the treaty confirmed the Indian right or granted a new right is not dispositive of the question as to whether there was a disposition of territory or property belonging to the United States. Those treaties dwelt with territory and property and in doing so they dwelt with sovereignty over the territory and the right to individual patches of soil, as Chief Justice Marshall noted in *Johnson v. McIntosh*, 21 U.S. (8 Wheat.) 543, 5 L.Ed. 681 (1823). They also in some instances involved disputed claims to both territory and soil. In settling on the tribes the reserved territory the sovereign rights of the respective parties were involved, but in the "reservation" of specific acreage of *soil* to individual Indians, different claims were involved and this phase of the agreements was more concerned with what might be termed "property." It is clear that at one time such "reservations" were considered as a recognition of land already owned by the Indians. This would be particularly true where the Indian at the time actually occupied the soil. In any event even *Jones v. Meehan, supra,* recognized that the land reserved to Chief Moose Dung on his death passed to his eldest son "by the laws, customs, and usages of the tribe . . ." What the *Per Curiam* opinion, and many other opinions in this field fail to recognize is that the individual Indians acquired title by virtue of the *treaty* and that it is not completely correct to say that the United States granted the title. The treaties were the act of two governments. The Indians as possessors had far the greater claim to the extent that they actually occupied the soil and the grantors in the treaty were not solely the United States but included both signatories. And insofar as the right to the soil was concerned more came from the Indians than from the United States. It would hardly be correct to consider that soil actually occupied by an Indian for centuries was property belonging to the United States. The

United States generally recognized the rights of such possessors, and though Indian *claims* to broad territory were only recognized as a right of occupancy, the reservation of individual tracts was on a different footing and generally by one device or another were found to be vested in fee simple ·in the actual Indian occupant. *Jones v. Meehan, supra*, 175 U.S. at 32, 20 S.Ct. 1, is a good example.

By way of conclusion on all these Indian treaties, in short, I deny that recognizing the ancestral right of Chief Moose Dung to pitch his tepee by the waters of Thief River is sufficient legal authority to give away the entire Panama Canal without benefit of Congress. Claiming support from such decision indicates the weakness of appellee's case because the character of the two treaties, the relationship of the signatories, the consideration involved, the nature of our interest or claim to the property involved and our relationships to them are all different in material respects.

Therefore, the treaties with the Cherokees, the Chippewa Indians, and the transfer to Chief Moose Dung do *not* constitute authority that the Panama Canal Zone property of the United States may be transferred to Panama without the approval of *the Congress*. The same general *modus operandi* was followed in other Indian treaties.

This also disposes of the decision in *Francis v. Francis*, 203 U.S. 233, 27 S.Ct. 129, 51 L.Ed. 165 (1906), cited in the *Per Curiam* opinion. That is another Indian treaty case which interpreted one of the usual "reservations" that the Indians customarily made when they transferred some of their lands to the United States by treaty. As in the other Indian treaty cases, the first Justice Harlan's opinion did not overturn the Chancellor's ruling that the named Indian "and his heirs" obtained a fee simple estate in Indian lands which were "reserved [and] did *not* pass to the United States by the Treaty" (emphasis added) because under a rule of property in Michigan where the lands were located "[t]he term *reservation* was equivalent to an absolute grant." The re-

sult in that respect was not disturbed. Thus, again the peculiarities of a reservation by Indians of their own lands in a joint treaty with the United States, belies the fact that the title passed by the treaty was to property (soil) that actually belonged to the United States. A more accurate description of the actual situation would be that the Indians never relinquished their claim and the treaty confirmed their title. These Indian treaties thus, to a certain extent, fall within treaties dealing with disputed claims. The citation of *Francis* by the *Per Curiam* opinion at page —— of 188 U.S.App.D.C., at page 1062 of 580 F.2d overlooks the fact that it was the treaty of *both* parties that vested complete title, not the sole act of the United States. The case does not hold that the United States could transfer the soil by deed.

It also goes without saying that even if the Indians and the United States could jointly convey property to an Indian by a reservation of soil that he claimed, such precedents are not authority for the United States transferring property to Panama that is owned outright by the United States. The Panama Canal Treaty is an unquestioned disposition of property of the United States. The Indian treaties disposed of disputed territory and recognized claims of individual Indians to particular soil. This case is of interest though for another reason: it holds that the President, *"without the authority of an act of Congress,"* was not authorized to agree in the Treaty to a proviso that none of the reserved Indian lands could be conveyed without his consent. To a certain extent this recognizes that in Indian treaties the title is not conveyed to reservees but more accurately is merely recognized. *See* 50 U.S. (9 How.) at 365.

### B. *Treaties With Foreign Nations*

1. *Treaty of February 22, 1819 between the United States and Spain (8 Stat. 252).*—Spain ceded all of east and west Florida to the United States. The parties also agreed upon a boundary west of the Mississippi River beginning at the mouth of

the Sabine River in the Gulf of Mexico, thence generally north and west to the Red River and the Arkansas River, and thence to the source of that river, and thence due west along the 42nd line of latitude to the South Sea (Pacific Ocean). On both sides of that boundary line, the respective parties ceded to each other their *claims* and pretentions to the territory in question. The treaty indicated that the parties did not know the precise source of the Arkansas River and, particularly in the mountain areas, neither nation was sufficiently familiar with much of the areas traversed by the newly drawn boundary lines to know precisely what was accomplished. This indicated the "claim" nature of the asserted rights.

Taken by its four corners, this treaty is hardly a disposition of United States property. It is a mutual relinquishment of boundary claims which is a usual subject of diplomacy, particularly in undeveloped areas. The settlement of many boundary disputes are more the settlement of claims rather than transfers of property.[39]

2. *Treaty of August 9, 1842 between the United States and Great Britain (Webster-Ashburton Treaty) 8 Stat. 572.*—This settled the boundary between the United States and Canada from the east through the Great Lakes, the present boundary waters and thence to the Rocky Mountains along the 49th parallel. Like the prior treaty, the parties here did not know where the boundary line they drew would begin to run westward from the Lake of the Woods. One result of this arrangement was the odd "Northwest angle" in Minnesota, which is completely separated by water from all United States territory. The treaty recognized prior grants of land by both countries in disputed areas. This agreement is within the traditional treaty-making function and does not qualify as a disposition of territory. It would be hard to point to the transfer of any *property* that belonged to the United States. This treaty is a perfect example of the settlement, in many respects, of highly questionable claims and not of the transfer of territory or property.

3. *The Treaty of June 15, 1846 between the United States and Great Britain. The Oregon-Washington boundaries (9 Stat. 869).*—The treaty recited that there was "doubt and uncertainty . . . respecting the sovereignty and government of . . . the northwest coast of America . . . westward of the Rocky or Stony Mountains." The treaty continued the boundary line westward from the Rocky Mountains along the 49th parallel, and recognized the navigational rights on the Columbia River of the Hudson Bay Company and of British subjects on an equal footing with American citizens. This is another example of the settlement of doubtful and uncertain claims of the respective parties and not a transfer of property.

4. *Treaty of February 1, 1933 between the United States and Mexico (84 Cong.Rec. 9824).*—This treaty rectified the boundary along the Rio Grande River in the vicinity of El Paso and the Juarez Valley. The treaty involved a typical, minor boundary matter. Nevertheless, this Treaty looked to Congress for approval: Art. VIII provided that "[e]ach Government shall respectively secure title . . . ." Art. VII also provided that "Lands within the rectified channel . . . [that] pass from . . . one country to . . . the other . . . *shall be acquired in full ownership by the [respective] Government . . . .*" The treaty was thus executory and, moreover, since it required the appropriation of money, it looked to supporting enactments by the Congress of the United States and did not purport to be self-executing.

5. *Treaty of August 29, 1963 between the United States and Mexico: Solution of El Chamizal, 15 U.S.T. 21.*—This relocated the shifting channel of the Rio Grande River in the vicinity of El Paso and Juarez, and drew a boundary line at the center of a new channel for the river. By this arrangement, 823.50 acres of former United States land was ceded to Mexico by the treaty. However, far from this being an instance where the President attempted to transfer

---

**39.** *See* notes 23 and 24, *supra,* and accompanying text.

United States territory or property by a self-executing treaty without prior congressional act, *the treaty in Art. 6 specifically recognized the constitutional requirement and provided that the acquisition of the lands be transferred to Mexico and the rights of way for that portion of the new river channel in the territory of the United States shall not occur until "after . . . the necessary legislation has been enacted for carrying it out . . ."* This treaty thus supports appellant's contentions and not those of the appellee. That appropriations were also required may have been an additional reason for recognizing the constitutional role of Congress but that apparent necessity here has not caused the President to recognize the role of Congress. *Cf. Per Curiam* opinion, at —— n. 22, of 188 U.S. App.D.C., at 1063–1064 n. 22 of 580 F.2d. In its discussion of this Mexican treaty the *Per Curiam* opinion recognizes the necessity in that instance for approval by *Congress* because the treaty required implementing legislation (*Per Curiam* op., n. 22). The implementing legislation required by the Panama Canal Treaty will make that necessitated by the Mexican Treaty pale into insignificance.

6. *Treaty of November 23, 1970 between the United States and Mexico (23 U.S.T. 371).*—This is another instance where the treaty resolved boundary differences arising from the shifting of channels. This treaty likewise was contingent and not self-executing, Article ID provided, *i. e.,* that "the necessary legislation has been enacted for carrying it out." 23 U.S.T. 377. This is another treaty that supports appellants' contention and not those of the appellee.

7. *Treaty of November 22, 1971 between the United States and Honduras: Swan Islands (23 U.S.T. 2631).*—Both governments claimed sovereignty of the Swan Islands, but the United States had for many years maintained a navigation and communications facility there. By the treaty, the United States recognized the sovereignty of Honduras and transferred certain land, buildings, and equipment to Honduras. There was a second cooperative agreement whereby the United States was to operate the navigational facilities and Honduras

was to assume responsibility for a dock and landing strip. The United States retained title to a great number of buildings and equipment except the land, and by the treaty Honduras made the areas—sites—available to the United States. This was a cooperative program for continuation of meteorological and communication facilities in Swan Islands. To the extent that any property was transferred, it was certainly minimal and hardly justified legislation. It cannot be considered as authority for transferring eight billion dollars of United States property.

8. *Treaty of June 17, 1971 between the United States and Japan (23 U.S.T. 447).*—This related to the reversion of the Ryukyu (includes Okinawa) and Daito Islands. Some of this property may have been transferred pursuant to prior congressional enactments, *i. e.,* 40 U.S.C. §§ 511 and 512. Section 511 authorizes federal agencies having foreign excess property to dispose of such property. That is definitely authorization for the transfer of what would be excess property of the United States after the reduction of our military operations on Okinawa. The treaty relinquished in favor of Japan all rights and interests under Art. III of the Treaty of Peace with Japan of September 8, 1951. Japan in turn granted to the United States the use of facilities and areas in accordance with the treaty of January 19, 1960, which was the Treaty of Mutual Cooperation and Security providing for collective self-defense. Art. IX of this treaty terminated our *temporary right of military occupation.* It is hard to construe this treaty as authority for transferring United States property by treaty without implementing legislation.

9. *Treaty of January 25, 1955 between the United States and Panama (6 U.S.T. 2283).*—This treaty, as discussed earlier, provided for the transfers of certain property. Art. V provided for the conveyance to Panama of certain lands and improvements set forth in item 2 of the Memorandum of Understanding. This included certain specified lands, including the railway terminal operations in the city of Panama, and the

railway passenger station, and Paitilla Point. The treaty, however, was not self-executing as Art. V recognized the need to comply with Art. IV, § 3, cl. 2 of the Constitution, as that Article provided that the transfer of property was *"subject to the enactment of legislation by the Congress,"* and with respect to the small amount of property in Art. VI and Art. VII, Congress *did* enact legislation with respect thereto.[40]

It must be recognized that no court has had any opportunity to pass on the validity of many of these provisions, because when property or rights are transferred in a foreign country pursuant to asserted or *de facto* authority, as the practical matter, it is difficult, if not impossible thereafter, to litigate or rescind the transfer.

### C. *Treaty Summary*

In sum, no substantial support can be found in any of the 11 treaties for appellee's contention. The Indian treaties do not support his position because of their very nature, *i. e.*, the land allegedly transferred to the Indian is his land which he reserves from transfer to the United States under the treaty. The treaties with Spain and Great Britain involved the settlement of boundary claims and this is not a boundary controversy. Indeed, it would be hard to convince Spain and the British that in these treaties, which expanded our frontiers to absorb all of Florida on the south and to stretch our boundary westward from the Louisiana Purchase to the Pacific Ocean between the 42nd and 49th parallels, the United States was disposing of its own property. Two of the three treaties with Mexico specifically recognized the need for congressional legislation and the third treaty implicitly recognized such necessity; the Honduras treaty involved very minimal amounts of property; the Japan treaty had statutory authority to transfer surplus war property and otherwise merely relinquish our temporary right of military occupation; and the 1955 Panamanian treaty specifically recognized that legislation by Congress was necessary to the transfer of United States property.

When these eleven treaties are examined and analyzed, and those are culled out wherein the constitutional requirements were complied with through the enactment by Congress of implementing legislation and thus strongly support the position of the appellant-Congressmen, it appears obvious that there is dearth, if not an almost complete absence, of any supporting authority for the action of the appellee in attempting to bypass the entire House of Representatives in this transfer to Panama of the tremendous amount of property of the United States that is here involved.

### CONCLUSION

From the foregoing it is concluded that a political question is not involved, that established procedures of the Department of State and past United States procedures involving similar agreements with Panama and others recognize and require that Congress approve the transfer of United States property, that the Restatement of Foreign Relations Law reaches the same conclusion, and that the adjudicated cases hold that the power to dispose of United States property is vested exclusively in the Congress. In my opinion, we should accordingly declare the law to be that those provisions of the pending treaty which dispose of territory or property belonging to the United States to the Republic of Panama cannot come into force under the Constitution of the United States until approved by the Congress. In my view, because of the parties involved, it would not be necessary to issue an injunction.

The Report of the Senate Committee on Foreign Relations of a much earlier date has much advice that could well be followed by the relevant parties in the present controversy:

> The question has been debated how far Congress would be bound to give effect, in cases requiring its cooperation, to regulations by treaty on subjects put within its express province by the Constitution.

---

40. *See* note 18 *supra.*

Whichever may be the better opinion, the doubt supplies reason enough against putting the question to trial in other circumstances than those in which the concurrence of Congress may be safely assumed. And the reason is the stronger for this forbearance from the fact that in the contingency of conflict it would be not the interests only, but the faith, too, of the nation which might be compromised, as this would have been committed by the adoption of the treaty regulations.

The condition of the Government at this point is of peculiar delicacy as regards the arrangement of its imposts. Parties have been arrayed with vehemence and the greatest sensibility awakened on the subject. Regulation by treaty in these circumstances would doubtless be carried into effect by the House of Representatives. But the temper in which the supposed intrusion might be expected to be received would be anything but cordial or placid. Ought not the occasion to be considerable, the motive urgent, to warrant the exercise of the authority at this cost? This is a topic requiring only to be displayed, not dwelt on.

2 Hinds' Precedents § 1532, at 1000.

What is the great urgency for not recognizing the constitutional right and duty of the House of Representatives to pass on the transfer of the rare property here involved? The United States by the narrow margin of one vote was enticed into accepting Panama as the first choice over Nicaragua for the location of the Canal, and the operating rights promised by Panama in the 1903 treaty were purposely designed to assure that the United States would build the Canal in Panama and not in Nicaragua.[41] Thereafter, a national treasure beyond compare in the form of an engineering marvel was created by the ingenuity and genius of American statesmen, builders, and doctors who persevered where all others had failed miserably, or failed even to begin. And with an expenditure by Congress of this nation's wealth never before equalled in history created an international public facility that has given Panama a healthful community it never before possessed, a much higher standard of living than its neighbors, and under benign United States' management benefited the entire world.

The transfer of United States territory and property in the Panama Canal Zone directly affects immense vital interests of the entire nation involving as it does significant commercial concerns and our national security. Some of these matters were pointed out by Senator Hiram Johnson of California in 1939, when, in speaking on the ratification of the Hull-Alfaro Treaty, which proposed certain amendments in our relations with Panama, he remarked:

The Panama Canal will be protected, if protected, by us. The Panama Canal, if it be retained, and if it serve its purpose [as "the life line of the Republic," *id.*, 9838], will do so because of our efforts; and the Panama Canal, because of the peculiar relation we have to it, should not be in any degree tied, or hamstrung, or put in a strait jacket by a treaty made by the United States of America.

84 Cong.Rec. 9838 (1939). The momentous nature of these national interests peculiarly qualify the House of Representatives for its constitutional role because it directly represents our entire citizenry on a uniform basis—which was the principal reason that the Framers of the Constitution directed that the entire Congress should pass on such matters.

However, regardless of disputes on other issues, one conclusion is certain. That is

---

**41.** Bunau-Varilla, Envoy Extraordinary for the Republic of Panama, in a negotiation of the treaty for the Canal decided that the prior treaty draft would not do:

The "indispensable condition of success" was to write a new treaty "so well adapted to American exigencies" that it would be certain to pass in the Senate by the required two-thirds majority. A failure to obtain that two-thirds majority, he was convinced, could still mean a Nicaragua canal after all. The major difference in the new treaty must be in the share of sovereignty attributed to the United States within the canal zone. [Perpetuity was already provided for.]

D. McCullough, The Path Between the Seas 391 (1977).

that if the present attempt successfully usurps the constitutional right and duty of the House of Representatives to vote on the disposition of United States' property of the tremendous magnitude and value of our Panama holdings a precedent of such enormity will be created that the constitutional right of the House of Representatives to vote on transfers of property to foreign nations need never again be seriously recognized.

To the extent that the President may have discretion to choose between proceeding by treaty or other forms of international agreement, he cannot avoid the constitutional requirement that the entire Congress pass on all attempts to dispose of United States' territory and property to other nations. All past practices in this field indicate that prior Presidents have recognized that obligation even when property of much less value and significance was involved.[42]

**42.** The Standing of the Members of the House of Representatives to Request a Declaration of the law

The district court concluded that it lacked subject matter jurisdiction over plaintiffs' complaint because, in its view, plaintiffs had not met the " 'irreducible constitutional minimum' of a concrete injury in fact to their legislative roles." Memo. Op. at 12–13. I disagree with this conclusion.

Recently, we have considered cases involving standing of Congressmen to bring actions in the federal courts. Judge Wilkey's opinion in *Harrington v. Bush*, 180 U.S.App.D.C. 45, 553 F.2d 190 (1977), provides a thorough discussion of the applicable analytical framework:

The *most basic point* to consider is that there · are no special standards for determining Congressional standing questions. Although the interests and injuries which legislators assert are surely different from those put forth by other litigants, the technique for analyzing the interests is the same.

There is no single test or formula to be derived from the case law to determine if a particular complaining party has standing to sue. Rather, the case law provides a *series of inquiries designed primarily*[68] *to determine if the complaining party has suffered some injury in fact.*

180 U.S.App.D.C. at 59, 60–61, 553 F.2d at 204, 205–06 (emphasis original). The injury in fact requirement is constitutionally mandated; it is one of the requirements designed to implement the Art. III "case or controversy" limitation on federal judicial power. *Association of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150, 151, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970); *Harrington v. Bush, supra*, 180 U.S.App.D.C. at 61, 553 F.2d at 206. Footnote 68 in the *Harrington* opinion outlined the four separate inquiries demanded by the Supreme Court cases on standing: (1) first, and most important, that there be an injury in fact; (2) that the interests being asserted by the plaintiffs are within the zone of interests to be protected by the statute or constitutional guarantee in question; (3) that the injury result from (or be caused by) the challenged "illegal" action; and (4) that the injury be capable of

being redressed by a favorable decision. 180 U.S.App.D.C. at 60–61 n.68, 553 F.2d at 205–06 n.68. The district court found no injury in fact, and therefore had no reason to consider the other three inquiries. As to the critical question of whether an injury in fact exists, it is my conclusion that it does.

The prior cases in this circuit provide examples of how the analytical scheme articulated in *Harrington* applies to particular situations. *Kennedy v. Sampson*, 167 U.S.App.D.C. 192, 511 F.2d 430 (1974), involved Senator Kennedy's suit against the Administrator of the General Services Administration and the Chief of the White House Records seeking a declaration that the Family Practice of Medicine Act become law on December 25, 1970, and an order requiring appellants to publish the Act as a validly enacted law. The question on the merits was the effect of President Nixon's pocket veto; a preliminary question was the standing of Sen. Kennedy to bring the suit. The court found that Kennedy had standing, as a "logical nexus" existed between the status he asserted and the claim sought to be adjudicated:

If appellants' arguments are accepted, then appellee's vote in favor of the bill in question has been nullified and appellee has no right to demand or participate in a vote to override the President's veto. Conversely, if appellee's interpretation of the veto clause is correct, then the bill became law without the President's signature. In short, disposition of the substantive issue will determine the effectiveness *vel non* of appellee's actions as a legislator with respect to the legislation in question.

167 U.S.App.D.C. at 195, 511 F.2d at 433. Thus, in *Kennedy*, the facts presented a situation where the Executive's action had in effect nullified the Senator's vote; the validity of the action was determinative on the effect of the vote. And particularly he had been prevented from exercising his constitutional right to vote on the motion to overrule. In such circumstance, this court concluded that Senator Kennedy had standing to challenge the vote.

In *Mitchell v. Laird*, 159 U.S.App.D.C. 344, 488 F.2d 611 (1973), in dictum, we recognized

the standing of thirteen members of the House of Representatives to litigate presidential war powers, when we stated that a declaratory judgment

> would bear upon the duties of plaintiffs to consider whether to impeach defendants, and upon plaintiffs' quite distinct and different duties to make appropriations to support the hostilities, or to take other legislative actions related to such hostilities, such as raising an army or enacting other civil or criminal legislation. In our view, these considerations are sufficient to give plaintiffs a standing to make their complaint.

159 U.S.App.D.C. at 347, 488 F.2d at 614.

We concluded that plaintiffs lacked standing to bring their claims in both *Harrington, supra,* and in *Metcalf v. National Petroleum Council,* 180 U.S.App.D.C. 31, 553 F.2d 176 (1977). Neither plaintiff had demonstrated a cognizable injury to his person or to his ability to function as a legislator. Nothing impeded the legislative process whatsoever. Representative Harrington sought a declaration that certain foreign and domestic activities of the Central Intelligence Agency were illegal and also an injunction prohibiting the CIA from using the funding and reporting provisions of the Central Intelligence Agency Act of 1949 in connection with allegedly illegal activities. After an extensive analysis of the supposed injuries claimed by the plaintiff, we concluded:

> Since the appellant in this case has suffered no injury in a constitutional sense, he is in effect seeking to use the court to vindicate his own political values and preferences. By so doing, appellant is asking us in large part to usurp the legislative function and to grant him the relief *which his colleagues have refused him.*

180 U.S.App.D.C. at 70, 553 F.2d at 215 (emphasis added). Since appellant failed to show an injury in fact in the constitutional sense, we affirmed the district court's dismissal of his complaint.

A similar situation was posed in the *Metcalf* case, where Senator Metcalf sought declaratory and injunctive relief, alleging that the National Petroleum Council was unlawfully functioning as an advisory committee in violation of the Federal Advisory Committee Act and the Federal Energy Administration Act. He contended that the Council was not fairly balanced in membership and was improperly influenced by certain petroleum industry interest groups. We noted that his complaint was a generalized grievance that did not allege any specific, objective, present harm or threat of harm; the nature and effect of the unspecified harm was indeterminate. 180 U.S.App.D.C. at 42–43, 553 F.2d at 187–88. Nothing impeded the functioning of Sen. Metcalf in his role as a legislator, and we affirmed the district court's dismissal of the complaint.

We next considered a claimed controversy involving seventeen Congressmen who challenged General Services Administration regulations authorizing agencies to grant rights to patents and inventions developed from federal funds. Our decision in *Public Citizen v. Sampson,* 169 U.S.App.D.C. 301, 515 F.2d 1018 (1975), affirmed without opinion the decision of the district court, reported at 379 F.Supp. 662, granting the defendant's motion to dismiss the complaint. In evaluating plaintiffs' standing as Congressmen, the district court stated:

> It is beyond peradventure that plaintiff Congressmen could tomorrow propose legislation regulating the contractual authority of the General Services Administration.

379 F.Supp. at 667. The powers of the plaintiff Congressmen in that case as Representatives were not diminished in any respect.

As noted above, an injury in fact is required for standing in all cases; with respect to Congressmen as plaintiffs, the case law in this circuit, not surprisingly, demonstrates that this court will demand a showing of an injury in fact. We could not otherwise justify our jurisdiction. In all cases, this requirement helps guarantee that the "controversy" has sufficient adverseness and that the parties have sufficient interests to make out a justiciable dispute that satisfies the Art. III case or controversy requirement. Yet in the Congressmen cases, another dimension underlies our insistence on an injury in fact. Our prior cases express concern that Congressmen might seek redress in the courts simply because they failed to persuade their colleagues in making a particular legislative judgment, or they fear that they cannot succeed in a future vote on a particular matter of legislative concern. To grant such Congressmen standing to litigate their claims in the judicial system would have the effect of circumventing the legislative process. In cases in which this court has found the existence of standing, which means that an injury in fact was found to exist, there is no apparent risk that the legislative process will be circumvented or evaded by deciding the case on the merits. It is my opinion that the Congressmen in this case have suffered and are presently suffering an injury in fact, and that the concern which underlies our prior cases—namely, that we have no jurisdiction where a Member of Congress is seeking to evade the legislative process—is simply not a factor in this case.

On September 16, 1977, President Carter transmitted to the Senate for advice and consent to ratification two treaties—the Treaty Concerning the Permanent Neutrality and Operation of the Panama Canal, and the Panama Canal Treaty. In our opinion we only consider the transfers of property provided for by the Canal Treaty and not any of the rules and regulations concerning the operations of the Canal that are in the Neutrality Treaty. The transmittal to the Senate was made without the inclusion of the usual provisions that is inserted in treaties and international agreements when any participation by the House of Representatives is called for. By this act, President

Carter conformed to an earlier opinion of August 11, 1977 by the Attorney General stating that the approval of the treaties by the House of Representatives even "absent statutory authorization" was not necessary even though the Canal Treaty disposed of United States property. The procedures implemented for obtaining the Senate's advice and consent, which continue today, did not and do not contemplate approval by the House of Representatives to any portion of the treaties. It is my view that the injury in fact to the members of the House of Representatives occurred when President Carter transmitted the treaty in the form described above, i. e., without the customary provisions for enactment of necessary legislation by Congress where United States property was to be transferred. At this point, because of the form of the treaty, it was clear that the House of Representatives could not participate, and insofar as Art. IV required its participation, that this constitutional requirement was being violated. This is a sufficient injury to accord standing. This injury in fact was further substantiated when the Report of the Committee on Foreign Relations of the Senate acceded to the opinion of the Attorney General of August 11, 1977. Senate Executive Report N, No. 95–12, 95th Cong., 1st Sess. 65–69, February 3, 1978.

The central point posed by the Congressmen's claim is that Art. IV, § 3, cl. 2 requires that the House *participate* in the disposition of property: an Act of Congress, it is alleged, is required by the Constitution. The submission of the treaty to the Senate in its present form (*See* Appendix) clearly obviates any participation of the House and since the Senate is presently concurring in that decision, whatever action the House may take is effectively blocked by the President and the Senate. It appears *extremely unlikely*—a near certainty—that the Senate will amend the treaty as submitted to permit House participation in the disposition of property. The Report of the Senate Committee on Foreign Relations states:

> The Committee finds that the . . . Panama Canal Treaty can validly transfer to Panama property belonging to the United States without a need for implementing legislation.

Committee Report, at 69. It is extremely unlikely that the Committee will change its position on this issue and recommend that implementing legislation be sought. It is extremely unlikely that the Senate as a whole will reject the recommendation of its Committee on this point. The injury that occurred when the advise and consent procedures were initiated continues *so* long as the treaty remains in its present form and House concurrence is not sought. Thus, the entire membership of the House of Representatives is suffering *present* injury to its constitutional rights.

On August 11, 1977, Attorney General Bell issued his opinion on the procedures necessary for disposition of property, with special reference to the ratification procedures for the Panama Canal Treaty. This opinion was cited and relied upon by the Senate Foreign Relations Committee. Committee Report, at 69. Therein, Attorney General Bell opined that a treaty may dispose of territory or property belonging to the United States absent statutory authorization. While an Attorney General's opinion is not binding on a court, *see Harris County Commrs. v. Moore,* 420 U.S. 77, 87 n.10, 95 S.Ct. 870, 43 L.Ed.2d 32 (1975); *McElroy v. Guagliardo,* 361 U.S. 281, 285, 80 S.Ct. 305, 4 L.Ed.2d 282 (1960); *Romero v. Coldwell,* 455 F.2d 1163, 1165 (5th Cir. 1972), there is considerable authority that it is binding on an executive official who requests the opinion on a matter of law. Here, the Secretary of State requested the opinion, and the Bell opinion is definitive on the ratification procedure to be employed.

A long line of Attorney General opinions state that the teaching in the opinion is binding as a matter of law on those who request it. 5 Op.Atty.Gen. 97, 97 (1849); 6 Op.Atty.Gen. 326, 334 (1854); 20 Op.Atty.Gen. 654, 659 (1893); 25 Op.Atty.Gen. 301, 303–04 (1904). In *Smith v. Jackson,* 246 U.S. 388, 38 S.Ct. 353, 62 L.Ed. 788 (1918), the Court stated:

> [W]e are of opinion that it is obvious on the face of the statement of the case that the auditor had no power to refuse to carry out the law, and that any doubt which he might have had should have been subordinated, first, to the ruling of the Attorney General, and second, beyond all possible question, to the judgments of the courts below.

246 U.S. at 390–91, 38 S.Ct. at 354. *United States Bedding Co. v. United States,* 55 Ct.Cl. 459, 460–61 (1920) is to the same effect. The general rule does not apply when the matter is within the proper discretion of a department official; hence, the statement has been made that opinions are only entitled to weight and are not controlling. In those circumstances, the point is simply that an opinion is not controlling in a proper area of discretion. *See Senske v. Fairmont & Waseca Canning Co.,* 232 Minn. 350, 359–60, 45 N.W.2d 640, 646–47 (1951); 17 Op.Atty.Gen. 332, 333 (1882).

Hence, it is clear that the opinion of Attorney General Bell with respect to the procedure by which the treaties would be ratified was, in effect binding on the Secretary who requested it. This buttresses our conclusion that the procedure, which did not and does not involve the House, was solidified at the beginning of the transmittal process, and the injury in fact was suffered at that time.

This injury has some similarities to that suffered in *Kennedy*; the right to vote is effectively denied by the challenged action. It is claimed by appellee that the House is free to vote on any version of the treaty; but the procedure is already decided, and the ratification process is underway. As far as the Presi-

## APPENDIX

### TEXTS OF TREATIES RELATING TO THE PANAMA CANAL

### PANAMA CANAL TREATY

The United States of America and the Republic of Panama,

*Acting* in the spirit of the Joint Declaration of April 3, 1964, by the Representatives of the Governments of the United States of America and the Republic of Panama, and of the Joint Statement of Principles of February 7, 1974, initialed by the Secretary of State of the United States of America and the Foreign Minister of the Republic of Panama, and

*Acknowledging* the Republic of Panama's sovereignty over its territory,

*Have decided* to terminate the prior Treaties pertaining to the Panama Canal and to conclude a new Treaty to serve as the basis for a new relationship between them and, accordingly, have agreed upon the following:

## ARTICLE I

### ABROGATION OF PRIOR TREATIES AND ESTABLISHMENT OF A NEW RELATIONSHIP

1. Upon its entry into force, this Treaty terminates and supersedes:

(a) The Isthmian Canal Convention between the United States of America and the Republic of Panama, signed at Washington, November 18, 1903;

(b) The Treaty of Friendship and Cooperation signed at Washington, March 2, 1936, and the Treaty of Mutual Understanding and Cooperation and the related Memorandum of Understandings Reached, signed at Panama, January 25, 1955, between the United States of America and the Republic of Panama;

(c) All other treaties, conventions, agreements and exchanges of notes between the United States of America and the Republic of Panama concerning the Panama Canal

---

dent and Senate are concerned, any action taken by the House is irrelevant and inconsequential. The House is, in fact, being denied its right to participate, and the existence of this circumstance is enough to confer standing on this court to declare the law. This is quite distinct from the situation in *Metcalf* and *Harrington* where the plaintiffs were free to enact subsequent legislation which *could affect the merits of the issues.* Here, there is nothing the House can do which will alter the fact that they are being denied any present role in the process, as may be required by the Constitution. Moreover, there is no suggestion here that a judicial ruling on the merits will circumvent the legislative process in any way. Rather, the judicial ruling sought here would *protect and implement* the constitutional legislative process.

Under these circumstances, applying the relevant precedents in this circuit and the general principles outlined by the Supreme Court, it must be said that the plaintiffs have suffered an injury in fact sufficient to confer standing. A self-executing treaty means that if it is ratified, and the exchange of documents with Panama causes it to come into force, any objection by the House of Representatives or any other person as to its validity will receive the reply that Buanu-Varilla gave to Federico Boyd in 1903 that protestations would be pointless "as everything is finished." D. McCullough, *supra* note 41, at 395.

There can be no serious dispute about plaintiffs satisfying the other three inquiries relating to standing. Clearly, the denial of the Congressmen's participatory role in the disposition of property is "within the zone of interests to be protected or regulated by the . . . Constitutional guarantee in question." *Ass'n of Data Processing Serv. Organization, Inc. v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970). Also, the injury must be such "that fairly can be traced to the challenged action of the defendant, and not injury that results from the independent action of some third party not before the court." *Simon v. Eastern Ky. Welfare Rights Organization,* 426 U.S. 26, 41–42, 96 S.Ct. 1917, 1926, 48 L.Ed.2d 450 (1976). Here, it is the President's submission of the treaties to the Senate without provisions calling for *Congress* to act in the disposition of United States property which has *caused* the denial of the plaintiffs' participatory role under the Constitution in the disposition of property. Finally, the injury must be one "likely to be redressed by a favorable decision." *Id.,* 426 U.S. at 38, 96 S.Ct. at 1924. A judicial decision interpreting the Constitution and declaring the law on the controversy can afford the plaintiffs the precise relief that they request—their participation in the disposition of property to the extent that same is provided for by the Constitution.

It is my view that plaintiffs have standing to bring this action.

which were in force prior to the entry into force of this Treaty; and

(d) Provisions concerning the Panama Canal which appear in other treaties, conventions, agreements and exchanges of notes between the United States of America and the Republic of Panama which were in force prior to the entry into force of this Treaty.

2. In accordance with the terms of this Treaty and related agreements, the Republic of Panama, as territorial sovereign, grants to the United States of America, for the duration of this Treaty, the rights necessary to regulate the transit of ships through the Panama Canal, and to manage, operate, maintain, improve, protect and defend the Canal. The Republic of Panama guarantees to the United States of America the peaceful use of the land and water areas which it has been granted the rights to use for such purposes pursuant to this Treaty and related agreements.

3. The Republic of Panama shall participate increasingly in the management and protection and defense of the Canal, as provided in this Treaty.

4. In view of the special relationship established by this Treaty, the United States of America and the Republic of Panama shall cooperate to assure the uninterrupted and efficient operation of the Panama Canal.

## ARTICLE II

### RATIFICATION, ENTRY INTO FORCE, AND TERMINATION

1. This Treaty shall be subject to ratification in accordance with the constitutional procedures of the two Parties. The instruments of ratification of this Treaty shall be exchanged at Panama at the same time as the instruments of ratification of the Treaty Concerning the Permanent Neutrality and Operation of the Panama Canal, signed this date, are exchanged. This Treaty shall enter into force, simultaneously with the Treaty Concerning the Permanent Neutrality and Operation of the Panama Canal, six calendar months from the date of the exchange of the instruments of ratification.

2. This Treaty shall terminate at noon, Panama time, December 31, 1999.

## ARTICLE III

### CANAL OPERATION AND MANAGEMENT

1. The Republic of Panama, as territorial sovereign, grants to the United States of America the rights to manage, operate, and maintain the Panama Canal, its complementary works, installations and equipment and to provide for the orderly transit of vessels through the Panama Canal. The United States of America accepts the grant of such rights and undertakes to exercise them in accordance with this Treaty and related agreements.

2. In carrying out the foregoing responsibilities, the United States of America may:

(a) Use for the aforementioned purposes, without cost except as provided in this Treaty, the various installations and areas (including the Panama Canal) and waters, described in the Agreement in Implementation of this Article, signed this date, as well as such other areas and installations as are made available to the United States of America under this Treaty and related agreements, and take the measures necessary to ensure sanitation of such areas;

(b) Make such improvements and alterations to the aforesaid installations and areas as it deems appropriate, consistent with the terms of this Treaty;

(c) Make and enforce all rules pertaining to the passage of vessels through the Canal and other rules with respect to navigation and maritime matters, in accordance with this Treaty and related agreements. The Republic of Panama will lend its cooperation, when necessary, in the enforcement of such rules;

(d) Establish, modify, collect and retain tolls for the use of the Panama Canal, and other charges, and establish and modify methods of their assessment;

(e) Regulate relations with employees of the United States Government;

(f) Provide supporting services to facilitate the performance of its responsibilities under this Article;

(g) Issue and enforce regulations for the effective exercise of the rights and responsibilities of the United States of America under this Treaty and related agreements. The Republic of Panama will lend its cooperation, when necessary, in the enforcement of such rules; and

(h) Exercise any other right granted under this Treaty, or otherwise agreed upon between the two Parties.

3. Pursuant to the foregoing grant of rights, the United States of America shall, in accordance with the terms of this Treaty and the provisions of United States law, carry out its responsibilities by means of a United States Government agency called the Panama Canal Commission, which shall be constituted by and in conformity with the laws of the United States of America.

(a) The Panama Canal Commission shall be supervised by a Board composed of nine members, five of whom shall be nationals of the United States of America, and four of whom shall be Panamanian nationals proposed by the Republic of Panama for appointment to such positions by the United States of America in a timely manner.

(b) Should the Republic of Panama request the United States of America to remove a Panamanian national from membership on the Board, the United States of America shall agree to such request. In that event, the Republic of Panama shall propose another Panamanian national for appointment by the United States of America to such position in a timely manner. In case of removal of a Panamanian member of the Board at the initiative of the United States of America, both Parties will consult in advance in order to reach agreement concerning such removal, and the Republic of Panama shall propose another Panamanian national for appointment by the United States of America in his stead.

(c) The United States of America shall employ a national of the United States of America as Administrator of the Panama Canal Commission, and a Panamanian national as Deputy Administrator, through December 31, 1989. Beginning January 1, 1990, a Panamanian national shall be employed as the Administrator and a national of the United States of America shall occupy the position of Deputy Administrator. Such Panamanian nationals shall be proposed to the United States of America by the Republic of Panama for appointment to such positions by the United States of America.

(d) Should the United States of America remove the Panamanian national from his position as Deputy Administrator, or Administrator, the Republic of Panama shall propose another Panamanian national for appointment to such position by the United States of America.

4. An illustrative description of the activities the Panama Canal Commission will perform in carrying out the responsibilities and rights of the United States of America under this Article is set forth at the Annex. Also set forth in the Annex are procedures for the discontinuance or transfer of those activities performed prior to the entry into force of this Treaty by the Panama Canal Company or the Canal Zone Government which are not to be carried out by the Panama Canal Commission.

5. The Panama Canal Commission shall reimburse the Republic of Panama for the costs incurred by the Republic of Panama in providing the following public services in the Canal operating areas and in housing areas set forth in the Agreement in Implementation of Article III of this Treaty and occupied by both United States and Panamanian citizen employees of the Panama Canal Commission: police, fire protection, street maintenance, street lighting, street cleaning, traffic management and garbage collection. The Panama Canal Commission shall pay the Republic of Panama the sum of ten million United States dollars ($10,-000,000) per annum for the foregoing services. It is agreed that every three years from the date that this Treaty enters into force, the costs involved in furnishing said services shall be reexamined to determine

whether adjustment of the annual payment should be made because of inflation and other relevant factors affecting the cost of such services.

6. The Republic of Panama shall be responsible for providing, in all areas comprising the former Canal Zone, services of a general jurisdictional nature such as customs and immigration, postal services, courts and licensing, in accordance with this Treaty and related agreements.

7. The United States of America and the Republic of Panama shall establish a Panama Canal Consultative Committee, composed of an equal number of high-level representatives of the United States of America and the Republic of Panama, and which may appoint such subcommittees as it may deem appropriate. This Committee shall advise the United States of America and the Republic of Panama on matters of policy affecting the Canal's operation. In view of both Parties' special interest in the continuity and efficiency of the Canal operation in the future, the Committee shall advise on matters such as general tolls policy, employment and training policies to increase the participation of Panamanian nationals in the operation of the Canal, and international policies on matters concerning the Canal. The Committee's recommendations shall be transmitted to the two Governments, which shall give such recommendations full consideration in the formulation of such policy decisions.

8. In addition to the participation of Panamanian nationals at high management levels of the Panama Canal Commission, as provided for in paragraph 3 of this Article, there shall be growing participation of Panamanian nationals at all other levels and areas of employment in the aforesaid commission, with the objective of preparing, in an orderly and efficient fashion, for the assumption by the Republic of Panama of full responsibility for the management, operation and maintenance of the Canal upon the termination of this Treaty.

9. The use of the areas, waters and installations with respect to which the United States of America is granted rights pursuant to this Article, and the rights and legal status of United States Government agencies and employees operating in the Republic of Panama pursuant to this Article, shall be governed by the Agreement in Implementation of this Article, signed this date.

10. Upon entry into force of this Treaty, the United States Government agencies known as the Panama Canal Company and the Canal Zone Government shall cease to operate within the territory of the Republic of Panama that formerly constituted the Canal Zone.

## ARTICLE IV

### PROTECTION AND DEFENSE

1. The United States of America and the Republic of Panama commit themselves to protect and defend the Panama Canal. Each Party shall act, in accordance with its constitutional processes, to meet the danger resulting from an armed attack or other actions which threaten the security of the Panama Canal or of ships transiting it.

2. For the duration of this Treaty, the United States of America shall have primary responsibility to protect and defend the Canal. The rights of the United States of America to station, train, and move military forces within the Republic of Panama are described in the Agreement in Implementation of this Article, signed this date. The use of areas and installations and the legal status of the armed forces of the United States of America in the Republic of Panama shall be governed by the aforesaid Agreement.

3. In order to facilitate the participation and cooperation of the armed forces of both Parties in the protection and defense of the Canal, the United States of America and the Republic of Panama shall establish a Combined Board comprised of an equal number of senior military representatives of each Party. These representatives shall be charged by their respective governments with consulting and cooperating on all matters pertaining to the protection and defense of the Canal, and with planning for actions to be taken in concert for that pur-

pose. Such combined protection and defense arrangements shall not inhibit the identity or lines of authority of the armed forces of the United States of America or the Republic of Panama. The Combined Board shall provide for coordination and cooperation concerning such matters as:

(a) The preparation of contingency plans for the protection and defense of the Canal based upon the cooperative efforts of the armed forces of both Parties;

(b) The planning and conduct of combined military exercises; and

(c) The conduct of United States and Panamanian military operations with respect to the protection and defense of the Canal.

4. The Combined Board shall, at five-year intervals throughout the duration of this Treaty, review the resources being made available by the two Parties for the protection and defense of the Canal. Also, the Combined Board shall make appropriate recommendations to the two Governments respecting projected requirements, the efficient utilization of available resources of the two Parties, and other matters of mutual interest with respect to the protection and defense of the Canal.

5. To the extent possible consistent with its primary responsibility for the protection and defense of the Panama Canal, the United States of America will endeavor to maintain its armed forces in the Republic of Panama in normal times at a level not in excess of that of the armed forces of the United States of America in the territory of the former Canal Zone immediately prior to the entry into force of this Treaty.

## ARTICLE V
### PRINCIPLE OF NON–INTERVENTION

Employees of the Panama Canal Commission, their dependents and designated contractors of the Panama Canal Commission, who are nationals of the United States of America, shall respect the laws of the Republic of Panama and shall abstain from any activity incompatible with the spirit of this Treaty. Accordingly, they shall abstain from any political activity in the Republic of Panama as well as from any intervention in the internal affairs of the Republic of Panama. The United States of America shall take all measures within its authority to ensure that the provisions of this Article are fulfilled.

## ARTICLE VI
### PROTECTION OF THE ENVIRONMENT

1. The United States of America and the Republic of Panama commit themselves to implement this Treaty in a manner consistent with the protection of the natural environment of the Republic of Panama. To this end, they shall consult and cooperate with each other in all appropriate ways to ensure that they shall give due regard to the protection and conservation of the environment.

2. A Joint Commission on the Environment shall be established with equal representation from the United States of America and the Republic of Panama, which shall periodically review the implementation of this Treaty and shall recommend as appropriate to the two Governments ways to avoid or, should this not be possible, to mitigate the adverse environmental impacts which might result from their respective actions pursuant to the Treaty.

3. The United States of America and the Republic of Panama shall furnish the Joint Commission on the Environment complete information on any action taken in accordance with this Treaty which, in the judgment of both, might have a significant effect on the environment. Such information shall be made available to the Commission as far in advance of the contemplated action as possible to facilitate the study by the Commission of any potential environmental problems and to allow for consideration of the recommendation of the Commission before the contemplated action is carried out.

## ARTICLE VII
### FLAGS

1. The entire territory of the Republic of Panama, including the areas the use of

which the Republic of Panama makes available to the United States of America pursuant to this Treaty and related agreements, shall be under the flag of the Republic of Panama, and consequently such flag always shall occupy the position of honor.

2. The flag of the United States of America may be displayed, together with the flag of the Republic of Panama, at the headquarters of the Panama Canal Commission, at the site of the Combined Board, and as provided in the Agreement in Implementation of Article IV of this Treaty.

3. The flag of the United States of America also may be displayed at other places and on some occasions, as agreed by both Parties.

## ARTICLE VIII

### PRIVILEGES AND IMMUNITIES

1. The installations owned or used by the agencies or instrumentalities of the United States of America operating in the Republic of Panama pursuant to this Treaty and related agreements, and their official archives and documents, shall be inviolable. The two Parties shall agree on procedures to be followed in the conduct of any criminal investigation at such locations by the Republic of Panama.

2. Agencies and instrumentalities of the Government of the United States of America operating in the Republic of Panama pursuant to this Treaty and related agreements shall be immune from the jurisdiction of the Republic of Panama.

3. In addition to such other privileges and immunities as are afforded to employees of the United States Government and their dependents pursuant to this Treaty the United States of America may designate up to twenty officials of the Panama Canal Commission who, along with their dependents, shall enjoy the privileges and immunities accorded to diplomatic agents and their dependents under international law and practice. The United States of America shall furnish to the Republic of Panama a list of the names of said officials and their dependents, identifying the posi-

tions they occupy in the Government of the United States of America, and shall keep such list current at all times.

## ARTICLE IX

### APPLICABLE LAWS AND LAW ENFORCEMENT

1. In accordance with the provisions of this Treaty and related agreements, the law of the Republic of Panama shall apply in the areas made available for the use of the United States of America pursuant to this Treaty. The law of the Republic of Panama shall be applied to matters or events which occurred in the former Canal Zone prior to the entry into force of this Treaty only to the extent specifically provided in prior treaties and agreements.

2. Natural or juridical persons who, on the date of entry into force of this Treaty, are engaged in business or non-profit activities at locations in the former Canal Zone may continue such businesses or activities at those locations under the same terms and conditions prevailing prior to the entry into force of this Treaty for a thirty-month transition period from its entry into force. The Republic of Panama shall maintain the same operating conditions as those applicable to the aforementioned enterprises prior to the entry into force of this Treaty in order that they may receive licenses to do business in the Republic of Panama subject to their compliance with the requirements of its law. Thereafter, such persons shall receive the same treatment under the law of the Republic of Panama as similar enterprises already established in the rest of the territory of the Republic of Panama without discrimination.

3. The rights of ownership, as recognized by the United States of America, enjoyed by natural or juridical private persons in buildings and other improvements to real property located in the former Canal Zone shall be recognized by the Republic of Panama in conformity with its laws.

4. With respect to buildings and other improvements to real property located in

 the Canal operating areas, housing areas or other areas subject to the licensing procedure established in Article IV of the Agreement in Implementation of Article III of this Treaty, the owners shall be authorized to continue using the land upon which their property is located in accordance with the procedures established in that Article.

5. With respect to buildings and other improvements to real property located in areas of the former Canal Zone to which the aforesaid licensing procedure is not applicable, or may cease to be applicable during the lifetime or upon termination of this Treaty, the owners may continue to use the land upon which their property is located, subject to the payment of a reasonable charge to the Republic of Panama. Should the Republic of Panama decide to sell such land, the owners of the buildings or other improvements located thereon shall be offered a first option to purchase such land at a reasonable cost. In the case of non-profit enterprises, such as churches and fraternal organizations, the cost of purchase will be nominal in accordance with the prevailing practice in the rest of the territory of the Republic of Panama.

6. If any of the aforementioned persons are required by the Republic of Panama to discontinue their activities or vacate their property for public purposes, they shall be compensated at fair market value by the Republic of Panama.

7. The provisions of paragraphs 2–6 above shall apply to natural or juridical persons who have been engaged in business or non-profit activities at locations in the former Canal Zone for at least six months prior to the date of signature of this Treaty.

8. The Republic of Panama shall not issue, adopt or enforce any law, decree, regulation, or international agreement or take any other action which purports to regulate or would otherwise interfere with the exercise on the part of the United States of America of any right granted under this Treaty or related agreements.

9. Vessels transiting the Canal, and cargo, passengers and crews carried on such vessels shall be exempt from any taxes, fees, or other charges by the Republic of Panama. However, in the event such vessels call at a Panamanian port, they may be assessed charges incident thereto, such as charges for services provided to the vessel. The Republic of Panama may also require the passengers and crew disembarking from such vessels to pay such taxes, fees and charges as are established under Panamanian law for persons entering its territory. Such taxes, fees and charges shall be assessed on a nondiscriminatory basis.

10. The United States of America and the Republic of Panama will cooperate in taking such steps as may from time to time be necessary to guarantee the security of the Panama Canal Commission, its property, its employees and their dependents, and their property, the Forces of the United States of America and the members thereof, the civilian component of the United States Forces, the dependents of members of the Forces and the civilian component, and their property, and the contractors of the Panama Canal Commission and of the United States Forces, their dependents, and their property. The Republic of Panama will seek from its Legislative Branch such legislation as may be needed to carry out the foregoing purposes and to punish any offenders.

11. The Parties shall conclude an agreement whereby nationals of either State, who are sentenced by the courts of the other State, and who are not domiciled therein, may elect to serve their sentences in their State of nationality.

## ARTICLE X

### EMPLOYMENT WITH THE PANAMA CANAL COMMISSION

1. In exercising its rights and fulfilling its responsibilities as the employer, the United States of America shall establish employment and labor regulations which shall contain the terms, conditions and prerequisites for all categories of employees of the Panama Canal Commission. These regulations shall be provided to the Republic of Panama prior to their entry into force.

2. (a) The regulations shall establish a system of preference when hiring employees, for Panamanian applicants possessing the skills and qualifications required for employment by the Panama Canal Commission. The United States of America shall endeavor to ensure that the number of Panamanian nationals employed by the Panama Canal Commission in relation to the total number of its employees will conform to the proportion established for foreign enterprises under the law of the Republic of Panama.

(b) The terms and conditions of employment to be established will in general be no less favorable to persons already employed by the Panama Canal Company or Canal Zone Government prior to the entry into force of this Treaty, than those in effect immediately prior to that date.

3. (a) The United States of America shall establish an employment policy for the Panama Canal Commission that shall generally limit the recruitment of personnel outside the Republic of Panama to persons possessing requisite skills and qualifications which are not available in the Republic of Panama.

(b) The United States of America will establish training programs for Panamanian employees and apprentices in order to increase the number of Panamanian nationals qualified to assume positions with the Panama Canal Commission, as positions become available.

(c) Within five years from the entry into force of this Treaty, the number of United States nationals employed by the Panama Canal Commission who were previously employed by the Panama Canal Company shall be at least twenty percent less than the total number of United States nationals working for the Panama Canal Company immediately prior to the entry into force of this Treaty.

(d) The United States of America shall periodically inform the Republic of Panama, through the Coordinating Committee, established pursuant to the Agreement in Implementation of Article III of this Treaty, of available positions within the Panama Canal Commission. The Republic of Panama shall similarly provide the United States of America any information it may have as to the availability of Panamanian nationals claiming to have skills and qualifications that might be required by the Panama Canal Commission, in order that the United States of America may take this information into account.

4. The United States of America will establish qualification standards for skills, training and experience required by the Panama Canal Commission. In establishing such standards, to the extent they include a requirement for a professional license, the United States of America, without prejudice to its right to require additional professional skills and qualifications, shall recognize the professional licenses issued by the Republic of Panama.

5. The United States of America shall establish a policy for the periodic rotation, at a maximum of every five years, of United States citizen employees and other non-Panamanian employees, hired after the entry into force of this Treaty. It is recognized that certain exceptions to the said policy of rotation may be made for sound administrative reasons, such as in the case of employees holding positions requiring certain non-transferable or non-recruitable skills.

6. With regard to wages and fringe benefits, there shall be no discrimination on the basis of nationality, sex, or race. Payments by the Panama Canal Commission of additional remuneration, or the provision of other benefits, such as home leave benefits, to United States nationals employed prior to entry into force of this Treaty, or to persons of any nationality, including Panamanian nationals who are thereafter recruited outside of the Republic of Panama and who change their place of residence, shall not be considered to be discrimination for the purpose of this paragraph.

7. Persons employed by the Panama Canal Company or Canal Zone Government prior to the entry into force of this Treaty, who are displaced from their employment

**1112**

as a result of the discontinuance by the United States of America of certain activities pursuant to this Treaty, will be placed by the United States of America, to the maximum extent feasible, in other appropriate jobs with the Government of the United States in accordance with United States Civil Service regulations. For such persons who are not United States nationals, placement efforts will be confined to United States Government activities located within the Republic of Panama. Likewise, persons previously employed in activities for which the Republic of Panama assumes responsibility as a result of this Treaty will be continued in their employment to the maximum extent feasible by the Republic of Panama. The Republic of Panama shall, to the maximum extent feasible, ensure that the terms and conditions of employment applicable to personnel employed in the activities for which it assumes responsibility are no less favorable than those in effect immediately prior to the entry into force of this Treaty. Non-United States nationals employed by the Panama Canal Company or Canal Zone Government prior to the entry into force of this Treaty who are involuntarily separated from their positions because of the discontinuance of an activity by reason of this Treaty, who are not entitled to an immediate annuity under the United States Civil Service Retirement System, and for whom continued employment in the Republic of Panama by the Government of the United States of America is not practicable, will be provided special job placement assistance by the Republic of Panama for employment in positions for which they may be qualified by experience and training.

8. The Parties agree to establish a system whereby the Panama Canal Commission may, if deemed mutually convenient or desirable by the two Parties, assign certain employees of the Panama Canal Commission, for a limited period of time, to assist in the operation of activities transferred to the responsibility of the Republic of Panama as a result of this Treaty or related agreements. The salaries and other costs of employment of any such persons assigned to provide such assistance shall be reimbursed to the United States of America by the Republic of Panama.

9. (a) The right of employees to negotiate collective contracts with the Panama Canal Commission is recognized. Labor relations with employees of the Panama Canal Commission shall be conducted in accordance with forms of collective bargaining established by the United States of America after consultation with employee unions.

(b) Employee unions shall have the right to affiliate with international labor organizations.

10. The United States of America will provide an appropriate early optional retirement program for all persons employed by the Panama Canal Company or Canal Zone Government immediately prior to the entry into force of this Treaty. In this regard, taking into account the unique circumstances created by the provisions of this Treaty, including its duration, and their effect upon such employees, the United States of America shall, with respect to them:

(a) determine that conditions exist which invoke applicable United States law permitting early retirement annuities and apply such law for a substantial period of the duration of the Treaty;

(b) seek special legislation to provide more liberal entitlement to, and calculation of, retirement annuities than is currently provided for by law.

## ARTICLE XI

### PROVISIONS FOR THE TRANSITION PERIOD

1. The Republic of Panama shall reassume plenary jurisdiction over the former Canal Zone upon entry into force of this Treaty and in accordance with its terms. In order to provide for an orderly transition to the full application of the jurisdictional arrangements established by this Treaty and related agreements, the provisions of this Article shall become applicable upon the date this Treaty enters into force, and

shall remain in effect for thirty calendar months. The authority granted in this Article to the United States of America for this transition period shall supplement, and is not intended to limit, the full application and effect of the rights and authority granted to the United States of America elsewhere in this Treaty and in related agreements.

2. During this transition period, the criminal and civil laws of the United States of America shall apply concurrently with those of the Republic of Panama in certain of the areas and installations made available for the use of the United States of America pursuant to this Treaty, in accordance with the following provisions:

(a) The Republic of Panama permits the authorities of the United States of America to have the primary right to exercise criminal jurisdiction over United States citizen employees of the Panama Canal Commission and their dependents, and members of the United States Forces and civilian component and their dependents, in the following cases:

(i) for any offense committed during the transition period within such areas and installations, and

(ii) for any offense committed prior to that period in the former Canal Zone.

The Republic of Panama shall have the primary right to exercise jurisdiction over all other offenses committed by such persons, except as otherwise provided in this Treaty and related agreements or as may be otherwise agreed.

(b) Either Party may waive its primary right to exercise jurisdiction in a specific case or category of cases.

3. The United States of America shall retain the right to exercise jurisdiction in criminal cases relating to offenses committed prior to the entry into force of this Treaty in violation of the laws applicable in the former Canal Zone.

4. For the transition period, the United States of America shall retain police authority and maintain a police force in the aforementioned areas and installations. In such areas, the police authorities of the United States of America may take into custody any person not subject to their primary jurisdiction if such person is believed to have committed or to be committing an offense against applicable laws or regulations, and shall promptly transfer custody to the police authorities of the Republic of Panama. The United States of America and the Republic of Panama shall establish joint police patrols in agreed areas. Any arrests conducted by a joint patrol shall be the responsibility of the patrol member or members representing the Party having primary jurisdiction over the person or persons arrested.

5. The courts of the United States of America and related personnel, functioning in the former Canal Zone immediately prior to the entry into force of this Treaty, may continue to function during the transition period for the judicial enforcement of the jurisdiction to be exercised by the United States of America in accordance with this Article.

6. In civil cases, the civilian courts of the United States of America in the Republic of Panama shall have no jurisdiction over new cases of a private civil nature, but shall retain full jurisdiction during the transition period to dispose of any civil cases, including admiralty cases, already instituted and pending before the courts prior to the entry into force of this Treaty.

7. The laws, regulations, and administrative authority of the United States of America applicable in the former Canal Zone immediately prior to the entry into force of this Treaty shall, to the extent not inconsistent with this Treaty and related agreements, continue in force for the purpose of the exercise by the United States of America of law enforcement and judicial jurisdiction only during the transition period. The United States of America may amend, repeal or otherwise change such laws, regulations and administrative authority. The two Parties shall consult concerning procedural and substantive matters relative to the implementation of this Article, including the disposition of cases pend-

ing at the end of the transition period and, in this respect, may enter into appropriate agreements by an exchange of notes or other instrument.

8. During this transition period, the United States of America may continue to incarcerate individuals in the areas and installations made available for the use of the United States of America by the Republic of Panama pursuant to this Treaty and related agreements, or to transfer them to penal facilities in the United States of America to serve their sentences.

## ARTICLE XII

### A SEA–LEVEL CANAL OR A THIRD LANE OF LOCKS

1. The United States of America and the Republic of Panama recognize that a sea-level canal may be important for international navigation in the future. Consequently, during the duration of this Treaty, both Parties commit themselves to study jointly the feasibility of a sea-level canal in the Republic of Panama, and in the event they determine that such a waterway is necessary, they shall negotiate terms, agreeable to both Parties, for its construction.

2. The United States of America and the Republic of Panama agree on the following:

(a) No new interoceanic canal shall be constructed in the territory of the Republic of Panama during the duration of this Treaty, except in accordance with the provisions of this Treaty, or as the two Parties may otherwise agree; and

(b) During the duration of this Treaty, the United States of America shall not negotiate with third States for the right to construct an interoceanic canal on any other route in the Western Hemisphere, except as the two Parties may otherwise agree.

3. The Republic of Panama grants to the United States of America the right to add a third lane of locks to the existing Panama Canal. This right may be exercised at any time during the duration of

this Treaty, provided that the United States of America has delivered to the Republic of Panama copies of the plans for such construction.

4. In the event the United States of America exercises the right granted in paragraph 3 above, it may use for that purpose, in addition to the areas otherwise made available to the United States of America pursuant to this Treaty, such other areas as the two Parties may agree upon. The terms and conditions applicable to Canal operating areas made available by the Republic of Panama for the use of the United States of America pursuant to Article III of this Treaty shall apply in a similar manner to such additional areas.

5. In the construction of the aforesaid works, the United States of America shall not use nuclear excavation techniques without the previous consent of the Republic of Panama.

## ARTICLE XIII

### PROPERTY TRANSFER AND ECONOMIC PARTICIPATION BY THE REPUBLIC OF PANAMA

1. Upon termination of this Treaty, the Republic of Panama shall assume total responsibility for the management, operation, and maintenance of the Panama Canal, which shall be turned over in operating condition and free of liens and debts, except as the two Parties may otherwise agree.

2. The United States of America transfers, without charge, to the Republic of Panama all right, title and interest the United States of America may have with respect to all real property, including non-removable improvements thereon, as set forth below:

(a) Upon the entry into force of this Treaty, the Panama Railroad and such property that was located in the former Canal Zone but that is not within the land and water areas the use of which is made available to the United States of America pursuant to this Treaty. However, it is agreed that the transfer on such date shall not include buildings and other facilities,

except housing, the use of which is retained by the United States of America pursuant to this Treaty and related agreements, outside such areas;

(b) Such property located in an area or a portion thereof at such time as the use by the United States of America of such area or portion, thereof ceases pursuant to agreement between the two Parties.

(c) Housing units made available for occupancy by members of the Armed Forces of the Republic of Panama in accordance with paragraph 5(b) of Annex B to the Agreement in Implementation of Article IV of this Treaty at such time as such units are made available to the Republic of Panama.

(d) Upon termination of this Treaty, all real property and non-removable improvements that were used by the United States of America for the purposes of this Treaty and related agreements and equipment related to the management, operation and maintenance of the Canal remaining in the Republic of Panama.

3. The Republic of Panama agrees to hold the United States of America harmless with respect to any claims which may be made by third parties relating to rights, title and interest in such property.

4. The Republic of Panama shall receive, in addition, from the Panama Canal Commission a just and equitable return on the national resources which it has dedicated to the efficient management, operation, maintenance, protection and defense of the Panama Canal, in accordance with the following:

(a) An annual amount to be paid out of Canal operating revenues computed at a rate of thirty hundredths of a United States dollar ($0.30) per Panama Canal net ton, or its equivalency, for each vessel transiting the Canal after the entry into force of this Treaty, for which tolls are charged. The rate of thirty hundredths of a United States dollar ($0.30) per Panama Canal net ton, or its equivalency, will be adjusted to reflect changes in the United States wholesale price index for total manufactured goods during biennial periods. The first adjustment shall take place five years after entry into force of this Treaty, taking into account the changes that occurred in such price index during the preceding two years. Thereafter, successive adjustments shall take place at the end of each biennial period. If the United States of America should decide that another indexing method is preferable, such method shall be proposed to the Republic of Panama and applied if mutually agreed.

(b) A fixed annuity of ten million United States dollars ($10,000,000) to be paid out of Canal operating revenues. This amount shall constitute a fixed expense of the Panama Canal Commission.

(c) An annual amount of up to ten million United States dollars ($10,000,000) per year, to be paid out of Canal operating revenues to the extent that such revenues exceed expenditures of the Panama Canal Commission including amounts paid pursuant to this Treaty. In the event Canal operating revenues in any year do not produce a surplus sufficient to cover this payment, the unpaid balance shall be paid from operating surpluses in future years in a manner to be mutually agreed.

## ARTICLE XIV

### SETTLEMENT OF DISPUTES

In the event that any question should arise between the Parties concerning the interpretation of this Treaty or related agreements, they shall make every effort to resolve the matter through consultation in the appropriate committees established pursuant to this Treaty and related agreements, or, if appropriate, through diplomatic channels. In the event the Parties are unable to resolve a particular matter through such means, they may, in appropriate cases, agree to submit the matter to conciliation, mediation, arbitration, or such other procedure for the peaceful settlement of the dispute as they may mutually deem appropriate.

DONE at Washington, this 7th day of September, 1977, in duplicate, in the English and Spanish languages, both texts being equally authentic.

## ANNEX

### PROCEDURES FOR THE CESSATION OR TRANSFER OF ACTIVITIES CARRIED OUT BY THE PANAMA CANAL COMPANY AND THE CANAL ZONE GOVERNMENT AND ILLUSTRATIVE LIST OF THE FUNCTIONS THAT MAY BE PERFORMED BY THE PANAMA CANAL COMMISSION

1. The laws of the Republic of Panama shall regulate the exercise of private economic activities within the areas made available by the Republic of Panama for the use of the United States of America pursuant to this Treaty. Natural or juridical persons who, at least six months prior to the date of signature of this Treaty, were legally established and engaged in the exercise of economic activities in the former Canal Zone, may continue such activities in accordance with the provisions of paragraphs 2–7 of Article IX of this Treaty.

2. The Panama Canal Commission shall not perform governmental or commercial functions as stipulated in paragraph 4 of this Annex, provided, however, that this shall not be deemed to limit in any way the right of the United States of America to perform those functions that may be necessary for the efficient management, operation and maintenance of the Canal.

3. It is understood that the Panama Canal Commission, in the exercise of the rights of the United States of America with respect to the management, operation and maintenance of the Canal, may perform functions such as are set forth below by way of illustration:

a. Management of the Canal enterprise.

b. Aids to navigation in Canal waters and in proximity thereto.

c. Control of vessel movement.

d. Operation and maintenance of the locks.

e. Tug service for the transit of vessels and dredging for the piers and docks of the Panama Canal Commission.

f. Control of the water levels in Gatun, Alajuela (Madden) and Miraflores Lakes.

g. Non-commercial transportation services in Canal waters.

h. Meteorological and hydrographic services.

i. Admeasurement.

j. Non-commercial motor transport and maintenance.

k. Industrial security through the use of watchmen.

l. Procurement and warehousing.

m. Telecommunications.

n. Protection of the environment by preventing and controlling the spillage of oil and substances harmful to human or animal life and of the ecological equilibrium in areas used in operation of the Canal and the anchorages.

o. Non-commercial vessel repair.

p. Air conditioning services in Canal installations.

q. Industrial sanitation and health services.

r. Engineering design, construction and maintenance of Panama Canal Commission installations.

s. Dredging of the Canal channel, terminal posts and adjacent waters.

t. Control of the banks and stabilizing of the slopes of the Canal.

u. Non-commercial handling of cargo on the piers and docks of the Panama Canal Commission.

v. Maintenance of public areas of the Panama Canal Commission, such as parks and gardens.

w. Generation of electric power.

x. Purification and supply of water.

y. Marine salvage in Canal waters.

z. Such other functions as may be necessary or appropriate to carry out, in conformity with this Treaty and related agreements, the rights and responsibilities of the United States of America with respect to the management, operation and maintenance of the Panama Canal.

4. The following activities and operations carried out by the Panama Canal Company and the Canal Zone Government shall not be carried out by the Panama Canal Commission, effective upon the dates indicated herein:

(a) Upon the date of entry into force of this Treaty:

(i) Wholesale and retail sales, including those through commissaries, food stores, department stores, optical shops and pastry shops;

(ii) The production of food and drink, including milk products and bakery products;

(iii) The operation of public restaurants and cafeterias and the sale of articles through vending machines;

(iv) The operation of movie theatres, bowling alleys, pool rooms and other recreational and amusement facilities for the use of which a charge is payable;

(v) The operation of laundry and dry cleaning plants other than those operated for official use;

(vi) The repair and service of privately owned automobiles or the sale of petroleum or lubricants thereto, including the operation of gasoline stations, repair garages and tire repair and recapping facilities, and the repair and service of other privately owned property, including appliances, electronic devices, boats, motors, and furniture;

(vii) The operation of cold storage and freezer plants other than those operated for official use;

(viii) The operation of freight houses other than those operated for official use;

(ix) The operation of commercial services to and supply of privately owned and operated vessels, including the construction of vessels, the sale of petroleum and lubricants and the provision of water, tug services not related to the Canal or other United States Government operations, and repair of such vessels, except in situations where repairs may be necessary to remove disabled vessels from the Canal;

(x) Printing services other than for official use;

(xi) Maritime transportation for the use of the general public;

(xii) Health and medical services provided to individuals, including hospitals, leprosariums, veterinary, mortuary and cemetery services;

(xiii) Educational services not for professional training, including schools and libraries;

(xiv) Postal services;

(xv) Immigration, customs and quarantine controls, except those measures necessary to ensure the sanitation of the Canal;

(xvi) Commercial pier and dock services, such as the handling of cargo and passengers; and

(xvii) Any other commercial activity of a similar nature, not related to the management, operation or maintenance of the Canal.

(b) Within thirty calendar months from the date of entry into force of this Treaty, governmental services such as:

(i) Police;

(ii) Courts; and

(iii) Prison system.

5. (a) With respect to those activities or functions described in paragraph 4 above, or otherwise agreed upon by the two Parties, which are to be assumed by the Government of the Republic of Panama or by private persons subject to its authority, the two Parties shall consult prior to the discontinuance of such activities or functions by the Panama Canal Commission to develop appropriate arrangements for the orderly transfer and continued efficient operation or conduct thereof.

(b) In the event that appropriate arrangements cannot be arrived at to ensure the continued performance of a particular activity or function described in paragraph 4 above which is necessary to the efficient management, operation or maintenance of the Canal, the Panama Canal Commission may, to the extent consistent with the other provisions of this Treaty and related agreements, continue to perform such activity or function until such arrangements can be made.

■■■■■■■■■■

## TREATY CONCERNING THE PERMANENT NEUTRALITY AND OPERATION OF THE PANAMA CANAL

The United States of America and the Republic of Panama have agreed upon the following:

### ARTICLE I

The Republic of Panama declares that the Canal, as an international· transit waterway, shall be permanently neutral in accordance with the regime established in this Treaty. The same regime of neutrality shall apply to any other international waterway that may be built either partially or wholly in the territory of the Republic of Panama.

### ARTICLE II

The Republic of Panama declares the neutrality of the Canal in order that both in time of peace and in time of war it shall remain secure and open to peaceful transit by the vessels of all nations on terms of entire equity, so that there will be no discrimination against any nation, or its citizens or subjects concerning the conditions or charges of transit, or for any other reasons, and so that the Canal, and therefore the Isthmus of Panama, shall not be the target of reprisals in any armed conflict between other nations of the world. The foregoing shall be subject to the following requirements:

(a) Payment of tolls and other charges for transit and ancillary services, provided they have been fixed in conformity with the provisions of Article III(c);

(b) Compliance with applicable rules and regulations, provided such rules and regulations are applied in conformity with the provisions of Article III;

(c) The requirement that transiting vessels commit no acts of hostility while in the Canal; and

(d) Such other conditions and restrictions as are established by this Treaty.

### ARTICLE III

1. For purposes of the security, efficiency and proper maintenance of the Canal the following rules shall apply:

(a) The Canal shall be operated efficiently in accordance with conditions of transit through the Canal, and rules and regulations that shall be just, equitable and reasonable, and limited to those necessary for safe navigation and efficient, sanitary operation of the Canal;

(b) Ancillary services necessary for transit through the Canal shall be provided;

(c) Tolls and other charges for transit and ancillary services shall be just, reasonable, equitable and consistent with the principles of international law;

(d) As a pre-condition of transit, vessels may be required to establish clearly the financial responsibility and guarantees for payment of reasonable and adequate indemnification, consistent with international practice and standards, for damages resulting from acts or omissions of such vessels when passing through the Canal. In the case of vessels owned or operated by a State or for which it has acknowledged responsibility, a certification by that State that it shall observe its obligations under international law to·pay for damages resulting from the act or omission of such vessels when passing through the Canal shall be deemed sufficient to establish such financial responsibility;

(e) Vessels of war and auxiliary vessels of all nations shall at all times be entitled to transit the Canal, irrespective of their internal operation, means of propulsion, origin, destination or armament, without being subjected, as a condition of transit, to inspection, search or surveillance. However, such vessel may be required to certify that they have complied with all applicable health, sanitation and quarantine regulations. In addition, such vessels shall be entitled to refuse to disclose their internal operation, origin, armament, cargo or destination. However, auxiliary vessels may be required to present written assurances, certified by an official at a high level of the

government of the State requesting the exemption, that they are owned or operated by that government and in this case are being used only on government non-commercial service.

2. For the purposes of this Treaty, the terms "Canal," "vessel of war," "auxiliary vessel," "internal operation," "armament" and "inspection" shall have the meanings assigned them in Annex A to this treaty.

## ARTICLE IV

The United States of America and the Republic of Panama agree to maintain the regime of neutrality established in this Treaty, which shall be maintained in order that the Canal shall remain permanently neutral, notwithstanding the termination of any other treaties entered into by the two Contracting Parties.

## ARTICLE V

After the termination of the Panama Canal Treaty, only the Republic of Panama shall operate the Canal and maintain military forces, defense sites and military installations within its national territory.

## ARTICLE VI

1. In recognition of the important contributions of the United States of America and of the Republic of Panama to the construction, operation, maintenance, and protection and defense of the Canal, vessels of war and auxiliary vessels of those nations shall, notwithstanding any other provisions of this Treaty, be entitled to transit the Canal irrespective of their internal operation, means of propulsion, origin, destination, armament or cargo carried. Such vessels of war and auxiliary vessels will be entitled to transit the Canal expeditiously.

2. The United States of America, so long as it has responsibility for the operation of the Canal, may continue to provide the Republic of Colombia toll-free transit through the Canal for its troops, vessels and materials of war. Thereafter, the Republic of Panama may provide the Republic of

Colombia and the Republic of Costa Rica with the right of toll-free transit.

## ARTICLE VII

1. The United States of America and the Republic of Panama shall jointly sponsor a resolution in the Organization of American States opening to accession by all nations of the world the Protocol to this Treaty whereby all the signatories will adhere to the objectives of this Treaty, agreeing to respect the regime of neutrality set forth herein.

2. The Organization of American States shall act as the depositary for this Treaty and related instruments.

## ARTICLE VIII

This Treaty shall be subject to ratification in accordance with the constitutional procedures of the two Parties. The instruments of ratification of this Treaty shall be exchanged at Panama at the same time as the instruments of ratification of the Panama Canal Treaty, signed this date, are exchanged. This Treaty shall enter into force, simultaneously with the Panama Canal Treaty, six calendar months from the date of the exchange of the instruments of ratification.

DONE at Washington, this 7th day of September, 1977, in the English and Spanish languages, both texts being equally authentic.

## ANNEX A

1. "Canal" includes the existing Panama Canal, the entrances thereto and the territorial seas of the Republic of Panama adjacent thereto, as defined on the map annexed hereto (Annex B),[1] and any other interoceanic waterway in which the United States of America is a participant or in which the United States of America has participated in connection with the construction or financing, that may be operated wholly or partially within the territory of the Republic of Panama, the entrances

---

1. Not printed here.

thereto and the territorial seas adjacent thereto.

2. "Vessel of war" means a ship belonging to the naval forces of a State, and bearing the external marks distinguishing warships of its nationality, under the command of an officer duly commissioned by the government and whose name appears in the Navy List, and manned by a crew which is under regular naval discipline.

3. "Auxiliary vessel" means any ship, not a vessel of war, that is owned or operated by a State and used, for the time being, exclusively on government non-commercial service.

4. "Internal operation" encompasses all machinery and propulsion systems, as well as the management and control of the vessel, including its crew. It does not include the measures necessary to transit vessels under the control of pilots while such vessels are in the Canal.

5. "Armament" means arms, ammunitions, implements of war and other equipment of a vessel which possesses characteristics appropriate for use for warlike purposes.

6. "Inspection" includes on-board examination of vessel structure, cargo, armament and internal operation. It does not include those measures strictly necessary for admeasurement, nor those measures strictly necessary to assure safe, sanitary transit and navigation, including examination of deck and visual navigation equipment, nor in the case of live cargoes, such as cattle or other livestock, that may carry communicable diseases, those measures necessary to assure that health and sanitation requirements are satisfied.

## TEXTS OF SENATE CHANGES IN PACT

*WASHINGTON, March 16—Following are the texts of the two major amendments and two major reservations to the Neutrality Treaty between the United States and Panama, which were incorporated in the*

*resolution of ratification approved today by the Senate.*

*Adopted 84 to 5 March 10, 1978.*

### LEADERSHIP AMENDMENT 20

At the end of Article IV, insert the following:

"A correct and authoritative statement of certain rights and duties of the parties under the foregoing is contained in the Statement of Understanding issued by the Government of the United States of America on Oct. 14, 1977, and by the Government of the Republic of Panama on Oct. 18, 1977, which is herein incorporated as an integral part of this treaty, as follows:

" 'Under the Treaty Concerning the Permanent Neutrality and Operation of the Panama Canal (the Neutrality Treaty), Panama and the United States have the responsibility to assure that the Panama Canal will remain open and secure to ships of all nations. The correct interpretation of this principle is that each of the two countries shall, in accordance with their respective constitutional process, defend the canal against any threat to the regime of neutrality, and consequently shall have the right to act against any aggression or threat directed against the canal or against the peaceful transit of vessels through the canal.

" 'This does not mean, nor shall it be interpreted as, a right of intervention of the United States in the internal affairs of Panama. Any United States action will be directed at insuring that the canal will remain open, secure, and accessible, and it shall never be directed against the territorial integrity or political independence of Panama.' "

*Introduced by Senator Robert C. Byrd on behalf of Senator Howard H. Baker Jr. and 76 other senators, adopted 85 to 3 March 13.*

### LEADERSHIP AMENDMENT 21

"At the end of the first paragraph of Article VI, insert the following:

"In accordance with the Statement of Understanding mentioned in Article IV above: 'The Neutrality Treaty provides that the vessels of war and auxiliary vessels

of the United States and Panama will be entitled to transit the canal expeditiously. This is intended, and it shall so be interpreted, to assure the transit of such vessels through the canal as quickly as possible, without any impediment, with expedited treatment, and in case of need or emergency, to go to the head of the line of vessels in order to transit the canal RAPIDLY.'"

*Proposed by Senator Dennis DeConcini, Democrat of Arizona with Senator Wendell H. Ford, Democrat of Kentucky, as co-sponsor, adopted 75 to 23 today.*

## RESERVATION

Before the period at the end of the resolution of ratification, insert the following: "Subject to the condition, to be included in the instrument of ratification of the treaty to be exchanged with the Republic of Panama, that, notwithstanding the provisions of Article V or any other provision of the treaty, if the canal is closed, or its operations are interfered with, the United States of America and the Republic of Panama shall each independently have the right to take such steps as it deems necessary, in accordance with its constitutional processes, including the use of military force in Panama, to reopen the canal or restore the operations of the canal as the case may be."

*Introduced by Senator Sam Nunn, Democrat of Georgia, with 13 co-authors or co-sponsors, adopted 82 to 16 March 15.*

## RESERVATION

"Subject to the condition that the instruments of ratification of the treaty shall be exchanged only upon the conclusion of the protocol of exchange, to be signed by authorized representatives of both Governments, which shall constitute an integral part of the treaty documents and which shall include the following: that nothing in this treaty shall preclude Panama and the United States from making, in accordance with their respective constitutional processes, any agreement or arrangement between the two countries to facilitate performance at any time after Dec. 31, 1999, of their responsibilities to maintain the regime of neutrality established in the treaty, including agreements or arrangements for the stationing of any United States forces or maintenance of defense sites after that date in the Republic of Panama that Panama and the United States may deem necessary or appropriate."